JUDGE JONES

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

09 CV 10173

-------------------------------------------------------X

JUDY EHRENREICH

        Plaintiff

    v.

AMBAC FINANCIAL GROUP, INC.
SEAN T. LEONARD

        Defendants

-------------------------------------------------------X

**COMPLAINT**

**JURY TRIAL DEMANDED**

RECEIVED
DEC 1 4 2009
U.S.D.C. S.D.N.Y.
CASHIERS

       Plaintiff Judy Ehrenreich, as for her Complaint against the Defendants named herein, alleges as follows:

<u>**NATURE OF ACTION**</u>

       1.     Plaintiff is bringing this action to recover damages caused by Defendants' violation of Section 10(b) of the Securities Exchange Act of 1934 and rule 10b-5 promulgated thereunder. The allegations in this Complaint are based on Plaintiff's personal knowledge as to herself and on information and belief (including the investigation and review of publicly available information) as to all other matters.

<u>**JURISDICTION**</u>

       2.     The court has jurisdiction under the provisions of 28 U.S.C. § 1331 because this action arises under the provisions of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act").

<u>**VENUE**</u>

       3.     Venue is proper in this District pursuant to 15 U.S.C.A. § 78aa and 28 U.S.C.A. § 1391. Many of the acts and practices complained of herein occurred in substantial part in this District. Ambac also maintains its headquarters in this District.

## PARTIES

4.      Plaintiff Judy Ehrenreich is an individual, residing at 15 Elm Street, Woodmere, NY 11598.

5.      Defendant Ambac Financial Corporation, Inc. ("Ambac") is a Delaware corporation with its principal executive offices located at One State Street Plaza, New York, NY 10004.

6.      Defendant Sean T. Leonard at all relevant times was Senior Vice President and Chief Financial Officer of Ambac.  Mr. Leonard resigned from Ambac on November 24, 2009.

## THE SECURITIES EXCHANGE ACT OF 1934

7.      Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

8.      Enacted pursuant to the Exchange Act, Rule 10b-5 provides that,

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

> To employ any device, scheme, or artifice to defraud,

> To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

## OVERVIEW OF AMBAC'S BUSINESS

9.      Ambac is a holding company.  Through its subsidiaries, Ambac engages in two business segments: financial guarantee and financial services.

### The financial guarantee segment

10.      Ambac conducts its financial guarantee business through its subsidiary Ambac Assurance Corporation ("Ambac Assurance") and other subsidiaries.  Ambac Assurance and these other subsidiaries are referred to collectively as the "Insurance Subsidiary."

11.      The Insurance Subsidiary provides "guarantee insurance" for various types of bonds and other securities.  The essence of this insurance is that the Insurance Subsidiary promises to pay when due any principal or interest that the obligor on the guaranteed bond or other security fails to pay.

12.      The Insurance Subsidiary also provides credit protection in credit derivative form. These credit derivatives, which are privately negotiated contracts, are functionally equivalent to guarantee insurance and provide protection against certain credit risks such as a payment default by the obligor on a bond.

### The financial services segment

13.      Ambac conducts its financial services business through its subsidiary Ambac Capital Funding ("Ambac Capital") and other subsidiaries.  Ambac Capital and these other subsidiaries are referred to herein collectively as the "Financial Services Subsidiary."

14.      The Financial Services Subsidiary, among other things, enters into investment agreement transactions with various customers.  In a typical investment agreement transaction, a customer will invest funds with Ambac Capital, and Ambac Capital will commit to repay the funds at a specified time together with a guaranteed return.

15.      It is not uncommon for an investment agreement to require that, in the event of a credit ratings downgrade of the party receiving the investment, such party must post collateral with and/or make termination payments to the investing party.  All such obligations to post collateral and/or make termination payments are referred to herein as "collateral posting obligations" or "collateral posting requirements."

## OVERVIEW OF THE COMPLAINT

16.      Ambac reported a $3.2 billion loss for the fourth quarter of 2007.  As a result, the credit rating agencies began to question Ambac's AAA rating.

17.     In January 2008, a prominent hedge fund manager publicly warned that a downgrade of Ambac's credit rating could trigger massive collateral posting obligations at Ambac's financial services business which would strain Ambac's liquidity.   Thereafter, other institutional investors began to raise similar concerns.

18.     In response to these concerns, Ambac assured investors that its collateral posting obligations would not pose a problem because Ambac could satisfy these obligations by simply "selling securities in the Financial Services portfolio" in order to generate the cash required for collateral posting.   More specifically, Ambac stated in its Annual Report on Form 10-K filed on February 29, 2008:

> Ambac has posted collateral of $2,179.2 million under its outstanding investment agreements at December 31, 2007.  In the event that Ambac Assurance is further downgraded, Ambac may be required to post incremental collateral to its investment agreement counterparties, introducing liquidity risk….
>
> **Ambac will meet the collateral requirements either by selling securities in the Financial Services investment portfolio in the market or to Ambac Assurance.**

(emphasis added)

19.     The foregoing assurance conveyed the clear message that Ambac had sufficient assets in its Financial Services portfolio to satisfy its collateral posting requirements.  However, this assurance, while clear and unequivocal, was completely false and misleading.  In the preceding months, the Financial Services portfolio had suffered a precipitous decline in value.  As a result, Ambac knew that it was highly unlikely that it could satisfy its collateral posting obligations by simply "selling securities in the Financial Services portfolio."

20.     In July 2008, Ambac finally acknowledged the truth.  More specifically, Ambac confessed that it was confronting a potential $1.1 billion collateral posting shortfall because the value of the Financial Services portfolio was in fact "insufficient to cover the projected cumulative collateral requirement and terminations by approximately $1.1 billion."   Ambac later raised its estimate of the potential shortfall to $3.2 billion.  As detailed below, while Ambac first acknowledged the shortfall in July 2008, this shortfall actually arose in the first quarter of 2008 and prior to the time Ambac filed its misleading 10-K Report.

21.     Over the course of the following year, successive downgrades triggered the collateral posting shortfall at Ambac's Financial Services Subsidiary.  In order to deal with this

shortfall, Ambac was forced to deplete the liquidity of its Insurance Subsidiary. More specifically, Ambac caused the Insurance Subsidiary to transfer more than $4.5 billion to the Financial Services Subsidiary in order to provide the funds required to plug the shortfall.

22.      The depletion of the liquidity of Ambac's Insurance Subsidiary was also the depletion of Ambac's liquidity because, as a holding company, Ambac is largely dependent on its Insurance Subsidiary for funds.

23.      Thereafter, Ambac announced that, in order to preserve cash, it would discontinue paying interest on its 6.15% Directly-Issued Subordinated Capital Securities ("DISC securities"). The value of these securities plummeted as a result.

24.      Plaintiff, an individual investor, purchased Ambac's DISC securities in reliance upon Ambac's false assurance that Ambac could satisfy any collateral posting requirement by simply "selling securities in the Financial Services portfolio."

