## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUDY EHRENREICH, | ) |
| Plaintiff, | ) |
| v. | ) No. 09 Civ. 10173 (BSJ) |
| AMBAC FINANCIAL GROUP, INC. and SEAN T. LEONARD, | ) ECF Case |
| Defendants. | ) |

# MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Peter C. Hein
C. Lee Wilson
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000

*Attorneys for Defendants*

March 9, 2010

# TABLE OF CONTENTS

<u>Page</u>

TABLE OF AUTHORITIES .................................................................................. iii

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF THE CASE .............................................................................. 4

   A.    The parties ............................................................................................. 4

   B.    The 2007 10-K and the graphic risk disclosures in it and preceding it ............................ 4

   C.    Other graphic disclosures of risks and adversities faced by Ambac made prior to plaintiff's April 8, 2008 purchase. ........................................................ 7

   D.    Ratings downgrades and the July 7, 2008 press release, which plaintiff alleges "finally acknowledged the truth," but which is *not* alleged to have resulted in a drop in price of the DISCS. ........................................................ 8

   E.    Further downgrades as the financial crisis intensified, and the July 27, 2009 announcement that Ambac would exercise its right to defer interest payments. ............................................................................................ 9

ARGUMENT ....................................................................................................... 9

Point I:    **The Complaint fails to plead any material misstatement or omission of fact with the requisite particularity.** .................................................... 9

   A.    Plaintiff does not allege that Ambac's estimate of the investment portfolio's value as of December 31, 2007 was inaccurate; nor did Ambac have a duty to disclose information regarding mid-quarter changes in the portfolio's value after December 31, 2007. .......................... 10

   B.    Plaintiff fails to plead with particularity that Ambac's statement regarding its plans for meeting collateral requirements was materially misleading. .................................................................................... 12

       1.    **No reasonable investor could interpret the collateral requirements statement as an open-ended guarantee that, no matter how the Financial Services portfolio performed or how much Ambac Assurance's ratings might be downgraded in the future, Ambac would satisfy any collateral posting requirement by "simply" selling securities in the Financial Services portfolio.** ...................................................... 12

       2.    **Ambac's statement of its plan to meet collateral requirements is a forward-looking statement that is nonactionable under the PSLRA and the "bespeaks caution" doctrine.** ...................................................... 14

**Page**

      3.    The Complaint lacks particularized facts supporting its allegation of a portfolio decline in January and February so severe that "either there was already a collateral shortfall or it was evident that there was an extremely high risk of an imminent collateral shortfall" at the time Ambac's 2007 10-K was filed on February 29, 2008. ................................16

C.    In light of the graphic disclosures Ambac made prior to plaintiff's April 8, 2008 purchase, the Complaint fails to plead with particularity any misstatement or omission that was material or that an investor could reasonably rely on. ........................................................................................17

      1.    Plaintiff fails to allege materiality..........................................................17

      2.    No reasonable investor—much less this purchaser of debt at a distressed price in the midst of the financial crisis— could justifiably rely on the alleged misstatements or view them as significantly altering the "total mix" of information available. ....................................17

Point II:    **Scienter is not pled with the requisite particularity.** ..................................19

A.    Plaintiff has failed to adequately plead motive and opportunity. ....................................19

B.    The Complaint fails to plead "strong circumstantial evidence" of scienter....................21

C.    The more compelling inference is that Ambac's financial disclosures reflected the information then available as events unfolded............................................23

Point III:    **The Complaint does not adequately plead loss causation.** ..............................................23

A.    The Complaint itself asserts the July 7, 2008 press release "acknowledged the truth"—yet afterwards DISCS prices *went up*. ................................24

B.    Plaintiff's allegations fail to demonstrate a causal link between the alleged misstatements and the loss that plaintiff alleges occurred after a July 2009 announcement that Ambac was exercising its right to defer interest payments. ........................................................................................25

CONCLUSION.................................................................................................................25

### TABLE OF AUTHORITIES

**Case**                                                                                     **Page**

*60223 Trust* v. *Goldman, Sachs & Co.*, 540 F. Supp. 2d 449 (S.D.N.Y. 2007) ............................ 8 n.3

*Acito* v. *IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ................................................................. 21

*Amorosa* v. *Ernst & Young LLP*, --- F. Supp. 2d. ---,
    2010 WL 329956 (S.D.N.Y. 2010) ............................................................................ 9 n.3, 24 n.12

*Ashcroft* v. *Iqbal*, 129 S. Ct. 1937 (2009) ......................................................................................... 9

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ......................................... 1 n.1

*Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988) .............................................................................. 10, 17

*Blum* v. *Semiconductor Packaging Materials Co.*,
    1998 WL 254035 (E.D. Pa. 1998) ............................................................................................ 11 n.4

*Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336 (2005) ................................................................... 23, 24

*ECA Local 134 IBEW Joint Pension Trust of Chi.* v. *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ........................................................... 12 n.5, 17, 20 & n.11, 21

*First Nationwide Bank* v. *Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994) ................................. 1 n.1

*Gallagher* v. *Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001) ................................................................. 11

*Garber* v. *Legg Mason, Inc.*, 2009 WL 3109914 (2d Cir. 2009) ....................................... 17, 18 & n.9

*Halperin* v. *eBanker USA.com, Inc.*, 295 F.3d 352 (2d Cir. 2002) ................................................... 17

*Harsco Corp.* v. *Segui*, 91 F.3d 337 (2d Cir. 1996) .......................................................................... 17

*Higginbotham* v. *Baxter Int'l Inc.*, 495 F.3d 753 (7th Cir. 2007) ..................................................... 10

*I. Meyer Pincus & Assoc.* v. *Oppenheimer & Co.*, 936 F.2d 759 (2d Cir. 1991) .............................. 12

*In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973 (S.D.N.Y. 2004) .............................................. 16, 21

*In re AlphaStar Ins. Group Ltd.*, 383 B.R. 231 (S.D.N.Y. Bankr. 2008) ............................................. 20

*In re Ambac Fin. Group, Inc., Sec. Litig.*, 2010 WL 727227 (S.D.N.Y. 2010) .............. 18-19, 19 n.10

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ................................... 11 n.4

*In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) ............................................. 21

*In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, (S.D.N.Y. 2003),
    *aff'd*, 107 F. App'x 250 (2d Cir. 2004) .......................................................................................... 10

**Page**

*In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346 (S.D.N.Y. 2008) ....................................... 10

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29 (2d Cir. 2009) ....................................... 25

*In re Gilat Satellite Networks, Ltd. Sec. Litig.*,
    2005 WL 2277476 (E.D.N.Y. 2005).................................................................. 14, 15

*In re Gildan Activewear, Inc., Sec. Litig.*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2006)................................................................. 22

*In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358 (E.D.N.Y. 2003) ....................................... 18 n.9

*In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006)........................... 21

*In re Merrill Lynch & Co., Research Reports Sec. Litig.*,
    289 F. Supp. 2d 416 (S.D.N.Y. 2003).................................................................. 1 n.1

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    2008 WL 2324111 (S.D.N.Y. 2008)...................................................................... 25

*In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446 (S.D.N.Y. 2000) ................................... 11 n.4

*In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510 (S.D.N.Y. 2009)..................................... 21

*In re Regeneron Pharm., Inc. Sec. Litig.*, 2005 WL 225288 (S.D.N.Y. 2005) .................................. 18

*In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527 (S.D.N.Y. 2007)........................................ 24 n.12

*In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247 (S.D.N.Y. 2008)................................. 22

*In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407 (9th Cir. 1994) ............................................. 11 n.4

*In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024 (S.D.N.Y. 2006)................................................ 18

*Joffee* v. *Lehman Bros. Inc.*, 209 F. App'x 80 (2d Cir. 2006),
    *aff'g* 410 F. Supp. 2d 187 (S.D.N.Y. 2006)........................................................ 24 n.13

*Kemp* v. *Universal Am. Fin. Corp.*, 2007 WL 86942 (S.D.N.Y. 2007) ....................................... 17-18

*Kramer* v. *Time Warner, Inc.*, 937 F.2d 767 (2d Cir. 1991)............................................... 1 n.1, 18 n.9

*Ladmen Partners, Inc.* v. *Globalstar, Inc.*, 2008 WL 4449280 (S.D.N.Y. 2008).............................. 22

*Landmen Partners Inc.* v. *Blackstone Group, L.P.*,
    659 F. Supp. 2d 532 (S.D.N.Y. 2009).................................................................. 18, 19

*Lattanzio* v. *Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007) ................................................ 25

**Page**

*Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) ................................... 9, 24, 25

*Phillips* v. *Kidder, Peabody & Co.*, 933 F. Supp. 303 (S.D.N.Y. 1996) ............................ 18

*Ressler* v. *Liz Claiborne, Inc.*, 75 F. Supp. 2d 43 (E.D.N.Y. 1998) .................................. 21

*Rombach* v. *Chang*, 355 F.3d 164 (2d Cir. 2004) ............................................ 12, 14, 15, 21

*San Leandro Emergency Med. Group Profit Sharing Plan* v. *Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996) ................................................................................... 21

*Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ............................ 20

*Teachers' Ret. Sys. of La.* v. *Hunter*, 477 F.3d 162 (4th Cir. 2007) ........................... 24, 25

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital, Inc.*,
    531 F.3d 190 (2d Cir. 2008) ........................................................................... 16, 21

*Tellabs Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ............................ 19, 23

*Vladimir* v. *Bioenvision Inc.*, 606 F. Supp. 2d 473 (S.D.N.Y. 2009) .............................. 10

*Yu* v. *State St. Corp.*, 2010 WL 668645 (S.D.N.Y. 2010) ........................................... 18, 19

*Zucker* v. *Quasha*, 891 F. Supp. 1010 (D.N.J. 1995), *aff'd*, 82 F.3d 408 (3d Cir. 1996) ............. 11 n.4

**Statutes**

15 U.S.C. § 78m ............................................................................................................. 11

15 U.S.C. § 78u-4(b)(1) ................................................................................................... 9

15 U.S.C. § 78u-4(b)(2) ................................................................................................. 19

15 U.S.C. § 78u-5(a)(1)-(2), (c)(1) ............................................................................... 14

15 U.S.C. § 78u-5(c)(1)(A)(i) ....................................................................................... 15

15 U.S.C. § 78u-5(c)(1)(A)(ii) ..................................................................................... 18

15 U.S.C. § 78u-5(c)(1)(B) ...................................................................................... 15, 21

15 U.S.C. § 78u-5(i)(1) ................................................................................................ 15

**Rules**

Fed. R. Civ. P. 9(b) ........................................................................................................ 9

## PRELIMINARY STATEMENT

On April 8, 2008, in the midst of the financial crisis, plaintiff purchased in the secondary market a type of debt securities issued by Ambac Financial Group ("Ambac"), called Directly-Issued Subordinated Capital Securities ("DISCS"), at a distressed price—just **41.55%** of the face value at which Ambac had issued the DISCS in 2007. Compl. ¶¶ 84, 126. The DISCS prospectus supplement had expressly stated (including on its cover) that Ambac "may defer interest for up to ten consecutive years without giving rise to an event of default." Ex. 1 at cover; *see id.* at S-5, S-12 to S-13, S-22.[1]

Plaintiff's Complaint acknowledges that, prior to plaintiff's April 8, 2008 purchase, the "housing bubble [had] burst" and, as a result, "Ambac [had] incurred multi-billion losses due to its exposure to mortgage-backed securities." Compl. at 6 & ¶¶ 29-31. Specifically, prior to plaintiff's DISCS purchase, reports by Ambac and other public information included the following:

- Ambac had incurred $3.25 billion in losses for the fourth quarter of 2007, a loss that reflected $5.21 billion in fourth quarter mark-to-market losses on credit derivative exposures. *Id.* ¶ 31; *see* Ex. 6, Form 8-K at 1 (Jan. 22, 2008).

- In the period of January 16-18, 2008, Fitch, Inc. ("Fitch") downgraded the financial strength rating for Ambac Assurance, Ambac's principal operating subsidiary, from AAA to AA and kept it on Ratings Watch Negative; Moody's Investors Service ("Moody's") and Standard & Poor's Ratings Service ("S&P") also placed Ambac Assurance on review for a possible future downgrade. Compl. ¶¶ 33-35. Ambac disclosed that these actions could increase the collateral Ambac was required to post pursuant to investment agreements entered into by its Financial Services subsidiaries. Ex. 4, 2007 Form 10-K at 2, 40-41 (Feb. 29, 2008).

- On January 17, 2008, Ambac's stock traded as low as $4.50 per share, compared to a price as high as $96.10 in the preceding year. *See* Ex. 16.

- Ambac would reduce its quarterly dividend to $.01 per share. Ex. 4 at 47.

- Ambac set forth in its 2007 10-K extensive warnings regarding, *inter alia*, the possibility of declines in the investment portfolio, as well as the liquidity risks posed by reduced portfolio values,

---

[1] On a motion to dismiss, courts may take judicial notice of "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit," *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007), as well as market phenomena. *See In re Merrill Lynch & Co., Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 421 n.6 (S.D.N.Y. 2003) (judicial notice of "the internet bubble and its subsequent crash"); *First Nationwide Bank* v. *Gelt Funding Corp.*, 27 F.3d 763, 770 (2d Cir. 1994) (real estate market downturn); *Kramer* v. *Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) (junk bond market collapse). Pertinent excerpts are attached as exhibits to the accompanying Declaration of C. Lee Wilson, dated March 9, 2010 (cited as "Ex. __").

ratings downgrades, and increased collateral obligations.  *See* Ex. 4 at 1, 24, 33, 36, 40-41, 46, 72, 75-78; *see also id.* at 1-2, 32-42, 46.

- Ambac's March 2008 disclosures in connection with an effort to raise additional equity capital included yet further graphic warnings, *see, e.g.*, Ex. 3, Prospectus Supplement at S-iii, S-8, S-13 to S-14, S-18 to S-19 (Mar. 6, 2008), as did a Form 8-K filed on March 12, 2008 that further up-dated "certain risk factors [Ambac] previously disclosed in its Form 10-K," *see, e.g.*, Ex. 2 at 3, 5, 11, 16-17.  The graphic risk disclosures in each of these filings ranged from 15 to 29 pages in length.  *See* Ex. 4 at 1-2, 32-42, 46 (15 pages); Ex. 3 at S-ii to S-iii, S-7 to S-21, S-28 to S-38, 3 (29 pages); Ex. 2 at 3-20 (18 pages).  Graphic risk disclosures had also previously appeared in other public 8-K filings.  *See, e.g.*, Ex. 5, Form 8-K at 2-12 (Jan. 25, 2008).

- Among Ambac's disclosures was the fact that, in January and February 2008, multiple federal securities actions had been brought against Ambac alleging fraud and other violations of federal securities laws with respect to Ambac's public disclosures.  Ex. 4 at 41.

Ambac was not alone in reporting extensive losses and adversities in the midst of the world-wide credit crisis that unfolded prior to the time of plaintiff's April 8, 2008 purchase.  As Alan Greenspan observed, in the third quarter of 2007 "financial markets in much of the world seized up." Ex. 35.  Other bond insurers—MBIA, FGIC and SCA (now "Syncora")—likewise announced major losses in the third and fourth quarters of 2007 and first quarter of 2008 (Exs. 18, 21, 24), experienced downgrades in their credit ratings (*see* Exs. 20, 23, 25), and incurred drops in their stock prices (*see* Exs. 19, 22).

As the turmoil in the markets continued, March 2008 brought the widely publicized news that Bear Stearns, "the nation's fifth largest investment banking firm, was verging on bankruptcy from what its officials described as a sudden liquidity squeeze related to its large exposure to devalued mortgage-backed securities."  Ex. 30 at CRS-1.  On March 16, JP Morgan agreed to acquire Bear Stearns for $2 a share—less than 7% of its share price *just two days before*.  *Id.* at CRS-5.  As Mr. Greenspan stated in a March 16, 2008 article, "The current financial crisis in the US is likely to be judged in retrospect as the most wrenching since the end of the second world war."  Ex. 36.

In the face of graphic disclosures concerning losses and adversities at Ambac in particular and in the financial markets generally, plaintiff chose to purchase—**at 41 cents on the dollar**—a se-curity for which Ambac had the express option of deferring interest payments for up to ten years. *See* Ex. 1 at cover, S-5, S-12 to S-13, S-22.  After Ambac exercised this option in July 2009—allegedly followed by a drop in DISCS prices, *see* Compl. ¶ 87—plaintiff claimed fraud based upon

two allegedly misleading statements plucked out of the extensive disclosures of risks and adversities in the 258-page 2007 10-K filed almost two years before plaintiff filed suit.

As shown below, there was no misrepresentation. The first statement plaintiff challenges is the 10-K's estimated value of the Financial Services investment portfolio as of December 31, 2007. *Id.* ¶¶ 89-91. But plaintiff does not dispute the accuracy of this valuation as of December 31, 2007, and in preparing and filing its 2007 10-K on the timetable the SEC prescribes, Ambac had no duty to report in that 10-K on mid-quarter changes in the portfolio's value after December 31, 2007. The second allegedly misleading statement is the 10-K's description of Ambac's plan to sell securities from that portfolio to the market or to Ambac Assurance to meet potential collateral posting requirements that may arise in the event that the ratings agencies' determinations to put Ambac Assurance on negative watch in January 2008 resulted in downgrades. Ex. 4 at 77; *cf.* Compl. ¶¶ 91-92. But plaintiff disregards the 10-K's plain language and context, misinterpreting it as an open-ended guarantee that "Ambac could satisfy *any* collateral posting requirement by *simply* 'selling securities in the Financial Services portfolio'" (Compl. ¶ 24 (emphasis added)) to a buyer *other than* Ambac Assurance (*see, e.g., id.* ¶¶ 53, 79-83). In any event, because the statement is forward looking and accompanied by meaningful cautionary language, defendants are protected from liability under the PSLRA's safe harbor. Moreover, plaintiff fails to adequately plead materiality or reasonable reliance, particularly in light of the 10-K's cautionary statements and risk disclosures. *See* Point I, *infra*.

