JUDY EHRENREICH,

*Plaintiff,*

-*against*-

AMBAC FINANCIAL GROUP, INC. and SEAN T. LEONARD,

*Defendants.*

## Index No.:  09 Civ. 10173 (BSJ)

---

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

---

## SCHLAM STONE & DOLAN LLP
Richard H. Dolan, Esq.
Niall O'Murchadha, Esq.
26 Broadway – 19th Floor
New York, New York 10004
Telephone:    (212) 344-5400
Facsimile:    (212) 344-7677

*Attorneys for Plaintiff*
*JUDY EHRENREICH*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iii-vi

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT.............................................................................................................2

I.    DEFENDANTS MADE MISLEADING STATEMENTS AND OMISSIONS OF
MATERIAL FACT.............................................................................................3

    A.    Background To Defendants' Misleading Statements And Omissions....................3

        1.    During The First Two Months Of 2008, Investors Repeatedly Raised
Concerns About Ambac's Collateral Posting Obligations.........................3

        2.    In Early 2008, The Portfolio Suffered A Precipitous Decline In Value .....3

    B.    Defendants Made Misleading Statements And Omissions In The 10-K Report .....5

        1.    Ambac Misled Investors By Failing To Disclose That The Portfolio Had
Suffered A Precipitous Decline In Value....................................................5

        2.    Ambac Had A Duty To Disclose The Sharp Decline In The Portfolio's
Value ..........................................................................................................6

            a.    Once Ambac Chose To Speak About Its Plan Of "Selling
Securities," It Had A Duty To Be Accurate And Complete About
The Viability Of The Plan.............................................................6

            b.    SEC Regulations Required Ambac To Provide Up-To-Date
Information .................................................................................7

        3.    The Portfolio's Precipitous Decline In Value Was Material To Investors ..8

    C.    Neither The Safe Harbor Nor The "Bespeaks Caution" Defense Is Applicable......9

        1.    The Safe Harbor And "Bespeaks Caution" Defenses Are Inapplicable
Because The Crux Of The Complaint Is The Concealment Of Historical
Fact ............................................................................................................9

        2.    The Safe Harbor And "Bespeaks Caution" Defenses Are Inapplicable
Because Of The Absence Of Adequate Cautionary Language.................10

    D.    Defendants' Interpretation Of Ambac's Collateral Posting Assurances Ignores
Both The Plain Meaning And Context Of These Assurances................................11

    E.    Defendants Do Not Have A Corrective Disclosure Defense .................................12

II.     DEFENDANTS ACTED WITH SCIENTER ................................................................14

     A.     Plaintiff May Establish Scienter By Demonstrating That The Defendants Acted Recklessly ................................................................................................................14

     B.     Plaintiff May Demonstrate Recklessness By Showing That Defendants Ignored "Red Flags"....................................................................................................................15

     C.     The Financial Crisis In Early 2008 And The Resulting Market Volatility Were "Red Flags" That The Portfolio's Value As Of December 31, 2007, Was Not Indicative Of Its Value As Of February 29, 2008.....................................................15

     D.     Even Under Defendants' Best-Case Scenario, Mr. Leonard Was Extremely Reckless In Approving Ambac's Misleading Disclosure .....................................16

     E.     The Evidence Indicates That More Than Recklessness Was Involved ................17

     F.     The Inference Of Intentional Misconduct Is Buttressed By The Fact That Mr. Leonard Had A Motive To Issue The Misleading Statement .................................19

III.    PLAINTIFF RELIED ON DEFENDANTS MISLEADING STATEMENTS AND OMISSIONS..............................................................................................................20

IV.    PLAINTIFF'S LOSS WAS CAUSED BY THE MATERIALIZATION OF THE RISKS CONCEALED BY DEFENDANTS.............................................................................20

     A.     Loss Causation Can Be Established By Pleading The Materialization Of Concealed Risks, Including Risks Relating To Liquidity, Undercapitalization And Quality Of Collateral..........................................................................................20

     B.     The Materialization Of The Concealed Risk Need Not Be The Sole Cause Of Plaintiff's Loss...................................................................................................21

     C.     The Risk Concealed By Defendants Materialized And Caused Plaintiff's Loss...22

     D.     Issues Relating To The Chain Of Causation And Damages Involve Complex Factual Questions That Cannot Be Decided On A Motion To Dismiss ................22

     E.     Plaintiff Is Not Required To Show That The Price Of Her Securities Fell When The Truth Came Out .........................................................................................23

CONCLUSION....................................................................................................................24

# TABLE OF AUTHORITIES

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988) ..................................................................................23

*Caiola v. Citibank, N.A., N.Y.,*
    295 F.3d 312 (2d Cir. 2002) ........................................................................7

*Credit Suisse First Boston Corp. v. ARM Financial Group,*
    99 Civ. 12046, 2001 WL 30073 (S.D.N.Y Mar. 28, 2001) ..............................10

*Dura Pharmaceuticals., Inc. v. Broudo,*
    544 U.S. 336 (2005) ..................................................................................23

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,*
    553 F.3d 187 (2d Cir. 2009) ........................................................................8

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,*
    343 F.3d 189 (2d Cir. 2003) ......................................................................22

*Ganino v. Citizens Utilities Company,*
    228 F.3d 154 (2d Cir. 2000) ......................................................................14

*Global Crossing Estate Representative v. Winnick,*
    04 Civ. 2558, 2006 WL 2212776 (S.D.N.Y. Aug. 3, 2006) at *13 ...............23

*Goldman v. Belden,*
    754 F.2d 1059 (2d Cir. 1985) ......................................................................9

*Hall v. Children's Place Retail Stores, Inc.,*
    580 F. Supp. 2d 212 (S.D.N.Y. 2008) ......................................................7, 10

*Heller v. Goldin Restructuring Fund, L.P.,*
    590 F.Supp.2d 603 (S.D.N.Y. 2008) ......................................................20, 21

*Illinois State Bd. of Inv. v. Authentidate Holding Corp.,*
    09-1751-cv, 2010 WL 889294 (2d Cir. Mar. 12, 2010) ................................9

*In re AOL Time Warner, Inc. Sec. Litig.,*
    503 F.Supp.2d 666 (S.D.N.Y. 2007) ..........................................................23

*In re Ambac Financial Group, Inc. Sec. Litig.,*
    08 Civ. 41, 2010 WL 727227 (S.D.N.Y. February 22, 2010) ............2, 6, 10, 15

*In re Columbia 24 Sec. Litig.,*
    155 F.R.D. 466 (S.D.N.Y. 1994) ...............................................................14

*In re Comverse Technology, Inc. Sec. Litig.,*
    06-CV-1825, 2007 WL 680779 (E.D.N.Y. Mar. 2, 2007) ..............................23

*In re Comverse Tech., Inc. Sec. Litig.,*
    543 F. Supp 2d 134, (E.D.N.Y. 2008) ...............................................................15

*In re Dynex Capital, Inc. Sec. Litig.,*
    05 Civ. 1897, 2006 WL 314524 (S.D.N.Y. Feb. 10, 2006) ...............................21

*In re Flag Telecom Holdings, Ltd. Securities Litigation,*
    574 F.3d 29, __ (2d Cir. 2009)...........................................................................24

*In re Initial Pub. Offering Sec. Litig.,*
    544 F.Supp.2d 277 (S.D.N.Y. 2008).................................................................20

*In re Leslie Fay Cos. Sec. Litig.,*
    835 F.Supp. 167 (S.D.N.Y. 1993) .......................................................................4

*In re MBIA Sec. Litig.,*
    08-CV-264, 2010 WL 1253925 (S.D.N.Y. March 31, 2010) ...........................4, 7

*In re Morgan Stanley Information Fund Sec. Litig.,*
    592 F.3d 347 (2d Cir. 2010).................................................................................9

*In re Nortel Networks Corp. Sec. Litig.,*
    238 F.Supp.2d 613 (S.D.N.Y.2003)..................................................................9-10

*In re Omnicom Group, Inc. Sec. Litig.,*
    541 F.Supp.2d 546 (S.D.N.Y. 2008).................................................................20

