UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUDY EHRENREICH, <br><br> Plaintiff, <br><br> v. <br><br> AMBAC FINANCIAL GROUP, INC. and SEAN T. LEONARD, <br><br> Defendants. | No. 09 Civ. 10173 (BSJ) <br><br> ECF Case |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

Peter C. Hein
C. Lee Wilson
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000

*Attorneys for Defendants*

June 29, 2010

**TABLE OF CONTENTS**

<u>Page</u>

I. THE COMPLAINT FAILS TO PLEAD ANY MATERIAL MISSTATEMENT OR OMISSION OF FACT WITH THE REQUISITE PARTICULARITY..................................1

    A. Defendants had no duty to disclose the Financial Services investment portfolio's interim 2008 performance in Ambac's 2007 10-K annual report. ...............................................................................................................1

    B. That the February 29, 2008 value of the portfolio was not included in Ambac's 2007 10-K annual report filed that same day did not make statements in the 10-K misleading. .......................................................................2

        1. Plaintiff's reading of the "collateral requirements" sentence ignores its context and misconstrues its meaning. ...........................................................2

        2. Plaintiff has not pled with particularity there was "already" a collateral shortfall. ............................................................................................................3

    C. Plaintiff fails to adequately plead materiality or reasonable reliance. ...............4

II. THE PSLRA SAFE HARBOR IN ANY EVENT PRECLUDES LIABILITY. ..........................5

    A. The "collateral requirements" sentence is a forward-looking statement. .........5

    B. The PSLRA safe harbor precludes liability for the "collateral requirements" sentence. ..........................................................................................5

        1. The statement is accompanied by meaningful cautionary language. .........5

        2. Plaintiff failed to plead "actual subjective knowledge" with particularity. .....................................................................................................6

III. MOREOVER, SCIENTER IS NOT PLED WITH THE REQUISITE PARTICULARITY.................................................................................................................6

    A. Even assuming that pleading recklessness were sufficient (which it is not), plaintiff has failed to plead recklessness with particularity.......................7

    B. The Complaint fails to plead fraudulent intent with particularity.....................7

        1. Plaintiff fails to adequately plead motive and opportunity. .......................7

        2. The Complaint fails to plead "strong circumstantial evidence" of scienter. ........................................................................................................8

    C. An inference of nonfraudulent intent is far more compelling...........................9

IV. THE COMPLAINT ALSO DOES NOT ADEQUATELY PLEAD LOSS CAUSATION. ....................................................................................................................9

**Page**

A. The *rise* of DISCS prices after the July 7, 2008 press release "acknowledged the truth" negates plaintiff's argument for loss causation........................9

B. Plaintiff's failure to adequately plead a causal link between the alleged February 29, 2008 10-K misstatements and the loss plaintiff alleges occurred after a July 2009 announcement is an independent ground for dismissal..........................................................................................................10

V. THE COURT SHOULD DENY LEAVE TO REPLEAD AND DISMISS WITH PREJUDICE. ..........................................................................................................10

## TABLE OF AUTHORITIES

**Cases**

*Acito* v. *IMCERA Group, Inc.*,
  47 F.3d 47 (2d Cir. 1995) .................................................................................................. 10

*Amorosa* v. *Ernst & Young LLP*,
  682 F. Supp. 2d 351 (S.D.N.Y. 2010) ............................................................................ 10 n.10

*Blackmoss Inv. Inc.* v. *ACA Capital Holdings, Inc.*,
  2010 WL 148617 (S.D.N.Y. 2010) .................................................................................. 2 & n.1

*Campo* v. *Sears Holding Corp.*,
  2010 WL 1292329 (2d Cir. 2010) ............................................................................ 8 n.7, 9, 10

*Campo* v. *Sears Holding Corp.*,
  635 F. Supp. 2d 323 (S.D.N.Y. 2009) ................................................................................ 8 n.7

*Emergent Capital Inv. Mgmt., LLC* v. *Stonepath Group, Inc.*,
  343 F.3d 189 (2d Cir. 2003) .................................................................................................. 9

*Gordon Partners* v. *Blumenthal*,
  293 F. App'x 815 (2d Cir. 2008) ........................................................................................... 9

*Halperin* v. *eBanker USA.com, Inc.*,
  295 F.3d 352 (2d Cir. 2002) .................................................................................................. 5

*In re Austl. & N.Z. Banking Group Ltd. Sec. Litig.*,
  2009 WL 4823923 (S.D.N.Y. 2009) ..................................................................................... 2