25.      Plaintiff brings this action in order to recover the losses that she incurred as a direct result of the depletion of Ambac's liquidity and the resultant decline in the value of Ambac's DISC securities.

## GENERAL FACTUAL ALLEGATIONS

**Ambac guaranteed a massive amount of mortgage-backed securities during the housing bubble**

26.      As used herein, the term "mortgage-backed securities" refers to any security which, directly or indirectly, is backed by (or derives its value from) a pool of residential mortgages.

27.      During the period of the recent "housing bubble," Ambac guaranteed a massive amount of mortgage-backed securities.   By the end of 2007, Ambac was the guarantor of at least $82 billion of mortgage-backed securities, including securities backed by sub-prime loans.   (The data in this paragraph are derived from the table that appears on page 17 of Ambac's 2007 Report on Form 10-K under the caption "Guaranteed Portfolio By Bond Type as of December 31, 2007.")

28.      Some of these guarantees were in credit derivative form.  Under applicable accounting rules, Ambac is required to mark-to-market these credit derivatives to reflect changes in the estimated amount of Ambac's ultimate liability under these guarantees.

**When the housing bubble burst in 2007, Ambac incurred multi-billion losses due to its exposure to mortgage-backed securities**

29.      The housing bubble burst in 2007.   As is well known, there ensued a prolonged and substantial decline in residential real estate prices and an increase in mortgage defaults and foreclosures.

30.      By the end of 2007, it was apparent that Ambac's ultimate liability relating to its guarantee of mortgage-backed securities would be much higher than originally anticipated.  As a result, Ambac recorded multi-billion losses as described below.

31.      On January 22, 2008, Ambac announced in a press release that it would record a loss of $3.2 billion for the fourth quarter of 2007.   Ambac indicated that this loss reflected $5.2 billion of mark-to-market losses on credit derivative exposures and offered the following explanation:

> The $5,211.0 million fourth quarter 2007 mark-to-market loss on credit derivative exposures includes estimated credit impairment of $1,105.7 million related to certain collateralized debt obligations of asset-backed securities backed primarily by mezzanine level subprime residential mortgage-backed securities that have recently been internally downgraded to below investment grade. An estimate for credit impairment has been established because it is management's expectation that Ambac will have to make claim payments on these exposures in the future.

**Ambac's exposure to mortgage-backed securities causes the credit rating agencies to question Ambac's AAA credit rating; Fitch downgrades Ambac (January 2008)**

32.      Given Ambac's exposure to mortgage-backed securities, the rating agencies began to question Ambac's AAA credit rating.  The actions taken by the rating agencies in January 2008 are described below.

33.      On January 16, 2008, Moody's Investors Service ("Moody's") announced that it had placed Ambac and Ambac Assurance on review for possible downgrade.  At the time of this announcement, Moody's rating for Ambac Assurance and Ambac was Aaa and Aa2, respectively. Moody's commented:

Ambac has announced that it expects to record a $5.4 billion pre-tax ($3.5 billion after-tax) mark-to-market loss on its credit derivative portfolio for the quarter ended December 31, 2007….This is a significant change in Ambac's view of the ultimate losses to be realized from these transactions.  According to James Eck, a Moody's VP Senior Analyst, "This loss significantly reduces the Company's capital cushion and heightens concern about potential further volatility within Ambac's mortgage and mortgage related portfolios."

34.     On January 18, 2008, Standard & Poor's Ratings Services ("S&P") announced that it had placed the credit rating of both Ambac and Ambac Assurance on Credit Watch Negative.  At the time of this announcement, S&P's rating for Ambac Assurance and Ambac was AAA and AA, respectively.

35.     On January 18, 2008, Fitch downgraded Ambac Assurance's insurance financial strength rating from AAA to AA and downgraded Ambac's rating from AA to A.  Fitch also indicated that the ratings remained on Ratings Watch Negative.  Fitch commented:

> The decision to downgrade the IFS rating by two notches, coupled with the continuation of the Negative Rating Watch, reflects the significant uncertainty with respect to the company's franchise, business model and strategic direction; uncertain capital markets and the impact of Ambac's recent decisions on future financial flexibility; the company's future capital strategy; ultimate loss levels in its insured portfolio; and the challenges in the financial guaranty market overall….

36.     The downgrade by Fitch in January 2008 marked the first step of a downgrade process that played out over the next 18 months.  By August 2009, as detailed below, both Moody's and S&P had downgraded Ambac's credit rating to low junk, and Fitch had ceased to rate Ambac.

**A prominent hedge fund manager publicly warns that a downgrade of Ambac's credit rating would trigger collateral posting obligations that would strain Ambac's liquidity (January 18, 2008)**

37.     William Ackman is CEO of hedge fund Pershing Square Capital Management.  He has been a long-time critic of Ambac's business model.

38.     On January 18, 2008, Mr. Ackman wrote a lengthy letter to Moody's and S&P in which he questioned the adequacy of Ambac's capital and set forth arguments in support of his position that Ambac did not deserve a AAA rating.

39.    The Ackman letter was widely reported on by the media and copies of the letter were posted on the internet.

40.    In the course of his letter, Mr. Ackman warned that, in the event of a ratings downgrade of Ambac, collateral posting obligations would put a severe strain on Ambac's liquidity.  The following is an excerpt from the letter:

> Most bond insurer holding companies have limited cash… and have substantial cash needs….In addition, bond insurers with investment management or swap operations have additional liquidity needs in the event of a downgrade.

> We believe that both MBIA and Ambac have substantial collateral posting obligations in the event of a holding company downgrade….**[T]he increased collateral demands required in holding company downgrade scenarios will put a severe strain on holding company liquidity.**

(emphasis added)

**Other institutional investors raise questions concerning Ambac's collateral posting obligations (January 23, 2008)**

41.    After Mr. Ackman raised the issue of Ambac's collateral posting obligations, other institutional investors began to focus on this issue.

42.    On January 23, 2008, Ambac held a conference call to discuss Ambac's fourth quarter 2007 results.  During this call, several investors raised questions concerning Ambac's collateral posting obligations.

43.    For example, Mark Brodsky of Aurelius Capital asked:

> On the collateral, I think you said earlier in the call that presently you are posting $2.1 billion of collateral.  And that under some circumstances, it could grow to either $5 billion or $7 billion, roughly…..It wasn't clear earlier what the triggers are for the increase from [2.1] to 5 to 7. And whether there are any obstacles to posting the collateral, additional collateral, if you were called on to do so…

44.    Similarly, Stephen Stelmach of FBR Capital Markets asked:

> [Y]ou mentioned the collateral posting requirements and that the downgrade by Fitch does not impact those collateral posting obligations. I believe they get triggered at A. Should that eventually come to pass, what is the dollar amount of collateral that you have to post?

45.    After Mr. Leonard, Ambac's CFO, indicated that Ambac could be required to post between $5 billion to $7 billion of collateral under certain downgrade scenarios, Mr. Stelmach asked:

Okay.  And do you feel that you can accomplish that?  That seems pretty steep the $5 billion to $7 billion number.