Nor does the Complaint plead a strong inference of scienter. The Complaint fails to plead any legally cognizable motive, and fails to identify reports provided to defendants before the date of the 10-K showing the portfolio's performance in January and February 2008, much less any reports that contradicted anything in the 2007 10-K. *See* Point II, *infra*.

Loss causation is also absent. The Complaint in ¶¶ 86-87 alleges that a July 2009 announcement of the deferral of interest was followed by a 75% decline in price, but elsewhere in ¶ 20 the Complaint asserts that the "truth" came out in a July 7, 2008 press release issued over a year before—a press release that was followed by a *rise* in DISCS prices. Moreover, the Complaint fails to plead facts sufficient to permit ascribing the loss to the alleged misstatements, as distinct from other

factors, such as the marketwide credit crisis and its unfolding impact on Ambac.  *See* Point III, *infra.*

## STATEMENT OF THE CASE

**A.     The parties.**

Plaintiff purchased the DISCS at 41.55% of their face value on April 8, 2008.  Compl. ¶¶ 84, 125-126.  As noted, the prospectus supplement expressly stated that interest could be deferred on the DISCS for up to 10 years.  Ex. 1 at cover S-5, S-12 to S-13, S-22.  Plaintiff alleges the DISCS market value dropped after July 27, 2009, when Ambac announced it would discontinue paying interest on DISCS.  *See* Compl. ¶¶ 86-87.

Defendants are Ambac and Sean T. Leonard, Ambac's Senior Vice President and Chief Financial Officer at relevant times.  *Id.* ¶¶ 5-6.  Ambac engages in two primary business segments.  *Id.* ¶ 9.  First, its financial guarantee subsidiaries, such as Ambac Assurance Corporation ("Ambac Assurance"), provide insurance against risk of default on bonds and other financial instruments.  *Id.* ¶¶ 10-12.  Second, its Financial Services subsidiaries enter into investment agreements with customers who invest funds and are paid interest.  *Id.* ¶¶ 13-14.  Under specified conditions, including a downgrade of Ambac Assurance's credit ratings to certain levels, some of these investment agreements provide that Ambac must post collateral to the customer.  *Id.* ¶ 15; *see also* Ex. 4 at 33.  Ambac disclosed that "Ambac Assurance guarantees the . . . investment agreement obligations of its Financial Services affiliates."  Ex. 4 at 147; *see also id.* Exhibit 99.01 at 43.

**B.     The 2007 10-K and the graphic risk disclosures in it and preceding it.**

As noted, Ambac disclosed significant losses and adversities in the months preceding the 2007 10-K's filing, including third and fourth quarter 2007 losses (Compl. ¶ 31; Ex. 7, 3Q 2007 10-Q at 28; Ex. 8, Form 8-K at 1 (Oct. 24, 2007); Ex. 6 at 1) and negative actions by the ratings agencies in January 2008 (Compl. ¶¶ 33-35; Ex. 4 at 2-3, 19, 23, 32-34, 47).  The 2007 10-K reported Ambac's financial position as of December 31, 2007.  Among other things, the 10-K reported a 2007 net loss of $3.25 billion for Ambac (Ex. 4 at 99) and was replete with extensive cautionary statements and pages detailing risk factors (*see, e.g., id.* at 1-2, 24, 32-42, 46, 72, 75-78).

Plaintiff seizes upon two statements that she takes out of context from the 258-page 10-K.

First, the 10-K on page 30 reported that "[a]s of December 31, 2007, the Financial Services invest-ment portfolio had an aggregate fair value of approximately $7.8 billion." *Id.* ¶ 89. Plaintiff does not dispute the accuracy of the stated value as of December 31, 2007. Rather, plaintiff's complaint is that Ambac did not disclose that the portfolio's value had thereafter, in the 60-day period the SEC allows for a company to prepare and file its 10-K, allegedly "declined precipitously." *Id.* ¶ 90.

The 10-K also extensively discussed the negative rating agency actions taken in January 2008 and the potential adverse consequences of those actions, including the possibility that the rat-ings reviews that the agencies had announced might result in further downgrades and a correspond-ing increase in collateral posting obligations. To that effect, the 10-K explained that, in the period of January 16-18, 2008, Fitch downgraded Ambac Assurance from AAA to AA while continuing a negative ratings watch, and Moody's and S&P placed Ambac Assurance's AAA rating on review for a possible downgrade—a review they continued in February. Ex. 4 at 2-3, 19, 23, 33-34, 47; *see also* Compl. ¶¶ 33-35. The 10-K also repeatedly explained that additional downgrades in Ambac Assurance's ratings could result in increased collateral posting obligations under the Financial Ser-vices investment agreements, thus introducing liquidity risk. Ex. 4 at 24, 33, 76.

The 10-K also contained a specific section titled "Credit Ratings and Collateral" that in-cluded a description of Ambac's plans to deal with potential increased collateral requirements that might flow from downgrades resulting from the ratings reviews. *See id.* at 76-78. This description included the second statement plaintiff seizes on for her fraud claim—a forward-looking statement that "Ambac will meet the collateral requirements either by selling securities in the Financial Ser-vices investment portfolio in the market or to Ambac Assurance" (*id.* at 77)—and then continued:

> Based on the previously described rating agency actions by Moody's, Standard & Poor's and Fitch which occurred during January 2008, management subsequently identified certain investment securities in the Financial Services investment portfolio to potentially sell in order to satisfy additional collateral posting requirements upon a further ratings downgrade and/or to meet potential liquidity needs. Ambac can also enter into collateral swaps with external counterparties or with Ambac Assurance. *Id.*

This section went on to provide a table "summariz[ing] the estimated change in net collateral posting requirements of all the financial services products assuming immediate downgrades of Ambac's fi-nancial strength rating level by either S&P or Moody's at December 31, 2007." *Id.* at 78. The table

notes the collateral requirements of $2.053 billion that exist at current ratings levels; it then charts out the collateral requirements that could potentially be triggered by ratings downgrades down to six levels below the current ratings. *Id.* The table estimates collateral requirements of over $8 billion if ratings fell to A/A2—five levels below the then-current rating. *Id.*

Among the extensive cautionary statements and risk factors (*see id.* at 1-2, 32-42, 46), the 10-K included cautionary language related to ratings downgrades, investment portfolio values, and liquidity risk. The 10-K disclosed that future portfolio values could be materially affected by "the risk that market risks impact assets in our investment portfolio" (*id.* at 1), and that:

- "Our investment portfolio has been adversely affected by events and developments in the capital markets, including decreased market liquidity for investment assets; market perception of increased credit risk with respect to the types of securities held in our investment portfolio and corresponding credit spread-widening with respect to our investment assets; and extension of the duration of investment assets. Our investment portfolio may be further adversely affected by these and other events and developments in capital markets, including interest rate movements; downgrades of credit ratings of issuers of investment assets and/or financial guarantee insurers which insure investment assets; and foreign exchange movements which impact investment assets." *Id.* at 40.

- "Changes in general economic conditions . . . could adversely affect the performance of . . . our investment portfolio, e.g. leading to . . . decreases in the value of our investment portfolio and, therefore, our financial strength." *Id.* at 36.

The 10-K also disclosed the potential impact of future downgrades, which could cause significant increases in collateral posting requirements and adversely affect Ambac's liquidity:

- "[A] downgrade of our financial strength ratings below specified levels would allow investment agreement and derivative counterparties to demand collateral or terminate certain agreements, introducing liquidity and market risks." *Id.* at 24.

- "[A] downgrade could result in a significant amount of collateral to be posted which could have a material adverse effect on our liquidity." *Id.* at 33.

- "In the event that Ambac Assurance is further downgraded, Ambac may be required to post incremental collateral to its investment agreement counterparties, introducing liquidity risk." *Id.* at 76.[2]

---

[2] *See also id.* at 1-2 (noting risks of "changes in . . . credit or financial strength ratings" and of "constraints, including adverse business performance, affect[ing] Ambac's ability to pay dividends and make other payments"); *id.* at 41 & 75 (warning that blocks of portfolio assets sold to meet collateral requirements "would likely be sold at discounted prices"); *id.* at 74 (noting risks that could affect ability of Ambac Assurance to pay dividends to Ambac, including "adverse market changes").

Finally, the February 8, 2007 DISCS prospectus itself contains cautionary language relevant to plaintiff's claim. It repeatedly warns investors of Ambac's right to "defer interest for up to ten consecutive years without giving rise to an event of default" (Ex. 1 at cover; *see id.* S-5, S-12 to S-13, S-22) and cautions that "[d]eferral of interest payments could adversely affect the market price of the DISCS" (*id.* at S-14) and that "[t]he DISCS will be effectively subordinated to the obligations of our subsidiaries" (*id.* at S-15).