*In re Openwave Sys. Sec. Litig.,*
    528 F.Supp.2d 236 (S.D.N.Y. 2007).................................................................22

*In re Parmalat Sec. Litig.,*
    375 F. Supp.2d 278 (S.D.N.Y. 2005).................................................................21

*In re Philip Services Corp. Sec. Litig.,*
    383 F.Supp.2d 463 (S.D.N.Y. 2004)...................................................................4

*In re Refco, Inc. Sec. Litig.,*
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)...............................................................15

*In re Regeneron Pharm., Inc. Sec. Litig.,*
    2005 WL 225288 (S.D.N.Y. Feb. 1, 2005)......................................................9, 10

*In re Sadia, S.A. Securities Litigation,*
    643 F.Supp.2d 521 (S.D.N.Y. 2009).................................................................10

*In re Vivendi Universal, S.A. Sec. Litig.,*
    634 F.Supp.2d 352 (S.D.N.Y. 2009).............................................................21, 22

*Lattanzio v. Deloitte & Touche LLP,*
    476 F.3d 147 (2d Cir. 2007)...................................................................................21

*Lentell v. Merrill Lynch & Co.,*
    396 F.3d 161 (2d Cir. 2005)..............................................................................21, 22

*Manavazian v. ATEC Group, Inc.,*
    160 F.Supp.2d 468 (E.D.N.Y.2001) ...................................................................10

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce,*
    2010 WL 961596, 08 Civ. 8143, 2010 WL 961596 (S.D.N.Y. March 17, 2010) ............15

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004)...............................................................................10

*S.E.C. v. Bremont,*
    954 F.Supp. 726 (S.D.N.Y. 1997) ......................................................................17

*S.E.C. v. Gallard,*
    95 Civ. 3099, 1997 WL 767570 (S.D.N.Y. Dec. 10, 1997)................................17

*Shapiro v. UJB Fin. Corp.,*
    964 F.2d 272 (3d Cir.1992)...................................................................................6

*South Cherry St. LLC v. Hennessee Group LLC,*
    573 F.3d 98 (2d Cir. 2009).............................................................................14, 15

*Steinberg v. PRT Group, Inc.,*
    88 F.Supp.2d 294 (S.D.N.Y.2000) ....................................................................10

*TSC Indus., Inc. v. Northway, Inc.,*
    426 U.S. 438 (1976)...............................................................................................8

*Varghese v. China Shenghuo Pharmaceutical Holdings, Inc.,*
    672 F.Supp.2d 596 (S.D.N.Y. 2009)...................................................................23

*Vladimir v. Bioenvision Inc.,*
    606 F. Supp .2d 473 (S.D.N.Y. 2008)...................................................................8

*Whalen v. Hibernia Foods PLC,*
    04 Civ. 3182, 2005 WL 1799370 (S.D.N.Y. Aug. 1, 2005) ..............................15

# RULES, STATUTES AND OTHER AUTHORITIES

15 U.S.C. § 78u-5(c)(1)(A)................................................................................10

17 C.F.R. § 229.303(a)(1)...................................................................................8

17 C.F.R. § 240.12b-15.....................................................................................14

F.R.C.P. Rule 10b-5............................................................................................2

F.R.C.P. Rule 12b(6)......................................................................................8, 22

## PRELIMINARY STATEMENT

Plaintiff's complaint is straightforward. In Ambac's 2007 10-K Report, filed with the SEC on February 29, 2008, Defendants assured investors that Ambac could satisfy its potential collateral posting obligations by "selling securities in the Financial Services investment portfolio." This assurance conveyed the message that the value of that portfolio (the "Portfolio") was sufficient to satisfy Ambac's potential collateral posting obligations and directly brought "into play" the Portfolio's value. Having put that subject "in play," Defendants had a duty to disclose to investors that the Portfolio had recently suffered massive losses which made Ambac's collateral posting plan unrealistic. Instead, Defendants concealed the losses, hiding from investors the risk that they posed to Ambac's collateral posting plan.

In their motion to dismiss, Defendants pretend that Plaintiff's complaint is about forward looking statements and Ambac's inability to guarantee the future. As a result, they never confront the essence of Plaintiff's Complaint, which is that Ambac misled her by failing to disclose massive losses that had **already** occurred. To make their motion look substantial, when in fact it is not, Defendants make many arguments and cite authorities by the score, evidently trusting in the old saying that "quantity has a quality all its own." As we show below, Defendants' arguments are unavailing. The most glaring deficiencies in Defendants' arguments include:

**First**, Defendants assert that they satisfied their duty by accurately disclosing the value of the Portfolio as of December 31, 2007. But, as the Complaint alleges, the Portfolio lost at least $950 million between then and February 29, 2008, when the 10-K was filed. Because Defendants put the value of the Portfolio "in play," they had a duty to disclose accurate, up-to-date information as to the Portfolio's value rather than misleadingly stale information. This duty also arose under specific SEC disclosure rules cited below.

**Second**, Defendants invoke the "safe harbor" and the "bespeaks caution" defenses. But the Second Circuit has held that those defenses only apply to forward-looking statements. Here, Plaintiff is complaining that Defendants failed to disclose a decline in the Portfolio's value that had **already** occurred. In addition, Defendants did not provide adequate cautionary language as required for these defenses. While risk factors warned that bad things **might** occur in the future, the 10-K did not even hint that the Portfolio had **already** suffered a precipitous decline in value.

**Third**, Defendants assert that in March 2008 Ambac disclosed that the Portfolio had incurred an estimated $152 million increase in net unrealized losses during January 2008. But this disclosure of a **$152 million** loss effectively concealed the much larger minimum **$950 million** decline that had occurred by the time the 10-K was filed on February 29, 2008. Moreover, absent the filing of an amendment to the 10-K, Plaintiff had no reason to suspect an error in the 10-K Report and had no duty to search subsequent filings for corrective disclosure.

**Fourth**, Defendants challenge Plaintiff's scienter allegation by suggesting that Mr. Leonard was unable to obtain up-to-date values for the Portfolio and, therefore, relied on December 31 values. However, the turbulent market fluctuations in early 2008 were obvious "red flags" putting Mr. Leonard on notice that the year-end value of the Portfolio was not indicative of its value two months later when the 10-K was filed. Under those circumstances, Mr. Leonard was at best extremely reckless if, without knowing the current value of the Portfolio, he assured investors that Ambac could meet its collateral posting obligations by selling assets from the Portfolio. While recklessness alone is sufficient to establish scienter, there are numerous other facts alleged in the Complaint that give rise to a strong inference of intentional misconduct.

**Fifth**, Defendants assert that Plaintiff's loss was caused by intervening events and challenge Plaintiff's damages. But these arguments involve complex factual questions that cannot be decided on a motion to dismiss. Defendants also argue that loss causation is absent because Plaintiff cannot show that her securities dropped in price when the truth came out. But this is not a fraud-on-the-market case and thus there is no requirement for such a showing. Here, Plaintiff has established direct causation based on actual reliance and the materialization of the risk concealed by Defendants.

Accordingly, Defendants' motion to dismiss must be denied.

## ARGUMENT

The substantive and pleading standards applicable to a 10b-5 claim have been summarized in numerous cases and are not repeated here. *See, e.g., In re Ambac Financial Group, Inc. Sec. Litig.*, 08 Civ. 41, 2010 WL 727227, at *15-*16 (S.D.N.Y. February 22, 2010). This memorandum demonstrates that Plaintiff has properly pleaded a claim under Rule 10b-5.

# I. DEFENDANTS MADE MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

## A. Background To Defendants' Misleading Statements And Omissions

Plaintiff's Complaint (cited in the form "¶ __") alleges that Defendants made misleading statements in Ambac's 2007 Form 10-K, filed with the SEC on February 29, 2008. ¶ 47. Set forth below is the relevant context against which the 10-K must be read.