*In re Centerline Holding Co. Sec. Litig.*,
  2010 WL 2303312 (2d Cir. 2010) ......................................................................................... 7

*In re Focus Media Holding Ltd. Litig.*,
  2010 WL 1221881 (S.D.N.Y. 2010) ........................................................................ 1, 5, 5-6, 7

*In re Hardinge, Inc. Sec. Litig.*,
  2010 WL 447397 (W.D.N.Y. 2010) ...................................................................................... 4

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010) ............................................................................................... 2-3

*In re Omnicom Group, Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) ...................................................................................... 9-10, 10

*In re Sec. Capital Assurance, Ltd. Sec. Litig.*,
  2010 WL 1372688 (S.D.N.Y. 2010) ............................................................................... 10 n.10

**Page**

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*,
  202 F. Supp. 2d 8 (S.D.N.Y. 2001) ................................................................................ 7

*Kalnit* v. *Eichler*,
  264 F.3d 131 (2d Cir. 2001) ........................................................................................... 7

*Kelter* v. *Apex Equity Options Fund, LP*,
  2009 WL 2599607 (S.D.N.Y. 2009) ............................................................................... 6

*Lattanzio* v. *Deloitte & Touche LLP*,
  476 F.3d 147 (2d Cir. 2007) ..................................................................................... 10 n.10

*Lentell* v. *Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) ..................................................................................... 10 n.10

*Lowinger* v. *Pzena Inv. Mgmt., Inc.*,
  341 F. App'x 717 (2d Cir. 2009) .................................................................................... 2

*Masters* v. *GlaxoSmithKline*,
  271 F. App'x 46 (2d Cir. 2008) ............................................................................... 10 n.10

*Plumbers & Steamfitters Local 773 Pension Fund* v. *Can. Imperial Bank of Comm.*,
  2010 WL 961596 (S.D.N.Y. 2010) ........................................................................... 7, 8 n.7

*Pollio* v. *MF Global, Ltd.*,
  608 F. Supp. 2d 564 (S.D.N.Y. 2009) ....................................................................... 8 n.7, 10

*Porat* v. *Lincoln Towers Cmty. Ass'n*,
  464 F.3d 274 (2d Cir. 2006) ......................................................................................... 10

*Slayton* v. *Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010) ................................................................................ 5, 6 & n.5, 9

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008) ........................................................................................... 8

**Statutes & Rules**

15 U.S.C. § 78u-5(c) ............................................................................................................ 5

17 C.F.R. § 210.3-12(a) ....................................................................................................... 7

17 C.F.R. § 229.303 ............................................................................................................. 1

17 C.F.R. § 249.310(b)(1) .................................................................................................... 1

Plaintiff—who purchased DISCS at a distressed price in the midst of the financial crisis—bases her fraud claim on an out-of-context reading of one sentence from Ambac's 258-page-long 2007 10-K. There are multiple flaws in plaintiff's arguments, and multiple grounds for dismissal.

## I. THE COMPLAINT FAILS TO PLEAD ANY MATERIAL MISSTATEMENT OR OMISSION OF FACT WITH THE REQUISITE PARTICULARITY.

### A. Defendants had no duty to disclose the Financial Services investment portfolio's interim 2008 performance in Ambac's 2007 10-K annual report.

Plaintiff does not dispute that Ambac's 10-K accurately stated the portfolio's value as of December 31, 2007. Rather, "[t]he crux" of plaintiff's Complaint is that Ambac allegedly "fail[ed] to disclose the precipitous decline in the value of the Portfolio that occurred *after* December 31, 2007 and before Ambac filed its 10-K Report on February 29, 2008." Plaintiff's Brief ("PB") 6. But plaintiff fails to show the 10-K—entitled "**ANNUAL REPORT** . . . **[f]or the fiscal year ended December 31, 2007**"—was required to include such post-year-end data. Moving Brief ("MB") 10-11 & n.4.

Plaintiff relies on the Form 10-K instruction that "except where information is required to be given for the fiscal year or as of a specified date, it should be given as of the latest practicable date." PB 7-8. Yet Plaintiff cites no authority to suggest that Ambac was required to disclose the value of the Financial Services portfolio *at all*, let alone that the "latest practicable date" instruction requires an *annual* report on Form 10-K to include information beyond the end of the fiscal year. The Form 10-K and its instructions repeatedly characterize the 10-K as an "annual report" for the "fiscal year." *See, e.g.*, Pl.'s Ex. 1 at Gen. Inst. A. Indeed, the SEC provides 60 days to file the "annual report" because it takes time to compile, vet, and then disclose the data. 17 C.F.R. § 249.310(b)(1); *see In re Focus Media Holding Ltd.*, 2010 WL 1221881, at *4 (S.D.N.Y. 2010) (SEC disclosure rules recognize "how unworkable and potentially misleading a system of instantaneous disclosure" would be).