46.       During the conference call, Mr. Leonard did not give a clear response to the question of how Ambac would satisfy its collateral posting obligations.  However, he did so several weeks later.

**Ambac assures investors that its Financial Services Subsidiary has adequate resources to meet any potential collateral posting requirements (February 29, 2008)**

47.       On February 29, 2008, Ambac filed its 2007 Annual Report on Form 10-K (the "10-K Report").  In this 10-K Report, Ambac directly addressed the concerns relating to collateral posting that had been raised by investors over the previous two months.

48.       Ambac's response to the collateral posting concerns was simple and straightforward.  Ambac assured investors that collateral posting would not pose a problem because the Financial Services Subsidiary could satisfy any collateral posting requirement by simply "selling securities in the Financial Services portfolio" in order to generate the cash required for collateral posting.

49.       The following are excerpts from the 10-K Report relating to the collateral posting obligations of the Financial Services Subsidiary (pages 77 and 78):

> Ambac has posted collateral of $2,179.2 million under its outstanding investment agreements at December 31, 2007.  In the event that Ambac Assurance is further downgraded, Ambac may be required to post incremental collateral to its investment agreement counterparties, introducing liquidity risk....

> Ambac manages its liquidity risk through the maintenance of liquid collateral and bank liquidity facilities.  **Ambac will meet the collateral requirements either by selling securities in the Financial Services investment portfolio in the market or to Ambac Assurance.**

(emphasis added).

50.       The foregoing assurance conveyed the clear message that the value of the Financial Services investment portfolio was sufficient to satisfy the potential collateral posting obligations of the Financial Services Subsidiary.  Therefore, Ambac would be able to meet these obligations by simply "selling securities in the Financial Services investment portfolio."   Ambac was telling the world that Mr. Ackman was wrong.  Contrary to Mr. Ackman's warnings,

collateral posting was not a threat to Ambac's liquidity. All Ambac needed to do was sell some securities from the Financial Services portfolio.

51.     While the foregoing message was clear and unequivocal, it was also completely false and misleading.   As detailed below, the Financial Services portfolio had suffered a precipitous decline in value during the first two months of 2008. By February 29, 2008, the date on which the 10-K Report was signed and filed, Ambac knew that it was highly unlikely that it could satisfy its collateral posting obligations by simply "selling securities in the Financial Services portfolio."

**AMBAC finally acknowledges that the value of the Financial Services portfolio is not sufficient to satisfy collateral posting obligations; admits to a $1.1 billion shortfall (July 7, 2008)**

52.     On July 7, 2008, Ambac issued a press release in which it acknowledged for the first time that the value of the Financial Services investment portfolio was not sufficient to satisfy the potential collateral posting obligations of the Financial Services Subsidiary. More specifically, Ambac indicated that the potential shortfall amount was approximately $1.1 billion. The following is an excerpt from the July 7 press release:

> **Ambac Provides Financial Details Related to Collateral Requirements of Its Investment Agreement Business**
>
> NEW YORK, July 7, 2008 -- **Ambac Financial Group, Inc.** (NYSE: ABK) (Ambac) today announced that in response to persistent and unfounded speculation regarding Ambac's liquidity situation, it has released information about collateral requirements and terminations of its investment agreement business related to recent actions by the rating agencies....
>
> [T]he book value of investment agreement liabilities at May 31, 2008, amounted to $6.9 billion (down from $7.7 billion at December 31, 2007). The market value of the investment agreement asset portfolio, including cash of approximately $400 million, as of May 31, 2008, is approximately $5.6 billion. In addition, the market value of interest rate derivative contracts held by the investment agreement business is positive $160 million.
>
> Based on May 31, 2008 investment agreement asset portfolio market values:
>
> - Upon a downgrade of AAC to A+ or A1, which Ambac believes is unlikely, Ambac estimates that the investment agreement asset portfolio has sufficient value to meet projected cumulative collateral requirements and terminations.
>
> - Upon a downgrade to A or A2, which Ambac believes is unlikely, Ambac estimates that **the investment agreement asset portfolio is insufficient to cover the projected cumulative collateral requirement and terminations by approximately $1.0 billion.**

- Upon a downgrade to A- or A3, which Ambac believes is unlikely, Ambac estimates that **the investment agreement asset portfolio is insufficient to cover the projected cumulative collateral requirement and terminations by approximately $1.1 billion**.

(emphasis added)

53.    Ambac in the July 7 Press release also revealed for the first time that its true plan for dealing with the potential collateral posting shortfall at the Financial Services Subsidiary was to use the liquidity available at the Insurance Subsidiary.  More specifically, Ambac stated:

> In the event of cash and/or security shortfalls in the investment agreement business, management anticipates utilizing the resources of AAC [the Insurance Subsidiary] (through inter-company transactions).

**Ambac admits that potential shortfall amount is actually $3.2 billion (November 5, 2008)**

54.    In the July 7 press release, Ambac indicated that the potential collateral posting shortfall at the Financial Services Subsidiary was approximately $1.1 billion.  On November 5, 2008, Ambac issued a press release in which it indicated that it had "updated its calculations" and that the actual potential shortfall amount was really $3.2 billion.  Ambac stated:

> With respect to the impact of a potential downgrade on liquidity of the financial services business (which includes the investment agreement and derivative products businesses), Ambac has updated its calculations of the liquidity gap between the market value of the investment securities it holds in its financial services businesses and the value of the financial services liabilities that would need to be collateralized or terminated under various downgrade scenarios as of September 30. This liquidity gap is approximately $2.8 billion and $3.2 billion based on downgrades to A/A2 and BBB/Baa2, respectively.

**The collateral shortfall which Ambac first disclosed in the July 7, 2008 press release actually arose in the first quarter of 2008**

55.    The July 7 press released disclosed that as of May 31, 2008, the market value of the investment agreement portfolio was approximately $5.6 billion and, based on that value, there was a potential collateral shortfall of approximately $1.1 billion.

56.    While Ambac first disclosed the collateral shortfall in July 2008, the events which gave rise to this shortfall actually occurred in the first quarter of 2008.  These events are described below.

***During the first quarter of 2008, the Financial Services Portfolio declined by 24%***

57.   During the first quarter of 2008, the Financial Services investment portfolio suffered a precipitous decline in value.  More specifically, the value of the portfolio declined from $7.8 billion at December 31, 2007 to $5.9 billion at March 31, 2008, representing a loss in value of $1.9 billion or 24%.

58.   The first quarter 2008 loss in the Financial Services investment portfolio was unprecedented and of historical proportions.  At no time in the past, had the portfolio experienced a loss that came anywhere close to the loss that occurred in the first quarter of 2008.