**C.     Other graphic disclosures of risks and adversities faced by Ambac made prior to plaintiff's April 8, 2008 purchase.**

Other graphic disclosures followed soon after the 10-K. In a Form 8-K issued on March 12, 2008, Ambac updated investors on "Certain First Quarter 2008 Financial Developments"—information "based largely on [Ambac's] unaudited monthly financial data for and as of January 31, 2008." Ex. 2 at 2. This 8-K informed investors that the Financial Services portfolio had incurred an estimated $152 million increase in net unrealized losses during January. *See id.* The 8-K also reported approximately $650 million in mark-to-market losses for Ambac in January 2008 due to credit derivatives and total return swaps. *Id.* It went on to state: "Market conditions which give rise to such losses have continued into February 2008. If these conditions persist or worsen through the end of the first quarter, we would expect to incur a material net loss for the quarter." *Id.*

The March 12 8-K also updated certain risk factors previously disclosed in the 2007 10-K, in a discussion that spanned 18 pages. *See id.* at 3-20. Among the wide ranging risk topics it addressed, the 8-K specifically discussed the possibility of future ratings downgrades and the increased collateral-posting obligations they might trigger. *Id.* at 5. It warned that these collateral requirements "could have a material adverse effect on our liquidity," and that "it is likely that Ambac Assurance would need to lend or contribute investment assets or cash to the Financial Services businesses in order to satisfy these collateral-posting obligations." *Id.*

The graphic disclosures outlined above were also set forth in a March 6, 2008 prospectus supplement (*see* Ex. 3. at S-4, S-8), which Ambac issued in connection with a $1.5 billion equity offering—$1.3 billion of which was given as a capital contribution to Ambac Assurance (*see* Compl. ¶¶ 117-119; Ex. 13, Annual Statement of the Ambac Assurance Corporation 2008 at 14.4 note

10(b)).  This prospectus supplement also included pages upon pages of cautionary statements and detailed descriptions of potential risks.  *See* Ex. 3 at S-ii to S-iii, S-7 to S-21, S-28 to S-38, 3.

**D.     Ratings downgrades and the July 7, 2008 press release, which plaintiff alleges "finally acknowledged the truth," but which is *not* alleged to have resulted in a drop in price of the DISCS.**

In June 2008, S&P downgraded Ambac Assurance from AAA to AA, Moody's downgraded it from AAA to Aa3 (Compl. ¶ 74; Ex. 11, 2Q 2008 10-Q at 105), and Fitch withdrew its rating (*see* Ex. 10).  These downgrades triggered additional collateral-posting requirements, as well as investment agreement terminations, but they were "adequately covered by the investment agreement asset portfolio."  *Id.*  Ambac issued a press release on July 7, 2008, that discussed the possible impact if Ambac Assurance was further downgraded in the future.  Based on financial information updated as of May 31, 2008, the press release set forth a chart estimating the collateral requirements and terminations that could result if Ambac Assurance were downgraded up to three levels below Moody's current Aa3 rating.  *Id.*  Specifically, Ambac estimated that the investment portfolio's value as of May 31 was sufficient to cover potential collateral requirements and terminations if Ambac Assurance were downgraded to A+/A1, but the portfolio would fall short by $1.0 billion in the event of an A/A2 downgrade and by $1.1 billion in the event of an A-/A3 downgrade.  *Id.*; *see also* Compl. ¶ 52.  Ambac went on to discuss its plans for dealing with any such future downgrades:

> In the event of cash and/or security shortfalls in the investment agreement business, management anticipates utilizing the resources of AAC (through inter-company transactions).  Utilizing the resources of AAC would allow time for the assets in the investment agreement asset portfolio to recover in value and would preempt claims on insurance policies issued by AAC and prevent the realization of losses in the investment agreement asset portfolio.  Ex. 10; Compl. ¶ 53.

The Complaint states that the July 7, 2008 press release "finally acknowledged the truth" that Ambac had allegedly concealed in the 2007 10-K.  Compl. ¶ 20.  However, the Complaint does ***not*** allege that DISCS prices dropped as a result of this disclosure.  In fact, two days after the press release DISCS prices rose ***above*** their pre-July 7 level; they continued rising steadily over the next two months, exceeding plaintiff's initial purchase price by early September.  *See* Ex. 17.[3]

---

[3] The chart in Ex. 17 provides the DISCS daily market prices as reported by Bloomberg LP.  Because plaintiff relies on the price of the DISCS in pleading damages, Compl. ¶¶ 87, 132, this Court

(footnote continued)

**E.    Further downgrades as the financial crisis intensified, and the July 27, 2009 announcement that Ambac would exercise its right to defer interest payments.**

The financial crisis in the United States intensified in the Fall 2008.  On September 15, Lehman and declared bankruptcy, and on September 26, Washington Mutual followed suit.  Exs. 29, 31.  That same month, Fannie Mae, Freddie Mac, and AIG were "rescued" by the government.  Exs. 32, 33.  On September 14 and October 2, respectively, Merrill Lynch and Wachovia agreed to be sold for a fraction of what they had been worth a year earlier.  Exs. 34, 37.  By early October, Congress had enacted a "financial bailout" package (TARP) leading to multi-billion dollar cash infusions in banking institutions.  *See* Pub. L. No. 110-343; Ex. 28.

Beginning in November 2008, Ambac Assurance experienced further downgrades.  Compl. ¶ 74.  On July 27, 2009, Ambac announced its intention to discontinue paying interest on its DISCS beginning August 1, 2009.  *Id.* ¶ 86; Ex. 15, Form 8-K (July 27, 2009).  Plaintiff alleges that the price of DISCS dropped 75% immediately following this announcement.  Compl. ¶ 87.

**ARGUMENT**

**POINT I:    THE COMPLAINT FAILS TO PLEAD ANY MATERIAL MISSTATEMENT OR OMISSION OF FACT WITH THE REQUISITE PARTICULARITY.**

Under the PSLRA, plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  Likewise, courts "assiduously" apply Rule 9(b)'s heightened pleading requirements to securities fraud actions, requiring plaintiffs to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b); *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005).  Even apart from Rule 9(b) and the PSLRA, to survive a motion to dismiss a claim must be "plausible."  *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1949 (2009).

The Complaint alleges that the following two statements in Ambac's 2007 10-K Report, filed

---

(footnote continued)

may take judicial notice of the market price for the DISCS during the periods of time relevant to the Complaint.  *See, e.g.*, *Amorosa* v. *Ernst & Young LLP*, --- F. Supp. 2d ---, 2010 WL 329956, at *21 (S.D.N.Y. 2010); *60223 Trust* v. *Goldman, Sachs & Co.*, 540 F. Supp. 2d 449, 460 (S.D.N.Y. 2007).

9

February 29, 2008, were false or misleading:  (1) the statement that "[a]s of December 31, 2007, the Financial Services investment portfolio had an aggregate fair value of approximately $7.8 billion," and (2) Ambac's plan that "Ambac will meet the collateral requirements either by selling securities in the Financial Services investment portfolio in the market or to Ambac Assurance."  Compl. ¶¶ 89, 91.  The Complaint fails to demonstrate that either statement is actionable.

**A.    Plaintiff does not allege that Ambac's estimate of the investment portfolio's value as of December 31, 2007 was inaccurate; nor did Ambac have a duty to disclose information regarding mid-quarter changes in the portfolio's value after December 31, 2007.**

The Complaint does not allege that the $7.8 billion value estimate for the portfolio as of December 31, 2007 was inaccurate.  Rather, it asserts that this statement "failed to disclose that *subsequent to December 31, 2007*, the value of the Financial Services portfolio had declined precipitously."  Compl. ¶ 90 (emphasis added).  This allegation is insufficient.

First, the 10-K identifies $7.8 billion as the portfolio's estimated value "*[a]s of December 31, 2007.*"  Ex. 4 at 30.  "Accurate statements of past earnings figures are not themselves actionable under Section 10(b)."  *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 356 (S.D.N.Y. 2008); *see also In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *6 (S.D.N.Y. 2003) ("Defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy."), *aff'd*, 107 F. App'x 250, 252 (2d Cir. 2004) ("Accurate statements about past performance are self evidently not actionable under the securities laws . . . .").  Disclosure of the portfolio's 2008 performance was *not* "necessary to make [the valuation "*as of December 31, 2007*"] not misleading."  *See Vladimir* v. *Bioenvision Inc.*, 606 F. Supp. 2d 473, 485 (S.D.N.Y. 2009).

Second, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5," *Basic Inc.* v. *Levinson*, 485 U.S. 224, 239 n.17 (1988), and there was no duty to disclose the portfolio's monthly values for January and February 2008.  The "securities laws create a system of periodic rather than continual disclosures," and under that periodic reporting system, there is no duty to disclose mid-quarter monthly results.  *Higginbotham* v. *Baxter Int'l Inc.*, 495 F.3d 753, 760 (7th Cir. 2007) ("[W]hat rule of law requires 10-Q reports to be updated on any cycle other than quarterly?  That's what the 'Q' means.  Firms regularly learn financial information between quarterly reports,

and they keep it under their hats until the time arrives for disclosure. Silence is not 'fraud' without a duty to disclose.").[4]  This periodic disclosure system is statutory in nature, embodied in Section 13 of the Exchange Act, 15 U.S.C. § 78m. "[J]udges have no authority to scoop the political branches and adopt continuous disclosure under the banner of Rule 10b-5. *Especially* not under that banner, for Rule 10b-5 condemns only fraud, and a corporation does not commit fraud by standing on its rights under a periodic-disclosure system." *Gallagher* v. *Abbott Labs.*, 269 F.3d 806, 809-10 (7th Cir. 2001).