### 1. During The First Two Months Of 2008, Investors Repeatedly Raised Concerns About Ambac's Collateral Posting Obligations

During January and February 2008, investors repeatedly questioned whether a downgrade of Ambac's credit rating would strain Ambac's liquidity by triggering massive collateral posting obligations. As detailed in the Complaint, the key events include:

- During January 2008, (i) Moody's placed Ambac and Ambac Assurance on review for possible downgrade (¶ 33); (ii) S&P placed the credit rating of both Ambac and Ambac Assurance on Credit Watch Negative (¶ 34); and (iii) Fitch downgraded Ambac Assurance's insurance financial strength rating from AAA to AA, downgraded Ambac's rating from AA to A and indicated that the ratings remained on Ratings Watch Negative (¶ 35).

- On January 18, 2008, William Ackman, a prominent hedge fund manager, wrote to Moody's and S&P questioning the adequacy of Ambac's capital. ¶ 38. Mr. Ackman warned that, in the event of a ratings downgrade, Ambac's collateral posting obligations would put a severe strain on its liquidity. *Id.* The Ackman letter was widely reported in the media and was posted on the internet. ¶ 39.

- After Mr. Ackman raised the issue of Ambac's collateral posting obligations, other institutional investors began to focus on this issue. ¶ 41. For example, on January 23, 2008, Ambac held a conference call to discuss Ambac's fourth quarter 2007 results. ¶ 42. During this call, several investors raised questions concerning Ambac's collateral posting obligations and the liquidity implication of these obligations. ¶¶ 42-46.

By the time Ambac filed its 10-K Report on February 29, 2008, the issue of Ambac's collateral posting obligations was the focus of strong investor attention. ¶ 93.

### 2. In Early 2008, The Portfolio Suffered A Precipitous Decline In Value

The Complaint demonstrates that:

- During the first quarter of 2008, the Portfolio's value declined from $7.8 billion at December 31, 2007 to $5.9 billion at March 31, 2008, representing a loss in value of $1.9 billion or 24%. This was an unprecedented loss of historical proportions. ¶¶ 57-58.

- The first quarter 2008 decline in the Portfolio's value did not suddenly occur in March. ¶ 63. Rather, there was a sustained decline throughout the quarter. ¶¶ 63-68. By the time Ambac filed its 10-K Report on February 29, 2008, most of the decline had already occurred. *Id.*

- As a result of this loss in value, when the 10-K Report was filed on February 29, 2008, either the Financial Services Subsidiary already had insufficient assets to meet its collateral posting obligation or it was evident that there was an extremely high risk of an imminent collateral shortfall.[1] ¶ 73.

Defendants never directly dispute Plaintiff's claim that the Portfolio suffered a huge loss during the first two months of 2008. Instead, they challenge Plaintiff's use of various Markit ABX indices to support her claim. Defs. Mem. at 11-12, 16. But Defendants certainly know today the exact value of the Portfolio as of February 29, 2008. While Defendants have kept this information secret for now, the fact remains that this information is peculiarly within Defendants' knowledge and Plaintiff is thus entitled to leeway in pleading. *See In re Philip Services Corp. Sec. Litig.*, 383 F.Supp.2d 463, 476 (S.D.N.Y. 2004) ("However, such facts are peculiarly within Deloitte's knowledge, and thus are not required at the pleading stage"); *In re Leslie Fay Cos. Sec. Litig.*, 835 F.Supp. 167, 174 (S.D.N.Y. 1993) ("[T]he specifics of BDO's auditing procedures strike us as the type of facts which are particularly within defendants' knowledge and therefore, need not be included in the complaint."). In all events, Defendants fact-based challenge to Plaintiff's use of various Markit ABX indices is not appropriate on a motion to dismiss because it would require the Court to delve into complex factual disputes. *See, e.g., In re MBIA Sec. Litig.*, 08-CV-264, 2010 WL 1253925, at *11 (S.D.N.Y. March 31, 2010) ("[T]he Court will not decide on a motion to dismiss the fact-intensive inquiry of what meaning the market ascribed to the term 'ABS.'").

---

[1] As noted in the Complaint, on July 7, 2008, Ambac issued a press release in which it acknowledged for the first time that the value of the Portfolio was insufficient to satisfy the potential collateral posting obligations of the Financial Services Subsidiary and that the potential shortfall amount was $1.1 billion. ¶ 52. Although Ambac disclosed this potential shortfall in July 2008, the events which gave rise to it occurred in the first quarter of 2008. ¶¶ 56-68. Its consequences were felt later when the shortfall finally materialized. ¶¶ 74-83, 129.

**B.  Defendants Made Misleading Statements And Omissions In The 10-K Report**

**1.  Ambac Misled Investors By Failing To Disclose That The Portfolio Had Suffered A Precipitous Decline In Value**

In its 10-K Report (filed as Defs. Ex. 4), Ambac directly addressed investor concerns about its collateral posting obligation.[2] ¶45. Ambac's response was to assure investors that collateral posting would not pose a problem because the Financial Services Subsidiary could satisfy any collateral posting requirement by "selling securities in the Financial Services portfolio". ¶46. Specifically, Ambac stated:

> Ambac has posted collateral of $2,179.2 million under its outstanding investment agreements at December 31, 2007. In the event that Ambac Assurance is further downgraded, Ambac may be required to post incremental collateral to its investment agreement counterparties, introducing liquidity risk....
>
> Ambac manages its liquidity risk through the maintenance of liquid collateral and bank liquidity facilities. **Ambac will meet the collateral requirements either by selling securities in the Financial Services investment portfolio in the market or to Ambac Assurance.**

¶ 49 (quoting from the 10-K Report; emphasis added). *See* Def. Ex. 4, 10-K Report at 76-77.

That assurance conveyed the clear message that the Portfolio's value was sufficient to satisfy the potential collateral posting obligations of the Financial Services Subsidiary, and that Ambac would be able to meet these obligations by "selling securities in the Financial Services investment portfolio." ¶ 50. That representation in the 10-K made the Portfolio's current value extremely important to investors. Only by knowing the Portfolio's value could a reasonable investor assess whether Ambac's plan to satisfy its collateral posting obligations "by selling securities in the Financial Services investment portfolio" had a realistic chance of success.

But despite the critical importance to investors of the Portfolio's current value, Ambac concealed this information. ¶¶ 69-73. Nothing in the 10-K Report even hints that the Portfolio had suffered a sharp decline in value during the first two months of 2008. *Id.* Even less is there any suggestion that this decline posed serious risks to Ambac's plan to satisfy its collateral posting obligations by selling securities from that Portfolio. *Id.* Yet, as of the date of the filing

---

[2] The version of the 10-K filed as Defs. Ex. 4 is paginated differently from the version of the same 10-K used to prepare the Complaint. The page citations to the 10-K in this memo refer to Defs. Ex. 4, and are thus different from the page citations to the 10-K in the Complaint.

of the 10-K Report, either there was already a collateral shortfall or it was evident that there was an extremely high risk of an imminent collateral shortfall. *Id.*

Instead of telling investors the value of the Portfolio as of February 29, 2008 when the 10-K Report was filed, Ambac misleadingly provided the value as of December 31, 2007:

> As of December 31, 2007, the Financial Services investment portfolio had an aggregate fair value of approximately $7.8 billion and an aggregate amortized cost of approximately $8.1 billion.

¶ 70 (quoting from the 10-K Report). *See* Def. Ex. 4, 10-K Report at 30.

The crux of Plaintiff's Complaint is that Ambac misled investors about its ability to meet its collateral posting obligations by failing to disclose the precipitous decline in the value of the Portfolio that occurred after December 31, 2007 and before Ambac filed its 10-K Report on February 29, 2008.

### 2. Ambac Had A Duty To Disclose The Sharp Decline In The Portfolio's Value

Defendants argue that Ambac did not have a duty to disclose the Portfolio's precipitous decline in value. Defs. Mem. at 10-11. The essence of their argument is that, under the periodic disclosure system, Ambac was not required to disclose in its 2007 10-K Report the adverse events that occurred during the first two months of 2008, even though those events occurred prior to the filing of the 10-K Report. *Id.* Defendants are mistaken.