Plaintiff also cites the requirement that the 10-K include known trends that are reasonably likely to materially affect liquidity (*see* Item 303 of Reg. S-K, 17 C.F.R. § 229.303). PB 8. However, the 10-K *did* disclose relevant trends affecting the investment portfolio. It specifically states:

> ***Our investment portfolio has been adversely affected*** by events and developments in the capital markets, including decreased market liquidity for investment assets; ***market perception of increased credit risk*** with respect to the ***types of securities held in our investment portfolio*** and ***corresponding credit spread-widening with respect to our investment assets***; and extension of the duration of investment assets. ***Our investment***

>*portfolio may be further adversely affected* by these and other events and developments in capital markets, including interest rate movements; downgrades of credit ratings of issuers of investment assets and/or financial guarantee insurers which insure investment assets; and foreign exchange movements which impact investment assets.  Def.s' Ex. ("Ex.") 4 at 40 (emphasis added).

The 10-K also disclosed a net unrealized loss for investments at December 31, 2007, which was

>primarily due to *credit spread widening in highly rated asset-backed securities within the investment agreement investment portfolio*. . . . Credit spreads in asset-backed securities, especially mortgage-backed securities, have seen significant widening during the second half of 2007 as investor concern over the U.S. housing market has increased.  *This trend has continued into the first quarter of 2008*.  *Id.* at 79, 83 (emphasis added).

Credit spread widening is the precise risk plaintiff's Complaint identifies as driving the alleged portfolio decline in January and February 2008 (Compl. ¶ 61).  MB 5.  Furthermore, events in January and February 2008 alone cannot constitute a "trend" under Item 303.  "As a matter of law, a two month period of time does not establish a 'trend' for purposes of the disclosures required by Item 303."  *Blackmoss Inv. Inc.* v. *ACA Capital Holdings, Inc.*, 2010 WL 148617, at *10 (S.D.N.Y. 2010); *see also, e.g.*, *Lowinger* v. *Pzena Inv. Mgmt., Inc.*, 341 F. App'x 717, 720 (2d Cir. 2009).[1]

### B. That the February 29, 2008 value of the portfolio was not included in Ambac's 2007 10-K annual report filed that same day did not make statements in the 10-K misleading.

Plaintiff argues that the 10-K's statement that "Ambac will meet the collateral requirements either by selling securities in the Financial Services portfolio in the market or to Ambac Assurance" (Ex. 4 at 77) (hereinafter the "collateral requirements" sentence) put the portfolio's February 29, 2008 value "in play" and thus disclosure of the value was (supposedly) necessary to make this statement not misleading.  PB 6-7; *see id.* at 7-8.  However, "plaintiff[] 'must do more than say that the statements . . . were false and misleading; [she] must demonstrate with specificity why and how that is so.'"  *In re Austl. & N.Z. Banking Group Ltd.*, 2009 WL 4823923, at *7 (S.D.N.Y. 2009).

### 1. Plaintiff's reading of the "collateral requirements" sentence ignores its context and misconstrues its meaning.

One "core weakness in the Complaint is the plaintiff's failure to match its theory of fraud to the public statements made by [defendants]."  *Id.* at *14.  Plaintiff's reading ignores the rule that allegedly fraudulent documents must be reviewed "holistically and in their entirety," with defendants'

---

[1] In any event, plaintiff cannot satisfy the requirement "that a plaintiff plead, with some specificity, facts establishing that the defendant had *actual knowledge* of the purported trend."  *Blackmoss Inv. Inc.*, 2010 WL 148617, at *9-*10 (emphasis added); *see* MB 19-23; Points II.B.2, III.B-C.

2

representations "taken together and in context." *In re Morgan Stanley Info. Fund*, 592 F.3d 347, 365-66 (2d Cir. 2010). ***In context***, the statement plaintiff challenges reads as follows:

> Ambac will meet the collateral requirements either by selling securities in the Financial Services investment portfolio in the market or to Ambac Assurance. ***Based on the previously described rating agency actions by Moody's, Standard & Poor's and Fitch which occurred during January 2008***, management subsequently identified certain investment securities in the Financial Services investment portfolio to potentially sell in order to satisfy additional collateral posting requirements upon a further ratings downgrade and/or to meet potential liquidity needs. Ambac can also enter into collateral swaps with external counterparties or with Ambac Assurance. In either case, securities transferred to Ambac Assurance must meet Ambac Assurance's investment guidelines. Additionally, Ambac generally has the right to re-hypothecate collateral that it receives under derivative contracts. Ex. 4 at 77 (emphasis added).