59.   The table below shows the market value of the investment agreement portfolio as of December 31, 2007; March 31, 2008; and May 31, 2008.  The data in the table show that 86% of the total decrease in value that occurred during the period from December 31, 2007 to May31, 2008, occurred during the first quarter of 2008 with only 14% occurring thereafter.

|  | Value of Investment Portfolio(1) | Percent Decrease From December 31, 2007 |
|---|---|---|
| December 31, 2007 | $7.8 billion | NA |
| March 31, 2008 | $5.9 billion | 24% |
| May 31, 2008 | $5.6 billion | 28% |

(1) This data is derived from Ambac's 2007 fourth quarter operating supplement, page 19; 2008 first quarter operating supplement, page 19; and the July 7 press release.

60.   As can be seen from the table, the difference between the market value of the investment agreement portfolio at May 31, 2008 and March 31, 2008, is approximately $300 million.  Thus, if there was a $1.1 billion shortfall amount at May 31, 2008, there was already a substantial shortfall at March 31, 2008.

***The first quarter 2008 decline in the Financial Services investment portfolio was primarily driven by a decline in the value of highly rated mortgage-backed securities***

61.   On April 23, 2008, Ambac issued its earnings release for the first quarter of 2008. In this press release, Ambac indicated that the first quarter 2008 decline in the Financial Services investment portfolio was primarily driven by a decline in highly rated asset-backed securities. More specifically, the press release stated:

The increase in net unrealized losses are primarily due to credit spreads widening in highly rated asset-backed securities within the investment agreement portfolio.

62.     Ambac's Report on Form 10-Q for the first quarter of 2008 provides additional data on the decline in the value of the investment agreement portfolio.  This data indicates that mortgage-backed securities were responsible for a significant portion of the loss. (This data is set forth in the table that appears on page 69 of the 10-Q.)

**Most of the first quarter 2008 decline in the Financial Services investment portfolio occurred prior to February 29, 2008 (the date on which Ambac filed the misleading10-K Report)**

63.     The first quarter 2008 decline in the Financial Services investment portfolio did not suddenly appear in the last month of the quarter.  Rather, there was a sustained decline throughout the quarter.  Ambac filed its 10-K Report on February 29, 2008 (*i.e.*, after two-thirds of the quarter had elapsed).  By that time, most of the decline had already occurred.

64.      While we cannot trace the exact arc of the decline in the value of the investment portfolio, we can get a very good sense of the trajectory of the decline by examining the Markit ABX.HE indices of highly rated (*i.e.*, triple-A or double-A) mortgage-backed securities.

65.     The Markit ABX.HE.AAA indices and the ABX.HE.AA indices track baskets of highly rated mortgage-backed securities which are collateralized by subprime mortgages.   These indexes are widely used in the industry as a benchmark for the performance of various types of mortgage backed securities, including those backed by Alt-A.

66.     The data for the ABX.HE.AAA indices and ABX.HE.AA indices show:

- the mean decline in these indices during the first quarter of 2008 was 29%;
- 79% of the mean decline during the quarter had already occurred by February 29, 2008.

67. More detailed data for the highly rated ABX.HE indices are set forth in the table below. This table shows for each index: (i) the index value as of December 31, 2007, February 29, 2008, and March 31, 2008; (ii) the percentage decline in the index from December 31, 2007 to February 29, 2008 (*i.e.*, the decline for the first two months of 2008); (iii) the percentage decline in the index from December 31, 2007 to March 31, 2008 (*i.e.*, the decline for the full first quarter of 2008);

and (iv) the percent of the full first quarter 2008 decline that had already occurred by February 29, 2008.

| | December 31, 2007 | February 29, 2008 | March 31, 2008 | decline from Dec. 31 to Feb. 29 (two months) | total decline from Dec. 31 to Mar. 31 (three months) | % of total decline that had occurred by Feb. 29 |
|---|---|---|---|---|---|---|
| ABX.HE AA Indexes | | | | | | |
| ABX.HE.AA (series 6, v1) | 84.98 | 72.11 | 70.04 | 15% | 18% | 86% |
| ABX.HE.AA (series 6, v2) | 62.15 | 43.66 | 42.00 | 30% | 32% | 92% |
| ABX.HE.AA (series 7, v1) | 45.53 | 26.52 | 20.67 | 42% | 55% | 76% |
| ABX.HE.AA (series 7, v2) | 45.01 | 25.96 | 20.48 | 42% | 54% | 78% |
| | | | | | | |
| ABX.HE AAA Indexes | | | | | | |
| ABX.HE.AAA (series 6, v1) | 93.74 | 90.98 | 89.50 | 3% | 5% | 65% |
| ABX.HE.AAA (series 6, v2) | 86.84 | 73.41 | 75.23 | 15% | 13% | 100% |
| ABX.HE.AAA (series 7, v1) | 75.64 | 61.95 | 56.33 | 18% | 26% | 71% |
| ABX.HE.AAA (series 7, v2) | 74.66 | 60.04 | 51.73 | 20% | 31% | 64% |
| | | | | | | |
| Mean | | | | 23% | 29% | 79% |

68.    The data from the ABX.HE indices cited above leave little doubt that most of the first quarter 2008 decline in the value of the Financial Services investment portfolio had already occurred by February 29, 2008, the date on which Ambac filed the 10-K Report.

**In the 10-K Report filed on February 29, 2008, Ambac concealed the decline in the value of the Financial Services investment portfolio and falsely assured investors that Ambac could satisfy any collateral posting obligation by simply "selling securities in the Financial Services portfolio"**

69.     By the time Ambac filed its 10-K Report on February 29, 2008, two-thirds of the first quarter of 2008 had already elapsed and the value of the Financial Services portfolio had already declined precipitously from the value at December 31, 2007.  This decline in value was unprecedented and of historical proportions.  However, as detailed below, Ambac did not give any hint of this decline in the 2007 10-K.

70.     On page 31 of the 10-K, Ambac provided the following disclosure concerning the fair value of the Financial Services investment portfolio:

> As of December 31, 2007, the Financial Services investment portfolio had an aggregate fair value of approximately $7.8 billion and an aggregate amortized cost of approximately $8.1 billion.  Ambac Capital Funding's investment policy is designed to achieve the highest after-tax return, subject to minimum average quality rating of AA on invested assets, and to maintain cash flow that closely matches invested assets to funded liabilities to minimize interest rate and liquidity risk.

71.     In the foregoing disclosure, Ambac did not so much as give a hint that the value of the portfolio had declined precipitously subsequent to December 31, 2007.

72.     After concealing the decline in the value of the Financial Services investment portfolio, Ambac went on to address the issue of collateral posting.  On page 78 of the 10-K, Ambac assured investors that it could satisfy any collateral posting by merely selling securities in the Financial Services portfolio.  More specifically, Ambac stated:

> Ambac will meet the collateral requirements either by selling securities in the Financial Services investment portfolio in the market or to Ambac Assurance.