**Third**, information regarding losses on Ambac's investment portfolio during January 2008 was, in fact, available to plaintiff at the time of her April 8, 2008 DISCS purchase. In a prospectus supplement for the March 2008 equity offering, and in an 8-K filed on March 12, 2008, Ambac disclosed information from its unaudited monthly financial data for January 31, 2008, including its estimate that the Financial Services portfolio incurred $152 million in net unrealized losses in January. Ex. 2 at 2; Ex. 3 at S-4.

**Fourth**, the Complaint fails to plead facts sufficient to support plaintiff's conclusory assertions about how the portfolio performed in January and February 2008. The Complaint simply points to the portfolio's value as of March 31, 2008 (*see* Compl. ¶ 59) and suggests that values for the first two months of 2008 can be extrapolated by comparison to the performance of the Markit ABX.HE indices for AAA and AA residential mortgage-backed securities ("RMBS") (*see id.* ¶¶ 64-67). However, Markit, the company that created these indices, has stated that they were "*not* designed to be uncritically extrapolated to the broader ABS market, and [were] certainly not designed

---

[4] *See also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997) (Alito, J.) ("[e]xcept for specific periodic reporting requirements," there is no duty to provide material information); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1418-20 (9th Cir. 1994) (no obligation to disclose the extent to which quarter sales were lagging behind internal projections when "[t]he quarter . . . was not yet complete"); *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 458-59 (S.D.N.Y. 2000) (no duty to disclose anticipated loss in current quarter prior to the quarterly report); *Blum* v. *Semiconductor Packaging Materials Co.*, 1998 WL 254035, at *2 (E.D. Pa. 1998) ("no duty to update the public as to the status of the financial quarter in progress"); *Zucker* v. *Quasha*, 891 F. Supp. 1010, 1015-16 (D.N.J. 1995) (noting courts' reluctance to impose liability due to "failure to disclose financial data for a fiscal quarter in progress."), *aff'd*, 82 F.3d 408 (3d Cir. 1996).

as a valuation tool for individual securities." Ex. 26.[5]  In addition, the Complaint does not plead

facts showing how these subprime-only indices of RMBS issued in 2006 and 2007, *see* Compl. ¶ 67,

are relevant to evaluating the performance of the Financial Services investment portfolio.[6]  There

were significant intervening events—including the demise of Bear Stearns in March 2008—that

plaintiff does not adequately address in her conclusory pleading.  Finally, plaintiff fails to plead the

existence of any reports or other facts to suggest that Ambac actually evaluated the value of the port-

folio in the manner plaintiff urges.

**B.    Plaintiff fails to plead with particularity that Ambac's statement regarding its plans for meeting collateral requirements was materially misleading.**

**1.    No reasonable investor could interpret the collateral requirements statement as an open-ended guarantee that, no matter how the Financial Services portfolio performed or how much Ambac Assurance's ratings might be downgraded in the future, Ambac would satisfy any collateral posting requirement by "simply" selling securities in the Financial Services portfolio.**

"The test for whether a statement is materially misleading under Section 10(b) . . . is

'whether the defendants' representations, taken together and in context, would have misled a reason-

able investor.'"  *Rombach* v. *Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004).  A court thus must con-

sider the context in which a statement appears.  *See, e.g.*, *I. Meyer Pincus & Assoc.* v. *Oppenheimer*

*& Co.*, 936 F.2d 759, 762 (2d Cir. 1991).  Each time the Complaint quotes the allegedly misleading

statement regarding Ambac's plan to "meet the collateral requirements," however, it stops short of

quoting the language that follows.  *See* Compl. ¶¶ 49, 72, 91.

After stating that "Ambac will meet the collateral requirements either by selling securities in

the Financial Services investment portfolio in the market or to Ambac Assurance," the passage goes

---

[5] *See also* Ex. 27, "Don't Mark to Markit," *Economist*, Mar. 6, 2008 (ABX indices "prone to distortion (mostly downwards) by heavy speculation" and too illiquid to "take the weight of short-selling heaped on them").  Plaintiff relies on the ABX indices in her Complaint as if they were relevant evidence for market pricing (Compl. ¶¶ 64-68); the Court may therefore consider public record explanations of the ABX indices as they reflect on the context and structure of these indices.  *See, e.g.*, *ECA* v. *JP Morgan Chase Co.*, 553 F.3d 187, 199 nn.3-4 (2d Cir. 2009) (reviewing accounting textbooks to glean more information on a particular type of transaction).

[6] Notably, (i) the investment portfolio's RMBS were collateralized by Alt-A, not subprime mortgages; (ii) a portion of the portfolio's RMBS were issued before 2006; and (iii) over half of the portfolio's first quarter 2008 losses had ***nothing to do with RMBS***.  *See* Ex. 9, 1Q 2008 10-Q at 69 tbl.

on to explain that, "[b]ased on the previously described rating agency actions by Moody's, Standard & Poor's and Fitch which occurred during January 2008, management subsequently identified certain investment securities in the Financial Services investment portfolio to potentially sell in order to satisfy additional collateral posting requirements upon a further ratings downgrade and/or to meet potential liquidity needs." Ex. 4 at 77. This sentence indicates that "the collateral requirements" Ambac plans to meet using the investment portfolio are those suggested by the January 2008 rating agency actions—Fitch's downgrade, as well as the possibility of further downgrades resulting from the negative ratings watches placed by Fitch, Moody's, and S&P. *See id.*; *see also id.* at 40-41, 73, 119 (discussing further the designation of certain securities for potential sale after the January 2008 ratings actions). Moreover, the paragraph goes on to point out that "Ambac can also enter into collateral swaps," and that "Ambac generally has the right to re-hypothecate collateral that it receives under derivative contracts." *Id.* at 77. These statements contradict plaintiff's assertion that Ambac was limiting its collateral posting options to the sale of securities alone. In sum, no reasonable investor could read the "collateral requirements" statement as an open-ended guarantee that, regardless of how far Ambac Assurance was downgraded in the future or how poorly the Financial Services portfolio performed, "Ambac could satisfy any collateral posting requirement by simply 'selling securities in the Financial Services portfolio.'" Compl. ¶ 24.

The Complaint also suggests that the July 7, 2008 press release revealed "for the first time" Ambac's "true plan" of utilizing transactions with Ambac Assurance to cover collateral posting obligations. *See* Compl. ¶ 53. But the "collateral requirements" sentence in the 2007 10-K *expressly contemplates* the possibility of "selling securities . . . *to Ambac Assurance*." Ex. 4 at 77 (emphasis added). Nor did the 2007 10-K limit Ambac Assurance's potential involvement to the purchase of securities. *See id.* ("Ambac can also enter into collateral swaps . . . *with Ambac Assurance*" (emphasis added)). In addition, the 8-K filed by Ambac on March 12, 2008—prior to plaintiff's DISCS purchase, *see* Compl. ¶ 126—explicitly noted that, in the event of a significant ratings downgrade, "it is likely that Ambac Assurance would need to lend or contribute investment assets or cash to the Financial Services businesses in order to satisfy [the resulting] collateral-posting obligations." Ex. 2

13

at 5.[7] And the 10-K disclosed that Ambac Assurance guaranteed Financial Services obligations. Ex. 4 at 147. In short, nothing in Ambac's stated plan for "meet[ing] collateral requirements" can be read as precluding transactions with Ambac Assurance at some future point. *Id.* at 77.

Moreover, the 2007 10-K contains a table estimating the collateral requirements that might arise under various future ratings downgrades—from $2.053 billion at then-current levels to over $8 billion for ratings five levels below that. *Id.* at 78. Investors were fully informed both as to the estimated value of the investment portfolio (*see id.* at 30) and the collateral increases that could result under various ratings downgrades (*see id.* at 78). They were also informed of the risks that allegedly led to Ambac Assurance's "depletion" (Compl. ¶ 86)—the possibility of material declines in the investment portfolio, as well as liquidity risks posed by reduced portfolio values, ratings downgrades, and increased collateral obligations. *See, e.g.*, Ex. 4 at 1, 24, 33, 36, 40-41, 46, 72, 75-78. These disclosures undermine any claim that a reasonable investor, reading the collateral requirements statement "in context," could reasonably interpret it as an open-ended guarantee that all future collateral requirements would be covered by selling securities in the Financial Services portfolio. *Rombach*, 355 F.3d at 172 n.7.

> ### 2. Ambac's statement of its plan to meet collateral requirements is a forward-looking statement that is nonactionable under the PSLRA and the "bespeaks caution" doctrine.