### a. Once Ambac Chose To Speak About Its Plan Of "Selling Securities," It Had A Duty To Be Accurate And Complete About The Viability Of The Plan

Ambac assured investors that it would meet its collateral posting obligations "by selling securities in the Financial Services investment portfolio." This assurance conveyed the message that the value of the Portfolio was sufficient to satisfy Ambac's potential collateral posting obligations and directly brought "into play" the subject of the Portfolio's value. Having put that subject "in play," Ambac had a duty to speak truthfully about the Portfolio's decline in value. *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir.1992) ("[I]f a defendant represents that its… collateralization is 'adequate,' the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations …"); *In re Ambac*, 2010 WL 727227, at *24 n.34 ("[O]nce Ambac management compared the company's portfolio to the ABX index, the subject is 'in play' and management is bound to speak truthfully.") (citing *Schapiro*, 964 F.2d at 282).

The law on this issue was recently summarized by the court in *In re MBIA*:

> Of course, the lack of an independent duty to speak in the first instance becomes irrelevant once a party chooses to discuss material issues, because upon choosing to speak one "ha[s] a duty to be both accurate and complete." *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002); *see also Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 226 (S.D.N.Y. 2008) ("Once defendants choose to speak . . ., they undertake a duty to speak truthfully and to make such additional disclosures . . . necessary to avoid rendering the statements misleading." (Internal quotation marks omitted; second ellipses in original).

*In re MBIA*, 2010 WL 1253925, at *9.

Ambac assured investors that "by selling securities in the Financial Services investment portfolio" it would be able to meet its potential collateral posting obligations. Having chosen to speak on that subject – and particularly in light of investor concerns that prompted Ambac to speak about it, ¶¶ 43-46 – Ambac had a duty to be both accurate and complete and to make such additional disclosures as were necessary to avoid misleading the public. By concealing the Portfolio's precipitous decline in value which rendered Ambac's plan unrealistic, Defendants violated their duty and misled investors.

**b.    SEC Regulations Required Ambac To Provide Up-To-Date Information**

The SEC has promulgated specific instructions which govern the preparation of the Form 10-K. Part C of those instructions provides in pertinent part:

> (2)    Except where information is required to be given for the fiscal year or as of a specified date, **it shall be given as of the latest practicable date.**
>
> (3)    Attention is directed to Rule 12b-20, which states: "In addition to the information expressly required to be included in a statement or report, **there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading.**"

Pltf. Ex. 1 at 1-2 (also available at http://sec.gov/about/forms/form10-k.pdf) (emphasis added).

The instructions make clear that, absent a specific requirement to the contrary, the information in a Form 10-K must speak as of the "latest practicable date" and include any information necessary to make its disclosures not misleading. Despite Defendants' suggestions

to the contrary, no SEC rule directed Ambac to make collateral posting assurances based on outdated year-end data. To the contrary, under the SEC's rules Ambac had a duty to base its assurances on up-to-date values and to provide the information necessary to make its assurances not misleading. *See Vladimir v. Bioenvision Inc.*, 606 F. Supp .2d 473, 485 (S.D.N.Y. 2008) ( "[A] duty to disclose arises . . . when the SEC's rules require disclosure . . . .").

In addition, Item 303 of Regulation S-K governs the disclosures that an issuer must make in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of a 10-K Report (hereinafter the "MD&A"). Item 303(a)(1) mandates that the issuer discuss liquidity and "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." 17 C.F.R. § 229.303(a)(1).

Ambac included its collateral posting assurances in the MD&A section of its 10-K Report under the caption "Liquidity and Capital Resources." Defs. Ex. 4, 10-K Report at 73, 77-78. Under Item 303, Ambac had a duty to disclose "known trends," "events" and "uncertainties" that were reasonably likely to materially impact the success of its collateral posting plan and thus its liquidity. If Ambac had a duty to disclose "trends," then *a fortiori* Ambac had a duty to disclose adverse events that had *already* occurred (even if these events occurred after December 31, 2007). By concealing the fact that the Portfolio had declined significantly in value during the first two months of 2008, Ambac concealed a key risk to its liquidity in violation of the duty of disclosure imposed by Item 303 of Regulation S-K.

In reading the 10-K, Plaintiff had every right to believe that Ambac's collateral posting assurances were based on up-to-date values. By concealing the fact that the Portfolio had suffered a precipitous decline in value during the first two months of 2008, Defendants mislead Plaintiff in violation of the specific instructions promulgated by the SEC.

### 3. The Portfolio's Precipitous Decline In Value Was Material To Investors

An omission is material if there is a substantial likelihood that the "disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of the information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009). When presented with a Rule 12(b)(6) motion, "a

complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir. 1985). *See also In re Morgan Stanley Information Fund Sec. Litig.,* 592 F.3d 347, 360 (2d Cir. 2010).

Whether Ambac's plan to satisfy its collateral posting obligations "by selling securities in the Financial Services investment portfolio" was realistic turned critically on the Portfolio's value. By concealing the fact that the Portfolio's value had declined by at least $950 million[3], Ambac deprived investors of critical information having obvious importance to them, as shown, *inter alia,* by their direct questions during the January calls. Ambac's failure to disclose this information was a material omission.

### C. Neither The Safe Harbor Nor The "Bespeaks Caution" Defense Is Applicable

### 1. The Safe Harbor And "Bespeaks Caution" Defenses Are Inapplicable Because The Crux Of The Complaint Is The Concealment Of Historical Fact

The essence of Plaintiff's Complaint is that Ambac misled her by failing to disclose the precipitous decline in the value of the Portfolio that had **already** occurred. Thus, Plaintiff is not complaining (as Defendants suggest) that Ambac could not foresee or guarantee the future. Rather, Plaintiff is complaining that Defendants concealed historical facts which they had a duty to disclose.

The Second Circuit has held that both the PSLRA safe harbor and the "bespeaks caution" defenses only apply to forward-looking statements. *Illinois State Bd. of Inv. v. Authentidate Holding Corp.*, 09-1751-cv, 2010 WL 889294, at *3 (2d Cir. Mar. 12, 2010). Because Plaintiff is complaining about concealment of historical fact, neither the PSLRA safe harbor nor the "bespeaks caution" defense is applicable. *See In re Regeneron Pharm., Inc. Sec. Litig.*, 2005 WL 225288, at*13 (S.D.N.Y. Feb. 1, 2005) ("Statements that might arguably have some forward-looking aspect are unprotected by the PSLRA safe harbor provision to the extent that they are premised on representations of present fact."); *In re Nortel Networks Corp. Sec. Litig.*, 238

---

[3] During the first quarter of 2008, the Portfolio suffered a decline in value of $1.9 billion. ¶ 57. Most of this decline had occurred by February 29, 2008 when the 10-K was filed. ¶¶ 63, 68. Thus, the Complaint alleges a decline in value of at least $950 million (i.e., 50% of the $1.9 billion loss for the quarter). The exact amount is peculiarly within Defendants' knowledge.

F.Supp.2d 613, 629 (S.D.N.Y.2003) ("even when an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply") (internal quotations omitted); *Manavazian v. ATEC Group, Inc.*, 160 F.Supp.2d 468, 481 (E.D.N.Y.2001) (same).

### 2. The Safe Harbor And "Bespeaks Caution" Defenses Are Inapplicable Because Of The Absence Of Adequate Cautionary Language

The judicial "bespeaks caution" doctrine only applies when there is adequate cautionary language. *See, e.g., Steinberg v. PRT Group, Inc.*, 88 F.Supp.2d 294, 301 (S.D.N.Y.2000); *In re Ambac*, 2010 WL 727227, at *28. Likewise, in a case where the plaintiff alleges intentional misrepresentation, the PLSRA safe harbor only applies when there is adequate cautionary language. 15 U.S.C. § 78u-5(c)(1)(A).

"Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004). "Moreover, discussing hypothetical risks that might occur in the future does not adequately disclose actual problems that already have materialized." *In re Regeneron Pharmaceuticals, Inc. Sec. Litig.* 2005 WL 225288 at *19 (S.D.N.Y. Feb. 1, 2005). Even if Defendants disclose specific risks, this will not "shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." *Credit Suisse First Boston Corp. v. ARM Financial Group,* 99 Civ. 12046, 2001 WL 30073, at *7 (S.D.N.Y Mar. 28, 2001).