Read along with the rest of the paragraph, it is apparent that the "collateral requirements" sentence describes Ambac's plan to address collateral requirements stemming from the January 2008 Fitch downgrade, as well as the negative ratings watches placed by Fitch, Moody's, and S&P, which raised the potential for a further ratings downgrade. MB 12-14. The sentence was not addressing any and all possible future collateral requirements, as plaintiff suggests. PB 11-12. By ignoring the text that follows the "collateral requirements" sentence (*see, e.g.*, PB 5), plaintiff misconstrues its meaning.[2]

Plaintiff acknowledges the 10-K chart that outlines possible collateral requirements under a range of hypothetical future ratings levels (PB 11-12), but ignores that the chart's estimated collateral requirements under the most severe downgrades are as high as $8.144 billion (Ex. 4 at 78), ***exceeding*** the estimated December 31, 2007 portfolio value of $7.8 billion reported in the 10-K (*id.* at 30). This underscores that, in context, the "collateral requirements" sentence cannot be read as a guarantee that sales of portfolio securities would always be sufficient to meet future collateral requirements under any circumstances, irrespective of future ratings actions or market declines.

### 2. Plaintiff has not pled with particularity there was "already" a collateral shortfall.

Plaintiff repeatedly claims that, as of the 10-K's filing, there was "already" a collateral shortfall or there was an "extremely high risk of an imminent collateral shortfall." PB 4-6. Yet even assuming *arguendo* that the portfolio had dropped $950 million as of February 29, 2008, the resulting

---

[2] Plaintiff's brief also ignores the mention of collateral swaps and re-hypothecating collateral as other possibilities (MB 13), and the repeated instances—including in the "collateral requirements" sentence itself—where it is made clear that transactions may be ***with Ambac Assurance*** (*id.* at 13-14).

3

value ($6.85 billion) would still be nearly *3 1/2 times* the $2.053 billion required at then-current rating levels—hardly a shortfall. Ex. 4 at 78. At least three unknown variables would affect Ambac's ability to cover future collateral requirements by selling securities: (i) the future agency ratings; (ii) the amount of collateral required at those ratings levels;[3] and (iii) the future value of the investment portfolio.[4] Notably, the Complaint concedes that no collateral shortfall existed until November 5, 2008—*over eight months and multiple downgrades later*. Compl. ¶¶ 74-75. No amount of artful pleading can turn an alleged shortfall in *November* 2008 into one that "already" existed or was "imminent" in *February* 2008. *See In re Hardinge, Inc.*, 2010 WL 447397, at *9 (W.D.N.Y. 2010) (alleged August 2007 recognition of adversity did not mean such adversity existed or was known in January 2007).

### C. Plaintiff fails to adequately plead materiality or reasonable reliance.

Plaintiff fails to explain how the portfolio's alleged drop to $6.85 billion (from $7.8 billion)—still 3 1/2 times the collateral requirements at existing ratings levels—could be material in light of disclosures in the 10-K and other filings prior to plaintiff's purchase, not to mention public knowledge of the financial crisis. *See* Point I.A-B; MB 17-19. In this regard, it is appropriate for the court to consider updated information disclosed in Ambac's filings dated March 6 and March 12, 2008, prior to the date of plaintiffs' purchase, that reported on Financial Services portfolio losses in January 2008 (Ex. 2 at 2; Ex. 3 at S-4), and warned that Ambac Assurance would likely need to lend or contribute assets or cash to Financial Services in the event of further downgrades (Ex. 2 at 5; Ex. 3 at S-8). Notably, the Complaint *specifically relies* on the March 6 filing (Compl. ¶ 118), and the 2007 10-K *specifically advises* investors to consult risk factors "disclosed from time to time by Ambac in its subsequent reports on Form 10-Q and Form 8-K," which includes the March 12 8-K. Ex. 4 at 2.

---

[3] At a given rating level, collateral requirements would vary depending, *inter alia*, on the amount of principal and interest owed on the investment agreements. Indeed, estimated collateral requirements in the event of a downgrade to A/A2 decreased from $8.144 billion as of December 31, 2007 (Ex. 4 at 78) to $6.6 billion as of May 31, 2008 (Ex. 10)—a $1.544 billion drop in estimated collateral requirements that exceeds the $950 million loss in portfolio value that plaintiff postulates.