73.     The foregoing assurance was false and misleading because it concealed each of the following:

- the value of the Financial Services investment portfolio had declined precipitously subsequent to December 31, 2007;

- as a result of this decline in value, as of February 29, 2008 (the date the 10-K Report was filed), either there was already a collateral shortfall or it was

evident that there was an extremely high risk of an imminent collateral shortfall;

- as a result of this decline in value, Ambac did not have a realistic expectation of being able to satisfy its potential collateral posting obligations by merely selling securities from the Financial Services portfolio;

- as a result of the foregoing, there was a high risk that Ambac would have to deplete the liquidity of the Insurance Subsidiary in order to plug the collateral posting shortfall at the Financial Services Subsidiary;

- as a result of the foregoing, the collateral posting obligations of the Financial Services Subsidiary posed a significant threat to the liquidity of both the Insurance Subsidiary and Ambac (which is a holding company and dependent on the Insurance Subsidiary for funds).

**Successive credit rating downgrades of Ambac trigger multi-billion dollar collateral posting shortfall at the Financial Services Subsidiary**

74.     In the months following the filing of 10-K Report on February 29, 2008, Ambac and Ambac Assurance suffered successive credit rating downgrades.   The downgrades of Ambac Assurance are summarized below:

> Moody's
> June 19, 2008—Moody's downgrades Ambac Assurance to Aa3
> November 5, 2008—Moody's downgrades Ambac Assurance to Baa1
> April 13, 2009—Moody's downgrades Ambac Assurance to Ba3
> July 29, 2009—Moody's downgrades Ambac Assurance to Caa2
> Standard & Poor's
> June 5, 2008—Standard & Poor's downgrades Ambac Assurance to AA
> November 19, 2008—Standard & Poor's downgrades Ambac Assurance to A
> June 24, 2009—Standard & Poor's downgrades Ambac Assurance to BBB
> July 28, 2009—Standard & Poor's downgrades Ambac Assurance to CC

75.     In its November 5 press release, Ambac warned that the Financial Services Subsidiary would face a $2.8 billion shortfall on a downgrade to A/A2 and a $3.2 billion shortfall on a downgrade to BBB/Baa2.  As indicated above, the first downgrade threshold was

reached on November 5, 2008, and the second threshold was reached on April 13, 2009. Thus, by November 5, 2008, Ambac was facing a multi-billion dollar collateral posting shortfall at its Financial Services Subsidiary.

**Ambac depletes the liquidity of its Insurance Subsidiary in order to plug the collateral posting shortfall at the Financial Services Subsidiary**

76.     In order to plug the collateral posting shortfall at the Financial Services Subsidiary, Ambac transferred more than $4.5 billion in cash from the Insurance Subsidiary to the Financial Services Subsidiary. These transfers took the form of loans, purchases of securities and capital contributions.

77.     The foregoing transactions are disclosed in Ambac Assurance's 2008 Annual Statement (note 5.e on page 14.2 and note 10.b on page 14.4) and June 30, 2009 Quarterly Statement (note 10 on pages Q06.1). Ambac filed these Statements with the Insurance Department of the State of Wisconsin. The relevant disclosure from these Statements is quoted below:

Excerpts from 2008 Annual Statement:

The Company [Ambac Assurance] loaned cash and securities to Ambac Capital Funding, Inc. and Ambac Financial Services, LLC pursuant to a revolving credit facility approved by the Wisconsin Insurance Commissioner…. At December 31, 2008, the Company loaned cash of $1,000,000,000 and $473,000,000 to Ambac Capital Funding, Inc. and Ambac Financial Services, LLC, respectively….

During 2008, Ambac Financial contributed all the common capital stock of Ambac Capital Corporation, and thereby indirectly all the common capital stock and ownership interests of Ambac Investments, Inc. to the Company. Following this contribution, the Company purchased securities from Ambac Investments, Inc. with an economic value of $2,781,584,093. The Company sold securities to Ambac Investments, Inc. with a value of $800,270,044.

The Company purchased securities from Ambac Capital Services, LLC with a fair value of $238,315,951….

During 2008, the Company made capital contributions to Ambac Financial Services, LLC and Ambac Capital Services, LLC in the amount of $115,145,142 and $101,548,793, respectively.

Excerpts from the June 30, 2009 Quarterly Statement:

During the six months of 2009, the Company purchased securities from Ambac Investments, Inc. for $324,393,550. During the six months of 2009, Ambac Investments, Inc. repaid $45,000,000 of its $800,000,000 unsecured cash loan from the Company….

The Company loaned cash and securities to Ambac Financial Services, LLC pursuant to a revolving credit facility approved by the Wisconsin Insurance Commissioner. During the six months of 2009, the Company made net loans of $178,053,000 in cash to Ambac Financial Services, LLC….

78.     As detailed above, more than $4.5 billion in cash flowed from the Insurance Subsidiary to the Financial Services Subsidiary through various transactions. These transactions had the effect of depleting the liquidity of the Insurance Subsidiary.

**The statutory surplus of the Insurance Subsidiary is depleted as a result of the purchase of securities from the Financial Services Subsidiary**

79.     As described above, in addition to making loans, the Insurance Subsidiary purchased billions of dollars of securities from the Financial Services Subsidiary in order to provide the cash required to plug the collateral posting shortfall at the Financial Services Subsidiary.

80.     The foregoing purchase transactions purported to be on an arms' length basis. However, the Insurance Subsidiary got the short end of the bargain. As described below, within a short time after purchasing the securities from the Investment Services Subsidiary, the Insurance Subsidiary recorded more than $1 billion of losses as a result of the need to write down the value of these purchased securities.

81.     Ambac disclosed these write-downs in its first quarter 2009 and second quarter 2009 earnings press releases. The relevant disclosures are quoted below:

<u>Excerpts from Ambac's first quarter 2009 earnings press release</u>:

Net realized (losses)/gains in the AAC investment portfolio amounted to a net loss of ($742.9) million in the first quarter of 2009, down from a gain of $22.2 million in the first quarter 2008. The first quarter 2009 net loss was driven by other-than-temporary impairment write-downs of certain Alt-A RMBS securities amounting to ($744.7) million in the quarter. **The Alt-A RMBS securities had been purchased from the Financial Services investment agreement business in the fourth quarter 2008 and the first quarter 2009**, as approved by the Wisconsin Office of the Commissioner of Insurance (OCI) **to provide the investment agreement business with liquidity required for collateral and terminating its agreements**.

(emphasis added)

Excerpts from Ambac's second quarter 2009 earnings press release:

Other-than-temporary losses in the AAC investment portfolio amounted to ($675.4) million in the second quarter of 2009, compared to a net loss of ($2.4) million in the second quarter 2008. In connection with the Company's revised investment strategies, during the second quarter 2009, management determined its intent to sell certain investment securities (**primarily Alt-A RMBS securities** rated below investment grade by Moody's or S&P and tax-exempt municipal securities) held in the insurance company investment portfolio. As a result of this decision, other-than-temporary impairment charges were recorded through earnings on such securities that were in an unrealized loss position.