The PSLRA's safe harbor renders a forward-looking statement nonactionable when the statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" *or* where plaintiff fails to plead with particularity that the statement "was made with actual knowledge . . . that [it] was false or misleading." 15 U.S.C. § 78u-5(a)(1)-(2), (c)(1); *see Rombach*, 335 F.3d at 173; *In re Gilat Satellite Networks, Ltd. Sec. Litig.*, 2005 WL 2277476, at *11 (E.D.N.Y. 2005). And under the bespeaks caution doctrine, "alleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in

---

[7] The 2007 10-K expressly referred investors to risk factors disclosed in such subsequent reports on Form 8-K; investors were "advised to consult" these reports, which were made available on Ambac's website and the SEC's website. Ex. 4 at 2.

light of adequate cautionary language set out in the same offering." *Rombach*, 335 F.3d at 173.

In this case, Ambac's stated plan for meeting collateral requirements was clearly "identified as a forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i); *see* 2007 10-K at 1, 46 ("[F]uture or conditional verbs such as 'will' . . . identify forward-looking statements."); *id.* at 77 (discussing plans as to how "Ambac *will* meet the collateral requirements" (emphasis added)); *see also* 15 U.S.C. § 78u-5(i)(1) (defining "forward-looking statement" as "a statement of the plans and objectives of management for future operations"). In addition, the statement was accompanied by a detailed array of "meaningful cautionary statements" responding to the specific contingencies underlying plaintiff's allegations: a potential decline in the Financial Services investment portfolio and liquidity risks posed by ratings downgrades. 15 U.S.C. § 78u-5(c)(1)(A)(i); *see* Ex. 4 at 1, 24, 33, 36, 40-41, 46, 72, 75-78. *See generally* Stmt. of the Case, *supra*, Part B. For example, Ambac specifically warned that a material decline in the investment portfolio might result from "credit spread-widening with respect to our investment assets" (Ex. 4 at 40) and disclosed that the "significant widening" that had occurred in the second half of 2007 had continued into the first quarter of 2008 (*id.* at 83)—the risk plaintiff identifies as the primary cause of the first quarter losses (*see* Compl. ¶ 61). And not only did the 10-K repeatedly warn that ratings downgrades and increased collateral requirements might negatively impact Ambac's liquidity (*see* Ex. 4 at 1, 24, 33, 76), it also provided a table estimating the amount of collateral—from about $2 billion to more than $8 billion—that could be required under various ratings scenarios (*see id.* at 78). These warnings, among others, qualify as meaningful cautionary statements under the PSLRA's safe harbor and the bespeaks caution doctrine.

Alternatively, the "collateral requirements" statement is nonactionable under the PSLRA's safe harbor due to plaintiff's failure to plead with particularity that the statement "was made with actual knowledge" of its falsity. *See* 15 U.S.C. § 78u-5(c)(1)(B); *Gilat*, 2005 WL 2277476, at *11-*12, *15 ("The second prong of the PSLRA safe harbor immunizes 'forward-looking' statements that are not accompanied by cautionary language unless they are made with actual knowledge that they are misleading or false."). To satisfy this prong, plaintiff "must plead specific facts that support a strong inference that the Defendants had actual knowledge of the statements' falsity; in the absence

of such facts, the claims must be dismissed." *In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at

*12 (S.D.N.Y. 2004). As the discussion of scienter in Point II.B below demonstrates, the Complaint

fails to identify any reports provided to defendants at the time that contradicted the statements in the

2007 10-K. *See Teamsters Local 445* v. *Dynex Capital*, 531 F.3d 190, 196 (2d Cir. 2008).

### 3. The Complaint lacks particularized facts supporting its allegation of a portfolio decline in January and February so severe that "either there was already a collateral shortfall or it was evident that there was an extremely high risk of an imminent collateral shortfall" at the time Ambac's 2007 10-K was filed on February 29, 2008.

The Complaint's allegations are insufficient to demonstrate how the Financial Services port-

folio performed in January and February 2008. *See supra* Point I.A. *A fortiori*, the Complaint fails

to plead with particularity facts showing that as of the date the 10-K was filed there had been a de-

cline in the investment portfolio so great that "either there was already a collateral shortfall or it was

evident that there was an extremely high risk of an imminent collateral shortfall." Compl. ¶ 92.

There are no specific allegations identifying the investment portfolio's value as of February 29,

2008—the Complaint simply alleges that "most" of the first quarter decline of $1.9 billion occurred

in the first two months. *Id.* ¶¶ 63, 68. But even if one assumes that *all* of the first quarter 2008 de-

cline occurred in January and February, the resulting portfolio value of $5.9 billion would still be

almost three times the collateral requirements as of February 29, 2008 at existing ratings levels, and

more than double the amount required if Ambac Assurance were downgraded three additional levels.

*See* Ex. 4 at 78. In fact, even after the rating reviews initiated in January 2008 led to additional

downgrades in June 2008, the resulting "collateral and termination obligations [were] adequately

covered by the investment agreement asset portfolio." *See* Ex. 10. And even after those down-

grades, the portfolio's $5.6 billion value as of May 31, 2008 was still sufficient to cover collateral

requirements if Ambac Assurance were downgraded yet an additional level. *Id.*[8] Based on plain-

tiff's allegations, no collateral shortfall occurred until further ratings downgrades in November 2008

(Compl. ¶ 92)—after the demise of Lehman and the dramatic events of September and October

2008. *See* Stmt. of the Case, Part E, *supra*.

---

[8] The July 7 press release considers not only collateral requirements, but also a separate cost of $0.6 billion to $0.9 billion for investment agreement terminations. *See* Ex. 10.

C.     **In light of the graphic disclosures Ambac made prior to plaintiff's April 8, 2008 purchase, the Complaint fails to plead with particularity any misstatement or omission that was material or that an investor could reasonably rely on.**

A misstatement or omission is material under Rule 10b-5 if there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Basic*, 485 U.S. at 231-32. The "total mix" of information may include "information already in the public domain and facts known or reasonably available." *Garber* v. *Legg Mason, Inc.*, 2009 WL 3109914, at *2 (2d Cir. 2009). In addition to materiality, "[t]he general rule is that reasonable reliance must be proved as an element of a securities fraud claim." *Harsco Corp.* v. *Segui*, 91 F.3d 337, 342 (2d Cir. 1996).

1.     **Plaintiff fails to allege materiality.**

Plaintiff must plead facts demonstrating that any alleged misstatement or omission is material. *See ECA* v. *JP Morgan Chase Co.*, 553 F.3d 187, 202 n.8, 204-05 (2d Cir. 2009); *Garber*, 2009 WL 3109914, at *3. The only places that the Complaint even mentions the materiality is in a single heading and in a general recitation of the elements of the 10b-5 claim. *See* Compl. at 20, ¶ 135. This failure to allege particularized facts demonstrating materiality requires dismissal.

2.     **No reasonable investor—much less this purchaser of debt at a distressed price in the midst of the financial crisis— could justifiably rely on the alleged misstatements or view them as significantly altering the "total mix" of information available.**

In light of graphic disclosures made prior to plaintiff's DISCS purchase on April 8, 2008, the misstatements plaintiff alleges are immaterial as a matter of law and no reliance on them was justifiable. **First**, as noted, the 2007 10-K contained extensive cautionary language addressing the contingencies that plaintiff alleges later caused her losses. *See supra* Prelim. Statement; Point I.B.2. These and other risk factors were also reported in Ambac's other public filings, including, *inter alia*, disclosures in connection with the March 2008 equity offering and 8-Ks filed in January and March 2008. Such risk disclosures not only invoke the PSLRA's safe harbor provision (*see supra* Point I.B.2); they also demonstrate that any alleged misstatements or representations, "considered together and in context," are immaterial as a matter of law under the "bespeaks caution" doctrine because they would not "affect the total mix of information and thereby mislead a reasonable investor." *Halperin* v. *eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002); *accord Kemp* v. *Universal Am. Fin.*

*Corp.*, 2007 WL 86942, at *11 (S.D.N.Y. 2007); *In re Regeneron Pharm., Inc. Sec. Litig.*, 2005 WL 225288, at *15 (S.D.N.Y. 2005); *see also* 15 U.S.C. § 78u-5(c)(1)(A)(ii) (forward-looking state-ments not actionable when "immaterial").[9]

**Second**, the 2007 10-K informed investors as to the collateral requirements that might be triggered in the event of various potential future ratings downgrades, ranging up to $8 billion (*see* Ex. 4 at 78); that Ambac Assurance had guaranteed the collateral-posting obligations (*id.* at 147); and that transactions with Ambac Assurance might be used to address collateral requirements (*id.* at 77; *see also* Ex. 2 at 5). *See* Stmt. of the Case, Parts A-C, *supra*.

**Third**, investors were informed of the portfolio's $7.8 billion estimated value as of December 31, 2007. *See* Ex. 4 at 30. And while the 10-K did not address the portfolio's mid-quarter 2008 per-formance (and was not required to, *see* Point I.A, *supra*), other public filings made prior to plaintiff's DISCS purchase did. *See* Stmt. of the Case, Part C, *supra*.