The 10-K Report is full of warnings that bad things ***might*** occur in the future, but Defendants never disclosed that the Portfolio had ***already*** suffered a precipitous decline in value. Nor did Defendants give any hint that this decline ***already*** posed serious risks to Ambac's plan to satisfy its collateral posting obligations by selling securities from this Portfolio. Thus, the risk factors in the 10-K Report cannot qualify as "meaningful cautionary statements" with respect to the omission alleged by Plaintiff. *See In re Sadia, S.A. Securities Litigation*, 643 F.Supp.2d 521, 526 (S.D.N.Y. 2009) (forward looking statements are not protected "where defendants had no basis for their optimistic statements and **already knew** (**allegedly**) that **certain risks** had become reality.") (emphasis in original; internal citations and quotation marks omitted); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F.Supp.2d 212, 226 (S.D.N.Y. 2008) (same).

### D. Defendants' Interpretation Of Ambac's Collateral Posting Assurances Ignores Both The Plain Meaning And Context Of These Assurances

Defendants argue that Ambac's collateral posting assurances were not misleading because Ambac had sufficient assets to meet its collateral posting obligations as long as Ambac was not downgraded below A+/A1. Defs. Mem. at 13, 16. In other words, Defendants argue that the 10-K's collateral posting assurances should be read as only addressing a scenario where Ambac was downgraded in a manner that did not trigger its maximum collateral posting obligations. Defendants' attempt to rewrite the 10-K in that fashion is untenable in view of both the plain meaning and context of Ambac's assurances.

Ambac did not issue its collateral posting assurances in a vacuum. Instead, as detailed above, Ambac made these assurances after investors repeatedly raised questions about Ambac's collateral posting obligations and the resulting liquidity implications. The questions during Ambac's January investor call made it clear that investors were concerned about Ambac's ability to meet its maximum potential collateral posting obligations -- *not* some small subset of these obligations, as Defendants' lawyers now suggest.

For example, one investor asked, "[o]n the collateral, I think you said earlier in the call that presently you are posting $2.1 billion of collateral. And that under some circumstances, it could grow to either $5 billion or $7 billion, roughly . . . . It wasn't clear earlier what the triggers are for the increase from [2.1] to 5 to 7. And whether there are any obstacles to posting the collateral, additional collateral, if you were called on to do so . . . ." ¶ 43. Similarly, after Mr. Leonard mentioned that Ambac could be required to post between $5 billion to $7 billion of collateral under certain downgrade scenarios, an investor asked, "Okay. And do you feel that you can accomplish that? That seems pretty steep for the $5 billion to $7 billion number." ¶ 45.

During the conference call, Mr. Leonard did not give a clear answer to these questions about how Ambac planned to satisfy its collateral posting obligations. ¶ 46. Instead, he did so several weeks later in the 10-K Report by making the collateral posting assurances quoted above. These assurances were unqualified and did not in any way indicate that they were limited to only certain downgrade scenarios.

To the contrary, in the paragraph immediately following its collateral posting assurances, Ambac provided a chart showing Ambac's potential collateral posting obligations under various

downgrade scenarios, including downgrades all the way to A-/A3 (the downgrade which triggered the maximum collateral posting obligation). Defs Ex. 4, 10-K Report at 78. Clearly Ambac was addressing *all* downgrade scenarios in the 10-K—not just those where Ambac's ratings did not go below A+/A.

To suggest, as Defendants do, that Ambac's collateral posting assurances only addressed the least material subset of the potential downgrades shown in Ambac's downgrade chart ignores both the plain meaning and context of those assurances.[4]

### E.    Defendants Do Not Have A Corrective Disclosure Defense

Defendants argue that, while the 10-K did not disclose the Portfolio's steep loss in value, Ambac did disclose in March 2008 that the Portfolio had incurred an estimated $152 million increase in net unrealized losses during January 2008. Defs. Mem. at 7, 11, 18. The disclosure cited by Defendants appears in: (i) a prospectus supplement filed on March 6, 2008 in connection with a public offering of Ambac's common stock (Defs. Ex. 3 at S-4); and (ii) an 8-K filed on March 12, 2008 (the "March 8-K") (Defs. Ex. 2 at 2).

---

[4] The only support that Defendants offer for their reading is the following sentence which appears after Ambac's collateral posting assurances:

> Based on the previously described rating agency actions by Moody's, Standard & Poor's and Fitch which occurred in January 2008, management subsequently identified certain investment securities in the Financial Services investment portfolio to potentially sell in order to satisfy additional collateral posting requirements upon a further ratings downgrade and/or to meet potential liquidity needs.

(Defs. Mem. at 12-13; Def. Ex. 4, 10-K Report at 77).

That sentence does not in any way support Defendant's strained reading. The sentence told investors that Ambac had already identified certain assets that would likely be sold in the near term. This was important because, as Ambac disclosed elsewhere in the 10-K, a portion of the securities identified were in an unrealized loss position and, as a result, Ambac "recorded an impairment write-down of $40.1 million . . . because we do not have the intent to hold the securities for a period of time sufficient to allow for any anticipated recovery in market value." Def. Ex. 4, 10-K Report at 77. The fact that Ambac told investors that it had already identified assets for sale in the event that the most likely, near-term downgrade scenarios occurred does not in any way suggest that Ambac's unqualified collateral posting assurances were limited to those near-term downgrade scenarios.

Ambac's subsequent disclosure that in January the Portfolio had a **$152 million** decline in value served, in context, only to hide the more than **$950 million** decline that the Complaint alleges had occurred by February 29, 2008 (the date the 10-K was filed). *See supra* note 3 and accompanying text. Thus, the disclosure of the January decline did not inform anyone that a much larger decline had *already* occurred prior to the filing of the 10-K.

Furthermore, when Ambac subsequently disclosed the January decline, Ambac did not mention, let alone retract, the misleading collateral posting assurances it had previously made in the 10-K Report. Thus, a reader of the subsequent filings was not likely to connect the dots and interpret the disclosure of the January decline as a repudiation or correction of the misleading collateral posting assurances that Ambac had previously made, particularly since the disclosure of the January decline was not made in the context of any discussion relating to collateral posting.

Defendants also argue that the March 8-K included a risk factor that warned that collateral posting "could have a material adverse effect on our liquidity" and that "it is likely that Ambac Assurance would need to lend or contribute investment assets or cash to the Financial Services business in order to satisfy these collateral- posting obligations." Defs. Mem. at 7. But the only thing that Ambac told investors in the March 8-K was that collateral posting *could* have an adverse effect on liquidity and that a loan or capital contribution *might* be required. That is a far cry from telling investors that the Portfolio had *already* suffered a precipitous decline in value. Even without any decline in value, collateral posting would have squeezed liquidity and a temporary loan or capital contribution might have been advisable in order to avoid a fire sale of the Portfolio or the realization of losses in the Portfolio.[5] Thus, a reader of this risk factor in the March 8-K was not likely to understand it as a repudiation or correction of the misleading collateral posting assurances that Ambac had previously made in the 10-K.

For these reasons, none of Ambac's subsequent disclosures was sufficient to negate the misleading collateral posting assurances that Defendants made in the 10-K. See *Ganino v.*

---

[5] When Ambac finally disclosed the collateral-posting shortfall in its July 7 press release, Ambac indicated that it would use the resources of Ambac Assurance (as opposed to the resources of the Financial Services Subsidiary) to satisfy collateral posting obligations of the Financial Services Subsidiary because "[u]tilizing the resources of AAC would allow time for the assets in the investment agreement portfolio to recover in value . . . and prevent the realization of losses . . . ." Defs. Ex. 10.

*Citizens Utilities Company*, 228 F.3d 154, 167 (2d Cir. 2000) ("corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements.") (internal citation and quotation marks omitted). Further, the "truth-on-the market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a §10(b) complaint for failure to plead materiality." *Ganino*, 228 F.3d at 167; *see also In re Columbia 24 Sec. Litig.*, 155 F.R.D. 466, 482-83 (S.D.N.Y. 1994) ("[D]efendants' burden [of establishing the truth-on-the-market defense is] extremely difficult, perhaps impossible, to meet at the summary judgment stage.").