[4] Plaintiff ignores the fact that portfolio decreases may result from early withdrawals of invested funds (Ex. 4 at 1, 28, 41, 46, 75), which would also reduce the potential collateral requirements. And just as adverse market developments assertedly lead to a loss of portfolio value in January and February 2008, a market recovery could increase the portfolio value and thus increase the extent to which this value exceeded estimated collateral requirements at the then-existing rating levels.

Moreover, that DISCS prices *went up* after Ambac allegedly "acknowledged the truth" in the July 7, 2008 press release itself indicates that the alleged omissions were immaterial. MB 8, 24.

## II. THE PSLRA SAFE HARBOR IN ANY EVENT PRECLUDES LIABILITY.

### A. The "collateral requirements" sentence is a forward-looking statement.

Plaintiff argues that Ambac's statement of how it "*will* meet" collateral requirements is not protected by the PSLRA safe harbor and the "bespeaks caution" doctrine because "Plaintiff is complaining about the concealment of a historical fact." PB 9. But plaintiff's citations all concern statements in which *the challenged language itself* is historical in nature. In contrast, the forward-looking "collateral requirements" sentence contains no representation of historical fact. Ex. 4 at 77. This sentence concerning plans for *future* sales of securities simply cannot be construed as a representation of the *present* value of those securities. Accordingly, the PSLRA safe harbor applies here. *See, e.g.*, *Focus Media*, 2010 WL 1221881, at *4-*5 & n.8 (analyzing third-quarter projections as forward-looking even though they were announced three days before the third quarter ended).

### B. The PSLRA safe harbor precludes liability for the "collateral requirements" sentence.

The "collateral requirements" sentence is nonactionable under the PSLRA safe harbor for three independent reasons: (i) it is immaterial (*see* Point I.C); (ii) it is accompanied by meaningful cautionary language; and (iii) plaintiff has not pled with particularity actual knowledge of the statement's falsity. 15 U.S.C. § 78u-5(c); *Slayton* v. *Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

#### 1. The statement is accompanied by meaningful cautionary language.

The extensive cautionary language in the 10-K addresses the very risks plaintiff identifies. PB 10; MB 1-2, 4-7, 14-15, 17-18. The 10-K explains at length that the portfolio's value *had already been* and *may continue to be* adversely affected by various trends, including "credit spread-widening" in "highly rated asset-backed securities" and "especially mortgage-backed securities." Point I.A; Ex. 4 at 1, 36, 40-41, 75, 79, 83. It also repeatedly warns that further downgrades could cause significant increases in collateral requirements that could materially affect Ambac's liquidity (*id.* at 24, 33, 76; *see also id.* at 1, 41, 75) and charts out a range of possible collateral requirements (*id.* at 78). Plaintiff cannot "overcome the existence of such language" in the 10-K. *Halperin* v. *eBanker USA.com, Inc.,* 295 F.3d 352, 359 (2d Cir. 2002); *see Focus Media*, 2010 WL 1221881, at

5

*5 (cautionary statements sufficient where they warned of "precisely what occurred"); *Kelter* v. *Apex Equity Options Fund, LP*, 2009 WL 2599607, at *6-*7 (S.D.N.Y. 2009) (same).

### 2. Plaintiff failed to plead "actual subjective knowledge" with particularity.

Even if this cautionary language were missing, the Second Circuit recently emphasized in *Slayton* v. *American Express Co.* that the PSLRA safe harbor ***requires dismissal*** if plaintiff fails to plead with particularity that the forward-looking statement at issue was made with "***actual subjective knowledge***" that it was false or misleading.  604 F.3d at 766, 773, 776 n.9; *see* MB 15-16, 21.

*Slayton* concerned a 10-Q filed by American Express ("Amex") on May 15, 2001, which said in effect that "while [Amex] had lost $182 million from its high-yield debt investments in the first quarter of 2001, it expected further losses from those investments to be substantially lower for the remainder of 2001."  604 F.3d at 762.  Allegedly, before the filing date, defendants were specifically advised that Amex "was facing additional losses on its high-yield debt investments," that the portfolio had suffered extensive deterioration due to a sharp rise in bond defaults, and that the range of potential losses was unknown.  *Id.* at 763.  Defendants ordered a review, but issued the 10-Q before receiving the results, which revealed additional losses of $400 million.  *Id.* at 763-64.  Shortly thereafter, in July 2001, Amex formally reported $826 million in additional portfolio losses.  *Id.* at 764.