(emphasis added)

82.      The above-quoted first quarter 2009 press release specifically acknowledged that the impaired Alt-A RMBS securities were purchased by the Insurance Subsidiary from the Investment Services Subsidiary.  While the second quarter 2009 press release is silent on this point, Ambac has confirmed by email that the overwhelming majority of the impaired Alt-A RMBS securities disclosed in that press release were also purchased from the Investment Services Subsidiary.

83.      As detailed above, the Insurance Subsidiary recorded more than $1 billion of losses in the first six months of 2009 attributable to the Alt-A RMBS securities that it had purchased from the Financial Services Subsidiary in 2009 and the fourth quarter of 2008.  These losses had had the effect of depleting the statutory surplus of the Insurance Subsidiary.

**Ambac suspends interest payment on DISC securities in order to preserve cash (July 27, 2009); price of DISC securities plummets**

*Background of DISC securities*

84.      In February 2007, Ambac issued $400 million of 6.15% Directly-Issued Subordinated Capital Securities ("DISC securities").

85.      In the prospectus for the DISC securities, Ambac indicated that it was dependent on its Insurance Subsidiary to provide the funds required to pay interest on the DISCS.  More specifically, Ambac stated:

As a holding company, Ambac Financial Group, Inc. is largely dependent on dividends from Ambac Assurance to pay…principal of and interest on its indebtedness…. Dividends from Ambac Assurance are subject to certain insurance regulatory restrictions.

*AMBAC suspends interest payments on DISCS; the price of the DISC securities plummets*

86.     Following the depletion of the liquidity and statutory surplus of the Insurance Subsidiary, the Insurance Subsidiary's ability to provide cash to service the DISC securities was impaired.  Therefore, on July 27, 2009, Ambac announced that it would discontinue paying interest on the DISC securities.  More specifically,  Ambac stated in its press release:

> Ambac also announced that, in order to preserve cash at Ambac Financial Group, Inc., it will discontinue paying the semi-annual interest on its directly-issued subordinated capital securities (DISCs) beginning August 1, 2009. Additionally, to preserve cash and surplus at AAC, it will discontinue paying the monthly dividend on AAC's outstanding auction market preferred shares beginning August 1, 2009.

87.     Immediately following the foregoing announcement, the DISC securities lost approximately 75% of their value.

## AMBAC'S MATERIAL MISTATEMENTS AND OMISSIONS

88.     Ambac filed it 10-K Report on February 29, 2008.  As detailed above, during the two-month period preceding the filing of the 10-K Report, the value of the Financial Services investment portfolio had declined precipitously.  However, Ambac did not give any hint of this decline in the 10-K Report.

89.     On page 31 of the 10-K Report, Ambac provided the following disclosure concerning the fair value of the Financial Services investment portfolio:

> **As of December 31, 2007, the Financial Services investment portfolio had an aggregate fair value of approximately $7.8 billion** and an aggregate amortized cost of approximately $8.1 billion.  Ambac Capital Funding's investment policy is designed to achieve the highest after-tax return, subject to minimum average quality rating of AA on invested assets, and to maintain cash flow that closely matches invested assets to funded liabilities to minimize interest rate and liquidity risk.

(emphasis added)

90.     The foregoing disclosure was misleading because it failed to disclose that subsequent to December 31, 2007, the value of the Financial Services portfolio had declined precipitously.

91.     After concealing the decline in the value of the Financial Services investment portfolio, Ambac went on to address the issue of collateral posting.  On page 78 of the 10-K Report, Ambac assured investors that it could satisfy any collateral posting obligation by merely selling securities in the Financial Services portfolio.  More specifically, Ambac stated:

Ambac will meet the collateral requirements either by selling securities in the Financial Services investment portfolio in the market or to Ambac Assurance.

92.     The foregoing assurance was false and misleading because it concealed each of the following:

- the value of the Financial Services investment portfolio had declined precipitously subsequent to December 31, 2007;

- as a result of this decline in value, as of February 29, 2008 (the date the 10-K Report was filed), either there was already a collateral shortfall or it was evident that there was an extremely high risk of an imminent collateral shortfall;

- as a result of this decline in value, Ambac did not have a realistic expectation of being able to satisfy its potential collateral posting obligations by merely selling securities from the Financial Services portfolio;

- as a result of the foregoing, there was a high risk that Ambac would have to deplete the liquidity of the Insurance Subsidiary in order to plug the collateral posting shortfall at the Financial Services Subsidiary;

- as a result of the foregoing, the collateral posting obligations of the Financial Services Subsidiary posed a significant threat to the liquidity of both the Insurance Subsidiary and Ambac (which is a holding company and dependent on the Insurance Subsidiary for funds).

## SCIENTER

**The misleading disclosure in the 10-K Report was a deliberate and carefully crafted response to concerns raised by the investment community**

93.     The issue of Ambac's collateral posting obligations was brought front and center by Mr. Ackman's letter to the rating agencies on January 13, 2008. As detailed above, this letter was a public attack by Mr. Ackman on Ambac's AAA credit rating. Thereafter, the issue of collateral posting was raised several times during Ambac's earnings conference call held on January 28, 2008. By the time Ambac filed its 10-K Report on February 29, 2008, the issue of Ambac's collateral posting obligation was the focus of strong investor attention.

94.     In the 10-K Report, Ambac addressed the collateral posting issue head on.  More specifically, Ambac assured investors that collateral posting would not pose a problem because Ambac could satisfy these obligations by merely selling securities from the Financial Services portfolio.

95.     The foregoing assurance was given at a time when investors were loudly raising questions concerning Ambac's collateral posting obligations and the implication these obligations had for Ambac's liquidity.  Given this backdrop, there is a strong inference that this assurance was a deliberate and carefully crafted response to the questions and concerns that were then being raised by the investment community.  The clear purpose of this assurance was to allay investor fears by conveying the clear message that the Financial Services subsidiary had adequate resources to meet its collateral posting obligations.  As detailed above, this assurance was false and misleading.

**Mr. Leonard, Ambac's CFO, personally reviewed and approved the misleading disclosure in the 2007 10-K**

96.     Sean Leonard at all relevant times was Chief Financial Officer of Ambac.  Mr. Leonard resigned from Ambac on November 24, 2009.

97.     Mr. Leonard signed the misleading 10-K Report.  Mr. Leonard also signed a certificate in which he certified that he had reviewed the 10-K Report and, based on his knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

98.     The foregoing gives rise to a strong inference that Mr. Leonard personally reviewed and approved the misleading disclosure in the 10-K Report relating to collateral posting.

**Mr. Leonard was fully familiar with the collateral posting issue at the time he approved the misleading disclosure in the 10-K Report**

99.     The 10-K Report was not Mr. Leonard's first encounter with the collateral posting question.

100.    As indicated above, several investors raised the question of Ambac's collateral posting obligations during Ambac's earnings conference call held on January 23, 2008.  In each

instance, although there were other executives on the call, Mr. Leonard took the lead in responding to these questions. Apparently, Mr. Leonard was Ambac's expert on the collateral posting issue and Ambac's designated point person for responding to collateral posting questions.