**Fourth**, given the well-known financial crisis in late 2007 and early 2008 (including Bear Stearn's rapid implosion in March 2008, Ex. 30), investors were fully aware (if they had not been previously) that any investment portfolio ran the risk of incurring significant losses. "Investors are presumed to be aware of public information concerning market trends." *Yu* v. *State St. Corp.*, 2010 WL 668645, at *6 (S.D.N.Y. 2010); *accord Landmen Partners, Inc.* v. *Blackstone Group, L.P.*, 659 F. Supp. 2d 532, 545 (S.D.N.Y. 2009); *Phillips* v. *Kidder, Peabody & Co.*, 933 F. Supp. 303, 320 (S.D.N.Y. 1996). The deterioration of financial markets and mortgage-backed securities in particu-lar was well known. *See, e.g., In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024, at *21-22 (S.D.N.Y. 2006) (omissions were "immaterial in light of the wealth of publicly available informa-tion" including news reports); *In re Ambac Fin. Group, Inc., Sec. Litig.*, 2010 WL 727227, at *29

---

[9] With respect to materiality, SEC filings may be relied on to demonstrate that certain information is publicly available, *see Garber*, 2009 WL 3109914, at 3, and investors may be charged with knowl-edge of such documents, *see In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 374 & n.6 (E.D.N.Y. 2003). This is especially so where, as here, the Complaint specifically relies on the SEC filing (*see, e.g.,* Compl. ¶ 118 (citing March 2008 prospectus)), or where the allegedly fraudulent document refers shareholders to other SEC filings (*see* Ex. 4 at 2). *See Kramer*, 937 F.2d at 773-74 ("of course," courts may consider "related documents that bear on the adequacy of the disclosure"); *Keyspan*, 383 F. Supp. 2d at 372-74 & n.6.

(S.D.N.Y. 2010).[10]

The Complaint has not identified any information specific to the Financial Services investment portfolio that Ambac failed to disclose. Rather, the Complaint attempts to manufacture an alleged omission by pointing to the "well known" bursting of the housing bubble, *see* Compl. ¶ 29, and the performance of ABX indices that allegedly are "widely used in the industry as a benchmark for the performance of various types of mortgage backed securities," *id.* ¶ 65. However, such general market trends "are already part of the 'total mix' of information available to investors." *Landmen*, 659 F. Supp. 2d at 545; *see also Yu*, 2010 WL 668645, at *6.

**Finally**, the fact that plaintiff only paid 41.55% of the DISCS face value (Compl. ¶ 126) is powerful evidence that risks plaintiff now complains of were already well known.

**POINT II:    SCIENTER IS NOT PLED WITH THE REQUISITE PARTICULARITY.**

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2); *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The court must weigh all "plausible nonculpable explanations for the defendant's conduct," *id.*, and if after doing so the inference of scienter is merely "plausible" or "reasonable," the complaint will not survive a motion to dismiss. *Id.* at 314, 323-24.

**A.    Plaintiff has failed to adequately plead motive and opportunity.**

"In order to raise a strong inference of scienter through 'motive and opportunity' to defraud, Plaintiffs must allege that [defendants] 'benefitted in some concrete and personal way from the pur-

---

[10] In the *In re Ambac* decision, the court dismissed securities law claims based on allegations of misrepresentations in Ambac's March 2008 offering documents. *Id.* Noting that "drastic disclosures" of losses and other adversities had been made by Ambac beginning in January 2008, *id.* at *30, the court ruled that alleged misstatements in the March 2008 offering documents (which included Ambac's 2007 Form 10-K, which was incorporated into the March 2008 prospectus by reference) were "immaterial as a matter of law because no reasonable investor could have been misled based on the 'total mix' of information available." *Id.* at *29. The court did allow claims brought by purchasers prior to that time to go forward, but those claims were based upon allegations of misstatements made before the 2007 10-K was filed that are substantially different from those alleged in this case. *See id.* at *7-*10, *12.

ported fraud.'" *ECA*, 553 F.3d at 198. "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *Id.*

The Complaint's primary allegation is that Leonard was motivated by his desire to successfully raise $1.5 billion of capital through an equity offering in March 2008. Compl. ¶¶ 114-121, 124. As noted, however, the prospectus supplement for that offering—publicly available before plaintiff's April 8, 2008 purchase—fully informed investors of the risks that plaintiff claims were being fraudulently concealed. It stated that further ratings downgrades would result in "significant collateral-posting obligations," which "could have a material adverse effect on our liquidity" and would likely lead to loans or capital contributions from Ambac Assurance. Ex. 3 at S-8. It also reported on certain first quarter developments, including approximately $152 million in net unrealized losses in the Financial Services portfolio during January 2008. *See id.* at S-4. The recitation of risk factors goes on for pages. *See id.* at S-ii to S-iii, S-7 to S-21, S-28 to S-38, 3. The Complaint thus cannot use the March 2008 offering to show that Leonard had motive and opportunity to engage in fraud. *See, e.g., In re AlphaStar Ins. Group Ltd.*, 383 B.R. 231, 260-61 (S.D.N.Y. Bankr. 2008) (defendant "could not have obtained a benefit by attempting to cover-up facts that were 'clear based on public information'").[11]

The Complaint also generally alleges that Leonard was motivated by "his own financial well being," *see* Compl. ¶¶ 122-124, and by a desire to preserve Ambac's AAA rating, *see* Compl. ¶¶ 114-115, 121. Neither of these allegations is sufficient to establish a concrete and personal motive. *See Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("[A] plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold.");

---

[11] As a separate matter, the Complaint fails to plead facts showing that, as of February 29, 2008, Leonard "benefitted in some concrete and personal way" if the March 2008 offering was successful. *ECA*, 553 F.3d at 198. The Complaint does note that the compensation committee later authorized a bonus for Leonard, and it quotes the committee's report on Leonard's accomplishments, including the success of the March 2008 offering. *See* Compl. ¶ 124. However, the Complaint fails to allege that Leonard had any reason to believe at the time of the offering that his bonus a year later would somehow turn on the success of the March 2008 offering—and certainly not in a way that was not "common to most corporate officers." *ECA*, 553 F.3d at 198.

*Acito* v. *IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("[T]he existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of sci-enter."); *San Leandro Emergency Med. Group Profit Sharing Plan* v. *Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996) ("We do not agree that a company's desire to maintain a high bond or credit rating qualifies as a sufficient motive for fraud in these circumstances . . . ."); *see also Rombach*, 355 F.3d at 177; *ECA*, 553 F.3d at 198; *In re PXRE Group, Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 531 (S.D.N.Y. 2009).

**B.      The Complaint fails to plead "strong circumstantial evidence" of scienter.**

A plaintiff who cannot make the motive showing may still plead "strong circumstantial evi-dence of conscious misbehavior or recklessness," though the allegations "must be correspondingly greater." *ECA*, 553 F.3d at 198-99.

As an initial matter, because plaintiff's allegations of recklessness do not support a strong in-ference that defendants had ***actual knowledge*** of the statement's falsity (Compl. ¶¶ 93-103), they are insufficient to demonstrate liability for the forward-looking statement regarding Ambac's plans to meet collateral requirements. *See* 15 U.S.C. § 78u-5(c)(1)(B); *Aegon*, 2004 WL 1415973, at *12. In any case, plaintiff fails even to demonstrate recklessness by simply alleging that defendants were aware of the collateral requirements issue and that Leonard signed the 2007 10-K (Compl. ¶¶ 93-103). *See In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 485 (S.D.N.Y. 2006); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 381-82 (S.D.N.Y. 2004).

"Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Dynex*, 531 F.3d at 196; *see also, e.g.*, *Ressler* v. *Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 52 (E.D.N.Y. 1998) (plaintiffs must identify "specific contemporaneous data or information known to the defendant that was inconsistent with the representation in question"); *PXRE*, 600 F. Supp. 2d at 531. A "broad reference to raw data" is insufficient without "an allegation that these data had been collected into reports" that contradict de-fendants' alleged misstatements. *Dynex*, 531 F.3d at 196. Here, the Complaint does not even allege that "raw data" existed as of February 29, 2008 that showed the decline in the portfolio through Feb-

21

ruary 2008; still less does it allege that such data "had been collected into reports" provided to Leonard and showing that the 2007 10-K statements were false or misleading. *See id.* at 196-97.