Even if Ambac had made adequate corrective disclosure in the March 8-K, this would not constitute a corrective disclosure defense because the instant case is not a fraud-on-the-market case. *See infra.* Thus, the relevant question is whether Plaintiff (as opposed to the market) learned, or had a duty to learn, the truth from the alleged corrective disclosure. Defendants do not claim that Plaintiff read or had actual knowledge of the purported corrective disclosure in the March 8-K. Nor do they cite any authority for the proposition that Plaintiff, after reading Ambac's 10-K Report, had a duty to monitor Ambac's subsequent filings for possible corrective disclosures. The 10-K Report is an annual report requiring comprehensive disclosure. *See http://sec.gov/about/forms/form10-k.pdf.* If the 10-K contained an error, SEC rules provided a mechanism for correcting it by filing an amendment to the 10-K. *See* 17 C.F.R. § 240.12b-15. Absent the filing of an amendment, Plaintiff had no reason to suspect an error in the 10-K and no duty to search subsequent filings for corrective disclosure. Thus, even if Ambac had included adequate corrective disclosures in its March 8-K, this would not affect Plaintiff's claim.

## II. DEFENDANTS ACTED WITH SCIENTER

### A. Plaintiff May Establish Scienter By Demonstrating That Defendants Acted Recklessly.

It is well established that "the scienter element can be satisfied by a strong showing of reckless disregard for the truth." *South Cherry St. LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009). And one clear example of reckless disregard is where "defendants failed to review or check *information that they had a duty to monitor* ..." *Id.* (emphasis in original). "Like any allegation of recklessness in tort, the plaintiff need only identify conduct that is 'highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the

defendant must have been aware of it.'" *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 08 Civ. 8143, 2010 WL 961596, at *7 (S.D.N.Y. March 17, 2010) (citing *South Cherry*, 573 F.3d at 109).

Once Plaintiff demonstrates recklessness, there is no need to demonstrate Defendants' conscious misbehavior or a specific motive. As a court in this District recently stated:

> [W]hen motive is lacking, plaintiff may establish a "strong inference" of scienter, under Second Circuit case law, by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. . . . Plaintiffs allege no facts to support an inference that defendants engaged in "conscious misbehavior." Accordingly, the issue before the court is whether plaintiffs have adequately pleaded "recklessness."

*In re Ambac*, 2010 WL 727227, at *19 (internal quotation marks, footnotes and citations omitted).

### B. Plaintiff May Demonstrate Recklessness By Showing That Defendants Ignored "Red Flags"

"The inquiry into whether corporate officers should have known of facts indicating the falsity of public statements is a fact-specific one; scienter may be found where there are specific allegations of various reasonably available facts, or 'red flags,' that should have put the officers on notice that the public statements were false." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) (internal quotation marks and citations omitted). *See also In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp 2d 134, 142 (E.D.N.Y. 2008) (finding scienter where it was alleged that red flags were so obvious that defendants "must have been aware" of the alleged fraud); *Whalen v. Hibernia Foods PLC*, 04 Civ. 3182, 2005 WL 1799370, at *3 (S.D.N.Y. Aug. 1, 2005) ("PwC knew about and ignored a wide variety of 'red flag' incidents or events, that should have put PwC on notice that fraud was afoot, and that taken together they are sufficient for the Court to find a strong inference of recklessness").

### C. The Financial Crisis In Early 2008 And The Resulting Market Volatility Were "Red Flags" That The Portfolio's Value As Of December 31, 2007, Was Not Indicative Of Its Value As Of February 29, 2008

As Defendants repeatedly state, it is common knowledge that the United States experienced a financial crisis of historic proportions during the years 2007-2008 driven in large

part by the collapse of the housing bubble.[6] This crisis, which was well underway during the first two months of 2008[7], was accompanied by extreme volatility in security markets generally[8] and in the market for mortgage-backed securities in particular[9]. The financial crisis and the associated market volatility were "red flags" putting Mr. Leonard on notice (assuming *dubitante* he did not already know) that the Portfolio's value might have declined significantly between December 31, 2007 and February 29, 2008 when the 10-K was filed.

Defendants specifically acknowledged those facts in their motion:

> [G]iven the well-known financial crisis in late 2007 and early 2008 (including Bear Stearn's rapid implosion in March 2008), investors were fully aware (if they had not been previously) that any investment portfolio ran the risk of significant losses. . . .The deterioration of financial markets and mortgage-backed securities in particular was well known.

Defs. Mem. at 18 (internal citations omitted).

Thus, Mr. Leonard was clearly on notice that the Portfolio's year-end value might well have materially misstated the Portfolio's value as of February 29, 2008.

### D. Even Under Defendants' Best-Case Scenario, Mr. Leonard Was Extremely Reckless In Approving Ambac's Misleading Disclosure

The Complaint alleges facts giving rise to a strong inference that Mr. Leonard personally reviewed and approved the misleading disclosure in the 10-K Report. ¶¶ 96, 97, 98. The Complaint also sets forth facts strongly supporting an inference that Mr. Leonard was fully

---

[6] Defendants acknowledge that the court may take judicial notice of market phenomena. *See* Defs. Mem. at 1 n.1 and the cases cited therein.

[7] The Federal Reserve Bank of St. Louis has posted a time-line of the financial crisis on its web site. Pltf. Ex. 2 (also available at http://timeline.stlouisfed.org/index.cfm?p=timeline.)

[8] For example, the S&P 500, which had reached a high of 1,565.5 on October 9, 2007, had by February 29, 2008 declined 15% to 1,330.63. *See* Pltf. Ex. 3 (also available at http://finance.yahoo.com/q/hp?s=^GSPC+Historical+Prices).

[9] During the first two months of 2008, the mean decline in the Markit ABX.HE.AAA indices and the ABX.HE.AA indices was 23%. ¶ 67. The aforementioned indices track baskets of highly rated mortgage-backed securities which are collateralized by subprime mortgages. ¶ 65. These indexes are widely used in the industry as a benchmark for the performance of various types of mortgage backed securities. *Id.*

familiar with the collateral posting issue at the time he reviewed and approved the misleading disclosure in the 10-K. ¶¶ 99, 100, 101.

The validity and reasonableness of the 10-K's assurance to investors that Ambac would meet its collateral posting obligations by "selling securities in the Financial Services investment portfolio" depended entirely on the value of the Portfolio. If Mr. Leonard gave that assurance without ascertaining the Portfolio's current value, he was at best extremely reckless. The fact that Mr. Leonard knew, and the 10-K disclosed, the Portfolio's year-end value does not exculpate Mr. Leonard because, as indicated above, there were obvious "red flags" putting him on notice that the year-end value was no longer indicative of the Portfolio's value as of February 29, 2008.

Defendants suggest that perhaps Mr. Leonard was unable to obtain up-to-date values for the Portfolio and, therefore, relied on the December 31, 2007 value. Defs. Mem. at 23. Given that Ambac told investors that it monitored its Portfolio on a continuous basis and had sophisticated systems and controls for this purpose, ¶ 106, Defendants' suggestion is absurd. In all events, even if it had any substance, Defendants would still be liable.

If Mr. Leonard could not obtain an up-to-date Portfolio valuation, then he had no basis for assuring investors that Ambac could meet its collateral posting obligations by "selling securities in the Financial Services investment portfolio." As noted, the December 31, 2007 values could not provide a basis in view of the "red flags." If he assured investors without an adequate factual basis, then his conduct constituted extreme recklessness sufficient to establish scienter. *See S.E.C. v. Bremont*, 954 F.Supp. 726, 730 (S.D.N.Y. 1997) ("[R]epresentations and opinions ... given without basis and in reckless disregard of their truth or falsity establish scienter under Rule 10b-5") (internal quotation marks and citations omitted); *S.E.C. v. Gallard*, 95 Civ. 3099, 1997 WL 767570, at *4 (S.D.N.Y. Dec. 10, 1997) (same).

### E. The Evidence Indicates That More Than Recklessness Was Involved

While recklessness is sufficient to establish scienter, the Complaint sets forth facts which indicate that Mr. Leonard was fully aware of the Portfolio's decline in value and deliberately concealed it from investors. These facts are summarized below.