And yet, *Slayton* held the PSLRA safe harbor applied and plaintiffs failed to plead actual knowledge.  *Id.* at 762, 766-67, 776 n.9.[5]  Under *Slayton*, a plaintiff must plead "actual subjective knowledge"; it is not enough even to allege the fraud was "so obvious that . . . defendant[s] must have been aware of it."  *Id.* at 776 n.9.  The pleadings here do not meet this standard.  *See* Point III.B.

### III.  MOREOVER, SCIENTER IS NOT PLED WITH THE REQUISITE PARTICULARITY.

As the "collateral requirements" sentence is forward-looking, pleading recklessness will not establish liability.  Point II.B.2.  The cases plaintiff cites are inapposite as they do not concern forward-looking statements.  PB 14-15.  In any event, plaintiff fails to plead even recklessness with par-

---

[5] *Slayton* separately held that the cautionary statements in defendants' 10-Q were inadequate. *See id.* at 772-73.  But the cautionary statements here are distinguishable.  First, they warn of the specific risks that plaintiff complains of (such as credit spread-widening in "[o]ur investment portfolio" and ratings downgrades).  *See* Points I.A, II.B.1; *cf. Slayton*, 604 F.3d at 772.  Second, the cautionary language here had changed in light of changes in events, such as the January 2008 rating agency actions and credit spread-widening that continued into 2008.  *Cf. Slayton*, 604 F.3d at 772-73.

ticularity (Point III.A), much less fraudulent intent (Point III.B-C), which is fatal to plaintiff's claim.

### A. Even assuming that pleading recklessness were sufficient (which it is not), plaintiff has failed to plead recklessness with particularity.

Defendants' opening brief addresses the flaws in plaintiff's recklessness allegations. MB 21-22. Plaintiff's brief cites a series of "red flag" cases (PB 15-16), but all involve egregious allegations identifying numerous specific sources of information indicating the defendant companies were actively engaging in fraud; none even remotely support plaintiff's attempt to characterize the state of the market in general as a "red flag." *P&SL 773* v. *Can. Imperial Bank*, 2010 WL 961596, at *10 (S.D.N.Y. 2010) ("[K]nowledge of a general economic trend does not equate to harboring a mental state to deceive, manipulate, or defraud."). In any event, if market conditions were a red flag to Leonard, they were also a red flag to plaintiff. Given the 10-K's disclosures—including that the portfolio had been and may continue to be adversely affected by market conditions (Ex. 4 at 40, 79, 83)—plaintiff was plainly on notice of the possibility that the value of the portfolio might have declined.

Furthermore, plaintiff's argument that *not* knowing the investment portfolio's value as of *the day of filing* "constituted extreme recklessness" is completely meritless. PB 17. Plaintiff's suggestion that the *Bremont* and *Gallard* cases—involving schemes to sell nonexistent securities and pocket the fees—are comparable to this case only highlights the lack of merit to plaintiff's claims.

### B. The Complaint fails to plead fraudulent intent with particularity.

Plaintiff fails to cite a single legal authority to support her claim of fraudulent intent. PB 17-20. The moving brief demonstrates the shortcomings in these pleadings. MB 19-23.

#### 1. Plaintiff fails to adequately plead motive and opportunity.

Plaintiff's claim (PB 20) that defendants were motivated by a desire to conceal the February 29, 2008 portfolio value from the March 6, 2008 offering documents fails because defendants had no duty to disclose such midquarter financial data even in the offering documents. *See* 17 C.F.R. § 210.3-12(a); *Focus Media*, 2010 WL 1221881, at *6-*7; *In re Turkcell Iletisim Hizmetler, A.S.*, 202 F. Supp. 2d 8, 12-13 (S.D.N.Y. 2001). Where plaintiff "does not present facts indicating a clear duty to disclose, plaintiff's scienter allegations do not provide strong evidence of conscious misbehavior or recklessness." *Kalnit* v. *Eichler*, 264 F.3d 131, 144 (2d Cir. 2001); *accord In re Centerline Holding Co.*, 2010 WL 2303312, at *2 (2d Cir. 2010). Plaintiff also pleads no particularized facts to

7

show that by March 6 the February data was known, reported to senior management, and vetted as would be necessary before public dissemination. In contrast, the January 2008 decline (which was known and reported in unaudited form) was disclosed in the offering documents. Ex. 3 at S-4.[6]

### 2. The Complaint fails to plead "strong circumstantial evidence" of scienter.

Strikingly, plaintiff makes *no response at all* to the *Dynex* requirement that a plaintiff alleging access to contrary facts must "specifically identify the reports or statements containing this information." *Teamsters Local 445* v. *Dynex Capital*, 531 F.3d 190, 196 (2d Cir. 2008); *see* MB 21-22.[7] Plaintiff's failure to specifically allege the existence of reports as of February 29, 2008 containing information on the portfolio's January and February performance is fatal to plaintiff's attempts to plead scienter. That the actual knowledge standard for pleading scienter in this case is *higher* than the recklessness standard imposed in *Dynex* further demonstrates the need for dismissal here.