101.    In view of the foregoing, there is a strong inference that Mr. Leonard was fully familiar with the collateral posting issue at the time he reviewed and approved the misleading disclosure in the 10-K Report in February 2008. At a minimum, he certainly understood that, without knowing the value of the Financial Services investment portfolio, one could not possibly provide assurances that Ambac could satisfy its collateral posting obligations by merely selling securities from such portfolio.

**Mr. Leonard was at best exceedingly reckless in approving the misleading disclosure**

102.    The disclosure in the 10-K Report was misleading because, among other things, it concealed the fact that the value of the Financial Services investment portfolio had declined precipitously and, as a result, Ambac could not satisfy its collateral posting obligations by merely selling securities from the Financial Services portfolio.

103.    If one gives Mr. Leonard the benefit of every doubt, the most one can say is that perhaps he closed his eyes to the decline in the value of the Financial Services portfolio. Perhaps he assured investors that collateral posting would not pose a problem without bothering to inquire as to the value of the investment portfolio. In this case, Mr. Leonard was at best exceedingly reckless in approving this misleading disclosure.

**The evidence indicates that more than mere recklessness was involved**

104.    While the foregoing "benefit of the doubt" scenario is theoretically possible, it is highly unlikely. As detailed below, the evidence gives rise to a strong inference that Mr. Leonard knew about the decline in value of the investment portfolio and deliberately concealed this fact from investors. This evidence is discussed below.

### *It is unlikely that Mr. Leonard could have remained oblivious to a decline in value that was of historic proportions*

105.    The decline in the value of the Financial Services investment portfolio during the two months preceding the filing of the 10-K Report was not the result of the normal fluctuations that are part and parcel of any investment portfolio. Nor was this decline the result of the typical bear market which arrives from time to time. Rather, this decline was an unprecedented event of

historical proportions.  It is highly unlikely that a decline of this scope could have escaped the notice of Ambac's chief financial officer.

106.    This is particularly true given that Ambac monitors its portfolio on a continuous basis and takes pride in the fact that it has sophisticated systems and controls for this purpose. For example, in the 10-K Report (pages 90 and 92) Ambac stated:

> [S]enior credit personnel monitor the portfolio on a continuous basis....

> The estimation of potential losses arising from adverse changes in market conditions is a key element in managing market risk.  Ambac utilizes various, systems, models and stress test scenarios to monitor and manage market risk.

### *Mr. Leonard approved the misleading disclosure on more than one occasion*

107.    Ambac filed its first quarter 2008 10-Q Report on May 12, 2008.  By this time, Ambac had closed its books for the first quarter and knew with a certainty that the value of the Financial Services investment portfolio had declined by 24%.  Nevertheless, Ambac repeated verbatim the false assurance that it had provided in the 10-K Report.  More specifically, Ambac stated on page 66 of the 10-Q Report:

> Ambac manages its liquidity risk through the maintenance of liquid collateral and bank liquidity facilities.  **Ambac will meet the collateral requirements either by selling securities in the Financial Services investment portfolio in the market or to Ambac Assurance.**

(emphasis added)

108.    Mr. Leonard signed the first quarter 2008 10-Q Report.  Mr. Leonard also signed a certificate in which he certified that he had reviewed the 10-Q Report and, based on his knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

109.    The foregoing gives rise to a strong inference that Mr. Leonard personally reviewed and approved the misleading disclosure in the first quarter 2008 10-Q Report relating to collateral posting.

110.    The fact that Mr. Leonard approved the misleading disclosure on two separate occasions supports the inference that more than mere recklessness was involved.

*When Ambac finally disclosed the truth, it significantly understated the amount of the collateral shortfall*

111.    On July 7, 2008, Ambac issued a press release in which it acknowledged for the first time that the value of the Financial Services investment portfolio was not sufficient to satisfy the potential collateral posting obligations of the Financial Services Subsidiary.  In this press release, Ambac indicated that the potential shortfall amount was approximately $1.1 billion.

112.    On November 5, 2008, Ambac issued a press release in which it indicated that it had "updated its calculations of the liquidity gap" and disclosed that the actual potential shortfall amount was really $3.2 billion.  Ambac's update of its calculation increased the potential shortfall amount by $2.1 billion or 190%.  Ambac did not deign to explain the basis for this $2.1 billion recalculation.

113.    The fact that Ambac disclosed the true shortfall amount in installments supports the inference that Ambac was engaged in a deliberate effort to conceal the true risks relating to its collateral posting shortfall.

## Mr. Leonard had a financial incentive to issue the misleading statements

*Introduction*

114.    Ambac's entire guaranty business was predicated on its having a AAA credit rating.  When the rating agencies began to question Ambac's AAA rating, Ambac was confronted with the possibility that its guarantee business would be completely shut down as a result of a ratings downgrade.

115.    In a last ditch effort to shore up its capital and preserve its AAA rating, Ambac launched a $1.5 billion capital raising transaction in February 2008.

116.    Ambac's 2009 Proxy Statement, indicates that Mr. Leonard led the team responsible for this transaction.

*The misleading statements in the 10-K Report facilitated Ambac's $1.5 billion capital raising transaction*

117.    Two weeks after Ambac filed the misleading 10-K Report, Ambac issued a press release announcing that it had successfully raised $1.5 billion though an offering of common stock and equity units.  Excerpts from this press release are set forth below:

**Ambac Announces the Closing of its Common Stock and Equity Unit Offerings for an Aggregate Capital Raise of $1.5 Billion**

NEW YORK, March 12, 2008 -- **Ambac Financial Group, Inc.** (NYSE:ABK) (Ambac) today announced that it has successfully closed its $1.155 billion public offering of 171,111,111 shares of common stock, par value $0.01 per share, at $6.75 per share. Ambac also placed 14,074,074 shares of common stock in a private placement for $95 million with two financial institutions.

In addition, Ambac announced that it has also completed its $250 million public offering of 5 million equity units, with a stated amount of $50 per unit....

As previously disclosed, Ambac currently intends to contribute the net proceeds from these offerings to its insurance company subsidiary Ambac Assurance Corporation in order to increase its capital position, less approximately $100 million, which it intends to retain at Ambac to provide incremental holding company liquidity ....

118.    In the prospectus for the offering, Ambac represented to investors that Ambac would use substantially all of the net proceeds from the offering to bolster the capital of Ambac's Insurance Subsidiary.

119.    The foregoing representation was literally true.  Ambac did in fact contribute substantially all of the offering proceeds to its Insurance Subsidiary.  However, this capital did not remain at the Insurance Subsidiary for long.  As detailed above, within a relatively short time-period thereafter, Ambac caused the Insurance Subsidiary to transfer more than $4.5 billion to the Financial Services Subsidiary in order to plug the collateral posting shortfall at the Financial Services Subsidiary.  Thus, all the proceeds from the March 2008 offering ended up being used to satisfy the collateral posting obligations of the Financial Services Subsidiary, rather than bolstering the capital of the Insurance Subsidiary.