Thus, plaintiff does not adequately plead scienter by asserting that Leonard must have known of the alleged portfolio decline because it was an "unprecedented event of historic proportions" and Leonard was Ambac's chief financial officer. Compl. ¶ 105. Such "[g]eneral allegations regarding the magnitude of the fraud or the organizational role of a defendant are insufficient to raise a strong inference of a defendant's scienter." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 304 (S.D.N.Y. 2008); *see, e.g.*, *In re Gildan Activewear, Inc., Sec. Litig.*, 636 F. Supp. 2d 261, 273 & n.6 (S.D.N.Y. 2009) (rejecting allegations that defendants "by virtue of their senior positions" must have known of problems making projected earnings "'impossible' or 'patently unrealistic'" to achieve). Equally unavailing is plaintiff's conclusory allegation that defendants must have known of the alleged portfolio decline because "Ambac monitors its portfolio on a continuous basis" (Compl. ¶ 106). *See, e.g.*, *Gildan Activewear*, 636 F. Supp. 2d at 273 (reference to "internal modeling" is insufficient without allegations as to "what those models revealed at the time" or how they might have affected the company's financial results); *Ladmen Partners, Inc.* v. *Globalstar, Inc.*, 2008 WL 4449280, at *16 (S.D.N.Y. 2008) (plaintiff cannot rely on "confidential internal monitoring activities" without "giv[ing] corroborating details, such as who conducted and analyzed the monitoring, what the reports generated during the course of such monitoring activities said, and why").

The only reports or statements plaintiff cites were made months ***after*** the 2007 10-K's filing. Plaintiff's description of the First Quarter 2008 10-Q as "misleading" (Compl. ¶¶ 107-110) is wholly without substance given that the 10-Q fully reported on the impact of the portfolio's first quarter losses (Ex. 9 at 30, 47, 57-58, 68-69, 72, 99-100) and provided comprehensive and graphic risk disclosures (*id.* at 27-28, 63-66, 85-91, 94-95, 99-100). Likewise, plaintiff's reference to the November 5, 2008 press release (*id.* ¶¶ 111-113) is irrelevant given that the liquidity gap calculations in that release were "***updated*** . . . ***as of September 30***." Ex. 12 at 6. In short, neither document provides any support for plaintiff's allegations that defendants acted with scienter as of the date of the 2007 10-K's filing.

C.    **The more compelling inference is that Ambac's financial disclosures reflected the information then available as events unfolded.**

Even if particularized facts had been pled supporting a cogent inference of scienter, "opposing inference[s] of nonfraudulent intent" are far more "compelling." *Tellabs*, 551 U.S. at 314, 323-24.

**First**, the more compelling, nonfraudulent inference for why defendants did not report mid-quarter monthly 2008 data in the 2007 10-K is that they had no duty to do so. *See* Point I.A *supra*.

**Second**, the suggestion that, on February 29, 2008, defendants were instantaneously aware of the alleged portfolio decline through February 2008 and its implications is implausible. The more compelling inference is that defendants had no such instantaneous awareness. Financial data takes time to gather, analyze, and collect into reports for review by senior officers, not to mention the time it takes to process that information for public release. Thus, it was not until its March filings that Ambac was able to provide unaudited financial information for the portfolio's *January* 2008 performance, supporting an inference that even as of that time the February data was still not available in usable form. Ex. 2 at 2; Ex. 3. at S-4.

**Third**, the fact that Ambac explicitly disclosed both the $7.8 billion value of the investment portfolio as of December 31, 2007 (Ex. 4 at 30) and the over $8 billion in estimated collateral requirements for potential future ratings downgrades (*id.* at 78) completely undercuts plaintiff's suggestion that defendants were trying to hide the possibility that the portfolio may not be sufficient to cover all collateral-posting obligations.

**Finally**, if Ambac were trying to hide the possibility that Ambac Assurance might participate in securities sales, loans, and capital contributions, why did it explicitly acknowledge all of these possibilities in SEC filings made prior to plaintiff's DISCS purchase in April 2008? *See, e.g.*, Ex. 2 at 5; Ex. 3. at S-8; Ex. 4 at 77. *See generally* Point 1.B.1, *supra*.

**POINT III:    THE COMPLAINT DOES NOT ADEQUATELY PLEAD LOSS CAUSATION.**

A Rule 10b-5 claimant must adequately plead "a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 342 (2005); *see* 15 U.S.C. § 78u-4(b)(4). Because a price decline can reflect a number of factors other than the alleged misrepresentations, *Dura*, 544 U.S. at 343, plaintiffs must plead loss causation "with sufficient specificity to

enable the court to evaluate whether the necessary causal link exists." *Teachers' Ret. Sys.* v. *Hunter*, 477 F.3d 162, 186 (4th Cir. 2007). "[I]f the connection is attenuated, or if the plaintiff fails to 'demonstrate a causal connection between the content of the alleged misstatements or omissions and "the harm actually suffered,"' a fraud claim will not lie." *Lentell*, 396 F.3d at 174 (citation omitted).

### A.   The Complaint itself asserts the July 7, 2008 press release "acknowledged the truth"— yet afterwards DISCS prices *went up*.

According to the Complaint, "Ambac finally acknowledged the truth" in a July 7, 2008 press release. Compl. ¶ 20; *see also id.* ¶¶ 52-53, 56. Therefore, due to this press release, the allegedly concealed facts "bec[a]me generally known." *Dura*, 544 U.S. at 344. For loss causation purposes, the question then is whether this July 7, 2008 disclosure caused the DISCS to depreciate. *See id.*[12] Yet plaintiff alleges no facts showing the impact of the July 7, 2008 disclosure on the value of the DISCS. There is good reason for this silence: As noted above, two days after the press release, DISCS prices rose *above* their pre-July 7 level, and the price then continued to *rise* steadily over the next two months. *See* Stmt. of the Case, Part D, *supra*. The lack of any DISCS price drop in response to the July 7 press release thoroughly refutes plaintiff's claim that alleged omissions in the 2007 10-K caused her losses.

Plaintiff attempts to plead loss causation by claiming that the risks allegedly concealed in the 2007 10-K "materialized," citing events from the end of 2008 through the second quarter of 2009. *See* Compl. ¶¶ 21-22, 76-83, 129-130. But by plaintiff's own allegations, these risks "had already been disclosed" in the July 7, 2008 press release, "so their revelation in [a later disclosing event] could not have caused [the DISCS] price to decline." *Teachers' Ret. Sys.*, 477 F.3d at 187-88.[13]

---

[12] *See also Amorosa*, 2010 WL 329956, at *21 (analyzing loss causation based on the court's determination of the "relevant corrective disclosure"); *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 545 (S.D.N.Y. 2007) ("[A] public disclosure, when alleged properly, is the incident which satisfies the loss causation requirement.").

[13] *See also Joffee* v. *Lehman Bros. Inc.*, 209 F. App'x 80, 81-82 (2d Cir. 2006) (rejecting argument that "the materialization of [concealed] risks caused [plaintiffs'] losses," because "all of the facts which plaintiffs allege were concealed were, in fact, revealed in various public filings"), *aff'g* 410 F. Supp. 2d 187, 191, 194 (S.D.N.Y. 2006) (same).

**B.    Plaintiff's allegations fail to demonstrate a causal link between the alleged misstatements and the loss that plaintiff alleges occurred after a July 2009 announcement that Ambac was exercising its right to defer interest payments.**

In any event, plaintiff fails to sufficiently plead an actual and proximate causal link between the alleged misstatements in the 2007 10-K and plaintiff's alleged loss after the July 2009 announcement of Ambac's decision to exercise its right (disclosed in the 2007 DISCS prospectus, *see* Stmt. of the Case, Part B, *supra*) to defer DISCS interest payments. *See Lentell*, 396 F.3d at 173. Plaintiff alleges that a series of intersubsidiary transactions between Ambac Assurance and the Financial Services subsidiaries depleted Ambac Assurance's liquidity and prevented it from paying dividends to Ambac in 2009. Compl. ¶¶ 21-22, 76-83, 86-87, 129-130. But the 2007 10-K fully disclosed that Ambac Assurance had guaranteed the obligations of the Financial Services subsidiaries. Ex. 4 at 147. The Complaint also ignores the fact that Ambac Assurance was precluded from paying 2009 dividends without regulatory approval due to its *2008* statutory net loss, and it pleads no facts addressing the role of "impairment on credit derivative exposures" as a nonfraudulent causal factor in this 2008 statutory net loss. *See, e.g.*, Ex. 14, 2008 Form 10-K at 88, 185-186.

Moreover, the Complaint fails to address the role of intervening market events, including the dramatic events of the fall of 2008, in Ambac's decision to defer DISCS interest payments and in Ambac Assurance's inability to pay dividends without statutory approval (Stmt. of the Case, Part E). "'[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases,' and a plaintiff's claim fails when 'it has not adequately ple[]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.'" *Id.* at 174 (alteration in original); *accord In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 2008 WL 2324111, at *7 (S.D.N.Y. 2008). And if nonfraudulent causal factors may have contributed to plaintiff's loss, plaintiff must allege "facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [defendant's] misstatements." *Lattanzio* v. *Deloitte & Touche LLP*, 476 F.3d 147, 157-58 (2d Cir. 2007); *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009).

## CONCLUSION

This Court should dismiss plaintiff's Complaint in its entirety and with prejudice.

WACHTELL, LIPTON, ROSEN & KATZ

/s/  Peter C. Hein_____
Peter C. Hein (pchein@wlrk.com)
C. Lee Wilson (clwilson@wlrk.com)
51 West 52nd Street
New York, NY  10019
(212) 403-1000

*Attorneys for Defendants*

March 9, 2010