**The misleading disclosure in the 10-K was carefully and deliberately crafted**. In the months preceding the filing of the 10-K Report, investors had repeatedly raised questions about

Ambac's collateral posting obligations and the liquidity implications of these obligations. ¶¶ 37-45, 93. In the 10-K Report, Ambac for the first time directly addressed these issues by assuring investors that it could satisfy it collateral posting obligations by "selling securities in the Financial Services investment portfolio." ¶ 94. Under those circumstances, there is a strong inference that Ambac's collateral posting assurance in the 10-K was carefully and deliberately crafted to respond – misleadingly – to investor concerns. ¶ 95. Indeed, on this point, the 10-K is a classic example of a partial truth doing the work of a complete lie.

**Mr. Leonard was fully familiar with the collateral posting issue at the time he approved the 10-K.** The 10-K Report was not Mr. Leonard's first encounter with the collateral posting question. ¶ 96. When the issue of collateral posting was raised several times on Ambac's investor conference call on January 23, 2008, Mr. Leonard acted as Ambac's designated point person for responding to collateral posting questions. ¶ 100. Those facts establish a strong inference that Mr. Leonard was fully familiar with the collateral posting issue at the time he reviewed and approved the misleading disclosure in the 10-K Report in February 2008. ¶ 101.

**It is highly unlikely that Mr. Leonard was oblivious to a decline in value that was of historic proportions.** The value of the Portfolio declined by $1.9 billion, or 24%, during the first quarter of 2008 (¶ 57), and most of this decline occurred prior to the time Ambac filed its 10-K Report (¶ 68). This decline was not the result of normal fluctuations impacting any investment portfolio, nor was it the result of a typical bear market. ¶ 105. Rather, the decline was an unprecedented event of historical proportions. *Id.* It is incredible that a decline of this scope escaped the notice of Ambac's chief financial officer. *Id.* Indeed, Ambac's senior credit personnel claimed to monitor Ambac's Portfolio on a continuous basis, and Ambac took pride in the fact that it has sophisticated systems and controls for this purpose. ¶ 106.

**Mr. Leonard approved the misleading disclosure on more than one occasion.** Ambac filed its first quarter 2008 10-Q Report on May 12, 2008. ¶ 107. By that time, Ambac had closed its books for the first quarter and knew with a certainty that the Portfolio had lost 24% in value and that there was a substantial collateral posting shortfall. *Id.* Nevertheless, in the May 10-Q, Ambac repeated verbatim the false collateral posting assurance that it had provided in the 10-K Report. *Id.* The Complaint sets forth facts giving rise to a strong inference that Mr. Leonard personally reviewed and approved the misleading disclosure in both the 10-K Report

(¶¶ 96, 97, 98) and 10-Q Report (¶¶ 108-109). That Mr. Leonard approved the misleading disclosure on two occasions supports the inference that more than mere recklessness was involved.

Defendants gloss over this evidence by stating that:

> Plaintiff's description of the 10-Q as "misleading" is wholly without substance given that the 10-Q fully reported on the impact of the portfolio's first quarter losses (Ex. 9 at 30, 47, 57-58, 68-69, 72, 99-100) and provided comprehensive risk disclosure (*id*. at 27-28, 63-66, 85-91, 94-95, 99-100).

Defs. Mem. at 22. In that sentence, Defendants cite no less than 24 separate pages in the 10-Q. But *nowhere* did the 10-Q disclosed to investors that: (i) the value of the Portfolio had declined by $1.9 billion, or 24%, during the first quarter of 2008; (ii) as a result, there **already** existed a substantial collateral posting shortfall; and (iii) this collateral posting shortfall which **already** existed (as opposed to bad things that might occur in the future) posed a serious risk to Ambac's plan to satisfy its collateral posting obligations by "selling securities in the Financial Services investment portfolio." Thus, the 10-Q was misleading in the same manner as the 10-K.

### F. The Inference Of Intentional Misconduct Is Buttressed By The Fact That Mr. Leonard Had A Motive To Issue The Misleading Statement

In a last ditch effort to shore up its capital and preserve its AAA rating, Ambac launched a $1.5 billion capital raising transaction in February 2008. ¶¶ 114-116. The success of this offering, which was completed on March 12, 2008, was crucial to Ambac's survival. *Id.* The Complaint details how the misleading statements in the 10-K Report facilitated the completion of this offering. ¶¶ 117-120. If investors had understood the true risks relating to Ambac's collateral posting obligations, it is unlikely that this offering would have succeeded. ¶ 120.

Mr. Leonard led the team responsible for Ambac's March 2008 offering. ¶ 116. Ambac's compensation committee later awarded Mr. Leonard a $950,000 cash bonus for 2008. ¶ 124. In justifying this bonus, the compensation committee cited, among other things, the fact that Mr. Leonard "led the team responsible for structuring, negotiating and executing Ambac's $1.5 billion capital raise in early 2008." *Id.* As the leader of Ambac's March 2008 offering, Mr. Leonard had a strong interest in successfully completing this offering. The success of this offering had the potential to bring Mr. Leonard a large bonus. The failure of the offering had the potential to ruin Mr. Leonard's reputation and destroy Ambac's business.

As set forth above, the Complaint alleges numerous facts giving rise to a strong inference that Mr. Leonard knew about the Portfolio's decline in value and deliberately concealed it from investors. That Mr. Leonard had a motive to conceal it buttresses this inference.[10]

Defendants dismiss his motive by claiming that the prospectus supplement relating to the offering adequately disclosed the Portfolio's loss in value and the risks relating to Ambac's collateral posting obligations. Defs. Mem. at 20. This is just a rehash of Defendants' corrective disclosure argument. As noted above, that argument is wrong because the prospectus supplement only disclosed a very small portion of the minimum $950 million loss in value that the Complaint alleges had occurred by February 29, 2008. The fact that Ambac, under Mr. Leonard's leadership, completed a major capital raising transaction without ever disclosing this loss of historical proportions is further evidence of intentional misconduct.

## III. PLAINTIFF RELIED ON DEFENDANTS MISLEADING STATEMENTS AND OMISSIONS

The Complaint alleges that Plaintiff read and relied upon each of Ambac's misleading statements and omissions. ¶¶ 125-127.

## IV. PLAINTIFF'S LOSS WAS CAUSED BY THE MATERIALIZATION OF THE RISKS CONCEALED BY DEFENDANTS

### A. Loss Causation Can Be Established By Pleading The Materialization Of Concealed Risks, Including Risks Relating To Liquidity, Undercapitalization And Quality Of Collateral

"Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, a plaintiff may plead that it is the materialization of the undisclosed condition or event that causes the loss." *Heller v. Goldin Restructuring Fund, L.P.*, 590 F.Supp.2d 603, 623-24 (S.D.N.Y. 2008) (internal quotation marks and citations omitted). *See also In re Initial Pub. Offering Sec. Litig.*, 544 F.Supp.2d 277, 289 (S.D.N.Y. 2008) ("There are several possible methods of pleading loss causation, including 'direct causation,' 'materialization of risk,' and 'corrective disclosure.'") (internal citations omitted); *In re Omnicom Group, Inc. Sec. Litig.*, 541 F.Supp.2d 546, 551 (S.D.N.Y. 2008) (loss causation can be established where

---

[10] Plaintiff does not rely on motive standing alone to establish scienter. Rather, Mr. Leonard's motive buttresses the inference of scienter supported by numerous other facts. Thus, the motive cases cited by Defendants (Defs. Mem at 19-21), all of which address the question of when motive *alone* can establish scienter, are irrelevant here. Defendants do not cite any cases holding that motive cannot be used to buttress the inference of scienter established by other facts.

"the materialization of the risks that were concealed by the alleged misrepresentations or omissions proximately caused plaintiffs' loss") (internal citations omitted).