Plaintiff's brief does take issue with the disclosures in the first quarter 2008 10-Q (PB 19). Among other things, that 10-Q reported that the Financial Services portfolio had lost over $1.1 billion in its MBS and ABS holdings alone (Ex. 9 at 69).[8] That plaintiff considers this 10-Q "misleading in the same manner as the 10-K" (PB 19) simply reinforces the fact that plaintiff has adopted an unreasonable reading of the "collateral requirements" sentence that utterly ignores its context.

---

[6] In any event, plaintiff does not suggest how the omission of the portfolio's February 2008 performance made the offering documents misleading. The Complaint alleges that the prospectus represented that the proceeds would be used to bolster the capital at Ambac Assurance (Compl. ¶ 118), but the March 2008 prospectus (and the appended 2007 10-K) explicitly warned that, in the event of further downgrades, the Financial Services subsidiary and Ambac Assurance might engage in the very kinds of transactions plaintiff complains of (Compl. ¶¶ 76-83, 119). *See* Ex. 3 at S-8; Ex. 4 at 77. As explained in defendants' opening brief, plaintiff also fails to adequately plead that Leonard benefited in some concrete and personal way from the purported fraud. *See* MB 20 n.11.

[7] *See also Campo* v. *Sears Holdings Corp.*, 2010 WL 1292329 (2d Cir. 2010) (affirming dismissal where plaintiffs failed to show that alleged reports contained contrary information or that defendants had access to or viewed them), *aff'g* 635 F. Supp. 2d 323, 335-36 (S.D.N.Y. 2009); *P&SL 773*, 2010 WL 961596, at *9-*10; *Pollio* v. *MF Global, Ltd.*, 608 F. Supp. 2d 564, 572 (S.D.N.Y. 2009).

[8] The 10-Q satisfied any disclosure obligations by reporting the values of the Financial Guarantee and Financial Services portfolio's combined (Ex. 9 at 68), which is appropriate since Ambac Assurance (through which financial guarantee business was conducted, Compl. ¶ 10) had guaranteed Financial Services obligations like the collateral requirements (Ex. 4 at 147). Moreover, the value of the Financial Services portfolio alone as of March 31, 2008 was already publicly reported in another document on which plaintiff relies: Ambac's 1Q 2008 Operating Supplement, which was available on Ambac's website. *See* Compl. ¶ 59. Like the 10-K, the 10-Q also provided current estimates of possible collateral requirements under a broad range of potential future credit ratings (Ex. 9 at 66).

## C. An inference of nonfraudulent intent is far more compelling.

The more compelling inference here is that defendants believed their inclusion of the year-end portfolio value satisfied any duty of disclosure and that in any event defendants did not possess complete and reportable information of the portfolio's performance through February 29, 2008 on that same date, *the very day* the 10-K was filed. MB 23.[9] By way of comparison, in *Slayton* plaintiffs alleged, *inter alia,* that defendants had **specifically been told** that their high-yield debt portfolio had deteriorated and faced an unquantifiable range of additional losses, and that nevertheless defendants specifically reported that they expected losses *in that same portfolio* to be *substantially lower*. 604 F.3d at 762-63. Yet even under those facts, the Second Circuit concluded that opposing nonfraudulent inferences were more compelling. *Id.*; *see also Campo*, 2010 WL 1292329, at *4.

## IV. THE COMPLAINT ALSO DOES NOT ADEQUATELY PLEAD LOSS CAUSATION.

### A. The *rise* of DISCS prices after the July 7, 2008 press release "acknowledged the truth" negates plaintiff's argument for loss causation.