120.    The false statements in the 2007 10-K filed on February 29, 2008, concealed from investors the true risks relating to Ambac's collateral posting obligations.  If investors had understood these risks, it is unlikely that Ambac's March 2008 offering would have succeeded.

### *Mr. Leonard had a financial interest in seeking to preserve Ambac's AAA rating*

121.    Mr. Leonard had more than professional pride at stake in leading the efforts to complete the March 2008 offering and preserve Ambac's AAA rating.

122.    Ambac has been very generous to its executive officers.  For example, Ambac's 2009 proxy statement indicates that Ambac paid Mr. Leonard total compensation of $5.1 million for the three years ended December 31, 2008.

123.    A downgrade of Ambac's credit rating threatened to put Ambac out of business. This, of course, would have impeded Ambac's ability to continue to shower wealth on its executive officers, including Mr. Leonard. Thus, in working to ensure the success of Ambac's March 2008 offering, Mr. Leonard was also working to ensure his own financial well being.

124.    Ultimately, Mr. Leonard failed in his efforts to preserve Ambac's credit rating, and Ambac has been forced to shut down its insurance business. Nevertheless, Ambac's compensation committee richly rewarded Mr. Leonard for his efforts in completing the March 2008 offering. More specifically, the compensation committee authorized a $950,000 cash bonus for Mr. Leonard and justified this bonus by citing, among other things, Mr. Leonard's contribution to the March 2008 offering and the important role he plays in communicating with investors. Set forth below is an excerpt from the compensation committee report:

> The Committee found the 2008 performance of Mr. Leonard, Ambac's CFO, to be exceptional. Mr. Leonard, who serves as a key member of Ambac's senior management team, **was instrumental in devising various capital alternatives and ultimately led the team responsible for structuring, negotiating and executing Ambac's $1.5 billion capital raise in early 2008, when Ambac was facing enormous pressure in the capital markets. Moreover, during this period of crises, Mr. Leonard effectively communicated with Ambac's regulators, rating agencies, investors and other constituents** which have proven critical as we stabilize our franchise and move forward. In addition, he was an integral part of several commutations. Mr. Leonard and his team are at the forefront of all accounting issues that may impact Ambac's business, providing sound advice and direction to ensure Ambac's financial statements are in line with GAAP, FASB and all other accounting and regulatory requirements. In setting Mr. Leonard's compensation, the Committee considered not only his outstanding performance in 2008, but also the critical role he continues to play in Ambac's current phase of strategic development.

(emphasis added)

## RELIANCE

125.    Plaintiff's husband, Joseph Ehrenreich, has a power- of-attorney to purchase securities for Plaintiff's account.

126.    On April 8, 2008, Plaintiff's husband purchased for Plaintiff's account $500,000 face amount of Ambac's DISC securities for an aggregate purchase price of $207,750.

127.    Prior to making this purchase, Plaintiff's husband did actually read and rely upon each of the misleading statements identified herein.

## CAUSATION

128.    As detailed above, Ambac concealed from investors that:

- as of February 29, 2008, the value of the Financial Services investment portfolio had declined precipitously;

- as a result of this decline, it was highly unlikely that the Financial Services Subsidiary would be able to satisfy its potential collateral posting obligations by merely selling securities from the Financial Services investment portfolio;

- as a result of the foregoing, there was a high risk that Ambac would have to deplete the liquidity of the Insurance Subsidiary in order to plug the collateral posting shortfall at the Financial Services Subsidiary; and

- as a result of the foregoing, the collateral posting obligations of the Financial Services Subsidiary posed a significant threat to the liquidity of the Insurance Subsidiary and the liquidity of Ambac (which is a holding company and dependent on the Insurance Subsidiary for funds)

129.    The precise risk which Ambac concealed materialized.  As detailed above, Ambac caused the Insurance Subsidiary to transfer more than $4.5 billion to the Financial Services Subsidiary in order to plug the collateral shortfall at the Financial Services Subsidiary.  These actions depleted both the Insurance Subsidiary's liquidity and Ambac's liquidity (since Ambac is a holding company and dependent on the Insurance Subsidiary for funds).  Furthermore, as detailed above, the statutory surplus of the Insurance Subsidiary was depleted as a direct consequence of transactions entered into by the Insurance Subsidiary in order to provide the Financial Services Subsidiary with funds required to plug its collateral posting shortfall.

130.    As a direct consequence of the depletion of Ambac's liquidity described above, the DISC securities purchased by plaintiff are worth substantially less than such securities would be worth but for such liquidity depletion and substantially less than plaintiff paid for such securities.

131.    Furthermore, as a direct consequence of the depletion of Ambac's liquidity, Ambac no longer has the resources to continue paying interest on the DISC securities.  Ambac, therefore, announced on July 27, 2009, that "in order to preserve cash at Ambac Financial Group,

Inc., it will discontinue paying the semi-annual interest on its directly-issued subordinated capital securities (DISCs) beginning August 1, 2009."

132.    Immediately following the foregoing announcement, the DISC securities lost approximately 75% of their value.

## COUNT 1

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5

133.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

134.    This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thererunder.

135.    Each of the Defendants, by the use and means of instrumentalities of interstate commerce, the mails and/or facilities of a national securities exchange, made untrue statements of material fact and/or omitted to state material facts necessary to make statements made not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  These misleading statements and omissions concealed that the collateral posting obligations of the Financial Services Subsidiary posed a significant threat to the liquidity of the Insurance Subsidiary and the liquidity of Ambac.

136.    Each of the Defendants made the false and misleading statements and omissions with scienter.

137.    As a result of Defendants' false and misleading statements and omissions, Plaintiff was not aware of the concealed risks.

138.    Plaintiffs purchased Ambac DISC securities in reliance on the false and misleading statements.   Had Plaintiff been aware of the concealed risks Plaintiff would not have purchased the DISC securities.

139.    The precise risks which Defendants concealed through their false and misleading statements and omissions materialized.

140.    As a direct result of the materialization of these concealed risks, (i) Plaintiff's DISC securities are worth substantially less than such securities would be worth but for the

materialization of such risks and substantially less than Plaintiff paid for such securities; and (ii) Plaintiff is no longer being paid interest on the DISC securities.  Furthermore, immediately after Ambac announced that it would discontinue paying the interest on the DISC securities, the DISC securities lost 75% of their value.

141.   This claim was brought within two years after discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.   Awarding Plaintiff compensatory damages.

B.   Awarding Plaintiff pre-judgment and post-judgment interest, as well as reasonable attorneys' fees and other costs;

C.   Awarding such other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury in this action for all issues so triable.

Dated: December 11, 2009

By: _____
Richard H. Dolan (RD 2212)
Niall D. O'Murchadha (NO 8161)
Schlam Stone & Dolan LLP
26 Broadway
New York, New York 10004
Telephone:  (212) 344-5400
Facsimile:  (212) 344-7677
*Attorneys for Plaintiff*