Many courts in this District have found loss causation based on "materialization of a concealed risk" in a wide variety of circumstances, including a concealed risk related to liquidity problems, undercapitalization, quality of collateral and amount of debt. *See In re Vivendi Universal, S.A. Sec. Litig.*, 634 F.Supp.2d 352, 368 (S.D.N.Y. 2009) (causation based on concealment of risk of liquidity crisis and subsequent deterioration in liquidity position); *Heller* (causation based on concealment of undercapitalization and subsequent failure to meet investment objectives and diversify portfolio); *In re Dynex Capital, Inc. Sec. Litig.*, 05 Civ. 1897, 2006 WL 314524 (S.D.N.Y. Feb. 10, 2006) (causation based on misrepresentation of quality of bond collateral and subsequent downgrade of bonds); *In re Parmalat Sec. Litig.*, 375 F. Supp.2d 278, 307 (S.D.N.Y. 2005) (causation based on concealment of debt load and subsequent inability to pay bonds). The analysis of the loss causation issue in those cases is fully applicable here to sustain the Complaint.

## B. The Materialization Of The Concealed Risk Need Not Be The Sole Cause Of Plaintiff's Loss

In addition to demonstrating the materialization of a concealed risk, Plaintiff must show a causal connection between the materialization of the risk and her loss. *In re Vivendi*, 634 F.Supp.2d at 364 ("Once an event qualifies as materialization of the risk, plaintiffs must still prove their losses were caused by that event."). However, Plaintiff is not required to demonstrate that the materialization of the risk was the sole cause of her loss. *Id.* at 364-65. Rather, under Second Circuit law Plaintiff need only allege facts sufficient for the fact finder to "ascribe some rough proportion of the whole loss" to Defendants' fraud. *Id.* at 365 (quoting *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007).

While Plaintiff must adequately plead causation, she is not required to allege the precise loss attributable to Defendants' fraud. *Id.* at 365 (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005)). Furthermore, any amount of loss is sufficient to establish liability. *Id.* at 364 ("In theory plaintiffs need only prove that they suffered *some* damages from the fraud. Liability obviously does not hinge on how much damages.").

21

**C.    The Risk Concealed By Defendants Materialized And Caused Plaintiff's Loss**

Defendants concealed from investors that: (i) the Portfolio's decline in the value that had **already** occurred made it unlikely that Ambac could satisfy its potential collateral posting obligations by selling securities from the Portfolio; and (ii) as a result of this decline which had **already** occurred, Ambac's potential collateral posting obligations posed a serious threat to Ambac's liquidity.

The precise risk which Ambac concealed materialized later. ¶ 129. As detailed in the Complaint, Ambac subsequently depleted its liquidity in order to plug the collateral posting shortfall at the Financial Services Subsidiary. ¶¶ 74-83, 129.

Additionally, as detailed in the Complaint, the depletion of Ambac's liquidity was the direct cause of Plaintiff's loss for two reasons: (i) the depletion of Ambac's liquidity in and of itself negatively impacted the value of Ambac's DISC securities (*i.e.*, if Ambac had more liquidity the bonds would be worth some amount more because liquidity is one on the key factors that determine the price of a bond); and (ii) the depletion of Ambac's liquidity caused Ambac to suspend interest payments on the bonds which in turn drove down the value of the bonds and deprived Plaintiff of interest income. ¶¶ 130-132.

**D.    Issues Relating To The Chain Of Causation And Damages Involve Complex Factual Questions That Cannot Be Decided On A Motion To Dismiss**

The Second Circuit has noted that generally "the chain of causation is a matter of proof at trial." *Lentell*, 396 F.3d at 174 (internal quotation marks and ellipses omitted). The basis for that observation is that the chain of causation usually turns on complex factual issues that have to be sorted out by expert testimony. *See In Re Vivendi*, 634 F.Supp.2d at 364 ("Sorting out which declines were caused by such extraneous factors and which were caused by a materialization of the concealed risk is generally the province of an expert.") Consequently, factual issues relating to the chain of causation cannot be resolved on a motion to dismiss. *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) ("[I]f the loss was caused by an intervening event, like a general fall in the price of stocks, the chain of causation will not have been established. But such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss."); *In re Openwave Sys. Sec. Litig.*, 528 F.Supp.2d 236, 252-53 (S.D.N.Y. 2007) ("[W]hether the [stock] decline was attributable to some other cause, as defendants allege, is a matter for proof at trial.")

Similarly, the courts have held that questions relating to damages cannot be resolved on a motion to dismiss. *See Varghese v. China Shenghuo Pharmaceutical Holdings, Inc.*, 672 F.Supp.2d 596, 611 (S.D.N.Y. 2009) ("As Plaintiffs correctly point out, damages issues are not properly resolved at the motion to dismiss stage."); *Global Crossing Estate Representative v. Winnick*, 04 Civ. 2558, 2006 WL 2212776 (S.D.N.Y. Aug. 3, 2006) at *13 ("In the end, the question of damages is a factual question that cannot be resolved on the basis of the pleadings.").

Defendants assert that Plaintiff's loss was caused by intervening events and challenge Plaintiff's damages. But, as those cases hold, whether Plaintiff or Defendants are right can only be decided at trial, not on a motion to dismiss. Furthermore, Defendant's intervening events argument is wrong because the liquidity crisis at Ambac would not have occurred (or would have been substantially less severe) if the Portfolio's value had been as represented in the 10-K

### E.     Plaintiff Is Not Required To Show That The Price Of Her Securities Fell When The Truth Came Out

In *Dura Pharmaceuticals., Inc. v. Broudo,* 544 U.S. 336 (2005), the Supreme Court held that in **fraud-on-the-market cases**[11] a plaintiff must show that the price of the stock dropped when the truth came out.[12] The Second Circuit has recognized that *Dura* is limited to fraud-on-

---

[11] In most 10b-5 class actions, plaintiffs are unable to allege actual reliance on defendants' misrepresentations. Instead, they rely on the "fraud-on-the-market" doctrine of *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), to establish a presumption of reliance. The rationale underlying the "fraud-on-the-market" doctrine is that purchasers and sellers of securities rely on the integrity of the market price, and thus indirectly rely upon any material misrepresentations which impact the market price.

[12] The holding in *Dura* has been summarized as follows:

> [T]he Supreme Court held that plaintiffs can recover in **fraud-on-the-market** cases only if a specific loss was proximately caused by a defendant's misrepresentations. In so ruling, the Court held that a plaintiff cannot prove loss causation merely by establishing that a defendant's misconduct artificially inflated the price of the target company's stock on the date the plaintiff purchased its shares. Instead, a plaintiff must also prove that the company's stock price later declined (and thus caused plaintiff's shares to be worth less) immediately following a disclosure of the alleged misconduct to the public.

*In re Comverse Technology, Inc. Sec. Litig.*, 06-CV-1825, 2007 WL 680779 at*4 (E.D.N.Y. Mar. 2, 2007) (emphasis added). *See also In re AOL Time Warner, Inc. Sec. Litig.,* 503 F.Supp.2d 666, 677 (S.D.N.Y. 2007) ("Because, normally, in **fraud-on-the-market cases**, an inflated purchase

the-market cases. *See In re Flag Telecom Holdings, Ltd. Securities Litigation*, 574 F.3d 29, 36 (2d Cir. 2009) ("*Dura* stands for the proposition that in **fraud-on-the-market cases**, an inflated purchase price will not itself constitute or proximately cause the relevant economic loss.") (emphasis added) (internal quotation omitted).

In the instant case, Plaintiff alleges actual reliance on Defendants' misrepresentations and the materialization of the concealed risk to establish causation. Thus, this is not a fraud-on-the-market case and Plaintiff is not required to show that the price of her securities fell when the truth came out.

## CONCLUSION

For the foregoing reasons, and based on all prior pleadings and proceedings herein, Defendants' motion to dismiss should be denied in all respects. Should the Court grant any part of Defendants' motion, Plaintiff respectfully requests leave to re-plead.

Dated: New York, New York
      May 28, 2010

Respectfully submitted,
**SCHLAM STONE & DOLAN LLP**

By: _____

Richard H. Dolan (RD-2212)
Niall D. O'Murchadha (NO-8161)
26 Broadway
New York, NY 10004
(212) 344-5400

*Attorneys for Plaintiff*

---

price will not itself constitute or proximately cause the relevant economic loss, the Court concluded that the failure to claim that Dura's share price fell significantly *after the truth became known* precluded a finding that the plaintiff had pleaded loss causation.")(emphasis in bold added) (internal quotations and citations omitted).