Plaintiff does not dispute that after Ambac allegedly "acknowledged the truth" in the July 7, 2008 press release (Compl. ¶ 20), DISCS prices *went up*. MB 24. Rather, plaintiff asserts (without citing authority) that because she "alleges actual reliance . . . Plaintiff is not required to show that the price of her securities fell when the truth came out." PB 24. But as the Second Circuit has held, pleading actual reliance does not exempt plaintiff from the duty to plead loss causation:

> [Plaintiffs] argue that their demonstration of [actual] reliance . . . is sufficient in this instance [to show loss causation] because they allege "fraud on the plaintiff" as opposed to "fraud on the market." **This theory is without support.** Loss causation is an element of, and must be shown in, any Section 10(b) action. *Gordon Partners* v. *Blumenthal*, 293 F. App'x 815, 817 (2d Cir. 2008) (emphasis added) (quoting *Emergent Capital Inv. Mgmt., LLC* v. *Stonepath Group, Inc.*, 343 F.3d 189, 198 (2d Cir. 2003)).

Here, plaintiff alleges that materialization of concealed risks caused the DISCS market price to fall around July 27, 2009. Compl. ¶¶ 76-87; PB 22. But as the Second Circuit recently recognized, a necessary premise of this argument is that these risks were in fact concealed. *In re Omnicom Group, Inc.*, 597 F.3d 501, 513 (2d Cir. 2010) (excluding "publicly known" matters from materialization-of-

---

[9] Notably, this was not simply a portfolio of stocks whose values were reported daily on a public exchange. As the 2007 10-K reports (Ex. 4 at 80-82), the portfolio consisted of various bonds and other securities, including mortgage-backed securities and asset-backed securities. Valuating a portfolio of such securities takes time.

9

concealed-risk analysis); *see* MB 24.  Here, plaintiff's ***own pleadings*** admit that the allegedly concealed risks had already been disclosed by July 7, 2008.  Compl. ¶¶ 20, 52-53, 56.

> **B. Plaintiff's failure to adequately plead a causal link between the alleged February 29, 2008 10-K misstatements and the loss plaintiff alleges occurred after a July 2009 announcement is an independent ground for dismissal.**

Plaintiff's alleged losses after the suspension of the DISCS payments in July 2009 are "far too tenuously connected—indeed, by a metaphoric thread"—to the alleged misstatements in the 10-K filed in February 2008, ***over sixteen months earlier***.  *Omnicom*, 597 F.3d at 514.  For example, the only ***losses*** alleged (Compl. ¶ 83) were due to the sale of securities (which the "collateral requirements" sentence expressly contemplated), and they occurred in 2009, ***after*** Ambac Assurance's ***2008*** statutory loss had ***already*** precluded it from paying dividends without regulatory approval (Ex. 14 at 88, 185-86).  Courts in the Second Circuit have not hesitated to dismiss cases where loss causation is not adequately pled.[10]  The considerations noted in this reply, among others noted previously (*see* Point I.B.2; MB 25), conclusively demonstrate how plaintiff's pleadings fall short.

## V. THE COURT SHOULD DENY LEAVE TO REPLEAD AND DISMISS WITH PREJUDICE.

In granting a motion to dismiss, a district court has discretion to deny leave for good reason, such as when "leave would be futile."  *Acito* v. *IMCERA Group, Inc.*, 47 F.3d 47, 55 (2d Cir. 1995) (proposed amendments would not cure deficiencies in the complaint); *see also Pollio*, 608 F. Supp. 2d at 573-75.  Plaintiff makes a conclusory request for leave to replead in the last sentence of her brief (PB 24).  However where, as here, plaintiff has ***not*** "provide[d] a specific explanation of the manner in which [she] propose[s] to cure the defects in [the] complaint," leave to replead should be denied and dismissal should be with prejudice.  *Campo*, 2010 WL 1292329, at *4 (citing *Porat* v. *Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006)).

---

[10] *See, e.g.*, *Masters* v. *GlaxoSmithKline*, 271 F. App'x 46, 51 (2d Cir. 2008); *Lattanzio* v. *Deloitte & Touche LLP*, 476 F.3d 147, 157-58 (2d Cir. 2007); *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 172-78 (2d Cir. 2005); *In re Sec. Capital Assurance, Ltd.*, 2010 WL 1372688, at *28-*32 (S.D.N.Y. 2010); *Amorosa* v. *Ernst & Young LLP*, 682 F. Supp. 2d 351, 361-67 (S.D.N.Y. 2010).

                                  WACHTELL, LIPTON, ROSEN & KATZ

/s/ Peter C. Hein
Peter C. Hein (pchein@wlrk.com)
C. Lee Wilson (clwilson@wlrk.com)
51 West 52nd Street
New York, NY 10019
(212) 403-1000

*Attorneys for Defendants*

June 29, 2010